**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GEORGE MINEFF, on Behalf of Himself and All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>    v.<br><br>EGALET CORPORATION, ROBERT S. RADIE, STANLEY J. MUSIAL, and JEFFREY M. DAYNO,<br><br><br>                     Defendants. | COMPLAINT – Class Action<br><br>Case No. |

**<u>CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**

Plaintiff George Mineff ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Egalet Corporation ("Egalet" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Egalet common stock shares between December 15, 2015, and January 9, 2017, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Egalet is a specialty pharmaceutical company developing, manufacturing and commercializing innovative treatments for pain and other conditions. Egalet revolves around a

proprietary technology called Guardian Technology ("Guardian") which Egalet broadly applies for different classes of pharmaceuticals products.

3.     Notably, Egalet uses Guardian for its lead product ARYMO ER, an abuse-deterrent oral morphine formulation for the management of severe pain requiring daily "around-the-clock" long-term opioid treatment.

4.     Egalet submitted a New Drug Application ("NDA") to the United States Food and Drug Administration ("FDA") for ARYMO ER in December 2015 based on studies aiming to demonstrate its bioequivalence to a direct competitor's already approved drug named MS Contin.

5.     The Company made materially false and/or misleading statements, concerning ARYMO ER and the likelihood of the drug receiving oral abuse-deterrent labeling.

6.     As the truth about ARYMO ER was revealed, the stock price declined from $8.38 per share of Egalet stock on January 9, 2017, to close at $6.52 per share on January 10, 2017, a drop of approximately 22%.

7.     As noted in more detail herein, Egalet's statements regarding the lead product ARYMO ER and its chances to receive oral-abuse deterrent labeling contained materially false information or omitted information necessary to make those statements not misleading. As a result, Plaintiff and other members of the Class purchased Egalet common stock at artificially inflated prices and thereby suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff purchased Egalet common stock shares within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

13.     Defendant Egalet is a Delaware corporation with its principal executive offices located at 600 Lee Road, Suite 100, Wayne, PA, 19087. Egalet common stock trades on the NASDAQ under the ticker symbol "EGLT."

14.     Defendant Robert S. Radie ("Radie") is the Company's Chief Executive Officer ("CEO") and President of Egalet.

15.     Defendant Stan J. Musial ("Musial") is the Company's Executive Vice President, Chief Financial Officer ("CFO"), Principal Financial Officer, and Secretary.

16.     Defendant Jeffrey M. Dayno, M.D. ("Dayno") is the Company's Chief Medical Officer.

17.     Defendants in Paragraphs 14-15 are collectively referred to herein as the "Certifying Defendants." Defendants in Paragraphs 14-16 are collectively referred to herein as the "Individual Defendants."

18.     Each of the Individual Defendants:

   (a)     directly participated in the management of the Company;

   (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

   (c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   (e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   (f)     approved or ratified these statements in violation of the federal securities laws.

15.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Egalet's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and

committees thereof and via reports and other information provided to them in connection therewith.

16.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Egalet's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Egalet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Egalet's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase shares of Egalet's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

**A.     Background**

19.     Egalet is a specialty pharmaceutical company developing, manufacturing and commercializing innovative treatments for pain and other conditions. Egalet revolves around its proprietary technology Guardian which it applies for different classes of pharmaceuticals products.

20.     Guardian was developed to deliver commonly-abused prescription medications in an abuse-deterrent form. Guardian results in tablets that are extremely hard, very difficult to chew, resistant to particle size reduction, and inhibit/block attempts at chemical extraction of the active pharmaceutical ingredient. These features aim to address the risk of accidental misuse (e.g., chewing) in patients with chronic pain, as well as intentional abuse using more rigorous methods of manipulation.

21.     Notably, Egalet uses Guardian for one of its lead products, ARYMO ER (formerly known as Egalet-001), an abuse-deterrent oral morphine formulation for the management of severe pain requiring daily "around-the-clock" long-term opioid treatment.

22.     Egalet designed a pharmacokinetic development program for ARYMO ER aiming to demonstrate its bioequivalence to a direct competitor's already approved drug named MS

Contin. Egalet also completed abuse-deterrent studies to prove resistance to common forms of abuse, including oral abuse.

**B.     Material Misstatements and Omissions During the Class Period**

23.     The Class Period begins on December 15, 2015, when Egalet issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that Egalet submitted a NDA to the FDA for ARYMO ER("December 2015 Press Release"). The December 2015 Press Release stated in pertinent part that the Company's NDA submission to the FDA included "a comprehensive battery of abuse-deterrent studies (Category 1, 2 and 3) which were conducted to support abuse-deterrent label claims  . . . [for] oral abuse."

24.     On March 11, 2016, Egalet filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Certifying Defendants. In the 2015 Form 10-K, the Company stated that the NDA included a studies "conducted to support AD label claims for . . . oral abuse."

25.     During a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2015, Defendant Jeffrey Dayno stated in relevant part:

> in an oral clinical HAP study with ARYMO ER administered as an intact tablet or after multi-set manipulation, subjects reported statistically significant lower maximum drug liking compared to manipulated MS Contin, a positive result on the primary study endpoint.
>
> The cumulative results from the Category 1 and 2, 3, studies have demonstrated *that ARYMO ER with its abuse-deterrent properties takes more time and effort to attempt to manipulate with less success in defeating the tablet and then after those maneuvers has lower potential for accidental misuse by chewing* . . . .

Emphasis added.

26.     On August 4, 2016, Egalet issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that the joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and Drug Safety and Risk Management Advisory Committee ("Committee") of the FDA voted for approval of ARYMO ER ("August 2016 Press Release"). The press release stated in pertinent part that the FDA Advisory Committees recommended the approval of ARYMYO ER by a margin of 18 to 1 and also voted in favor by a margin of 16 to 1 that "if approved, ARYMO ER should be labeled as an abuse-deterrent product by the oral route of abuse." The August 2016 Press Release also stated that **"*[b]ased on the committees' votes, Egalet anticipates, if approved, the label for ARYMO ER will describe the product's abuse-deterrent properties that are expected to reduce, but not totally prevent, abuse of the drug when the tablets are manipulated*"** (emphasis added).

27.     During a conference call to discuss the Company's financial and operating results for the second fiscal quarter ended June 30, 2016, ("Q2 2016 Conf. Call"), Defendant Radie responded to JMP Securities analyst Jason Butler's question about the oral label:

Jason Butler:

"Hi, thanks for taking the question and congrats on the very positive day. First off, just wanted to dig into the oral abuse deterrent claim, how would you view the label in terms of the panel comments specifying just chewing resistance versus a label that included oral AD labeled, would that have any impact on commercialization in your view?"

Bob Radie:

"I don't think it is going to have any impact on commercialization. I do think that there were a few of the panelists today, who I think made some very valid points about the heterogeneity of oral abuse, and that it isn't one sort of type. And I think the agency certainly the body language appeared to some agreement that they may have to get a bit more specific as time goes on about what does oral abuse mean.

***We continue to believe that this product would be difficult to abuse orally. One because it is very hard and difficult if not impossible to chew,*** and then secondly as we stated in our discussion in our presentation today, the category [2,3] oral

study that we did do in some of the endpoints that the FDA questioned as well as the panelists questioned, we think it is important for the agency to keep in mind that what is eliminated from some of those scores is that level of effort to go into the manipulation step, which of course, doesn't get captured in some of the instruments like take drug again. They are just being handed the drug, already manipulated by a pharmacist in a blinded fashion to ensure blinding one, and ensure consistency of dose.

***While the panelist didn't fully grasp that concept, we will continue to have those discussions with the FDA in the hope of getting the broadest oral claim possible, but certainly based on the feedback from the advisers and the difficulty in chewing; we know we have a position here.***"

Emphasis added.

28.     The statements in paragraphs 23-27 above were false and/or misleading as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and/or misleading statements and/or failed to disclose that: (i) Egalet misrepresented ARYMO ER's oral abuse-deterrent profile, (ii) Egalet falsely or misleadingly overstated ARYMO ER's chances to receive the oral abuse-deterrent labeling, (iii) the NDA for ARYMO ER lacked sufficient data to support the oral-labeling claims, (iv) the label was likely not to include the oral abuse-deterrent claims, and (v) as a result of the foregoing, the Company's statements, as well as Defendants' statements about Egalet's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## C.     The Truth Emerges

29.     On January 9, 2017, after the market closed, Egalet issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that the FDA approved ARYMO ER ("Jan. 2017 Form 8-K"). The press release stated in pertinent part:

**Egalet Receives FDA Approval for ARYMO™ ER (morphine sulfate) C-II, an Extended-Release Morphine Product Formulated with Abuse-Deterrent Properties for Treatment of Chronic Pain**

*—Approval triggers $40 million from second tranche of secured debt financing—*

*—Conference call to be hosted today, Monday, January 9, at 8:15 PM EST—*

Wayne, Penn. — January 9, 2017 — Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, today announced that the U.S. Food and Drug Administration (FDA) has approved ARYMO™ ER (morphine sulfate) extended-release (ER) tablets C-II for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

ARYMO ER is the first approved product developed using Egalet's proprietary Guardian™ Technology—a physical and chemical barrier approach to abuse deterrence without the use of an opioid antagonist—creating tablets that are difficult to manipulate for the purpose of potential ARYMO ER Label "Given the need for treatments for the millions of Americans living with chronic pain, the growing problem of prescription abuse and the fact that we know diversion is a huge problem, it is important that we have more abuse-deterrent treatment options, like ARYMO ER, if and when these pain treatments end up in the wrong hands," said Nathaniel Katz, M.D., neurologist and pain specialist as well as founder and president of Analgesic Solutions.

ARYMO ER has been approved in three dosage strengths: 15 mg, 30 mg and 60 mg. The U.S. commercial launch, utilizing Egalet's established commercial infrastructure, is planned for the first quarter 2017.

"With the majority of ER opioids in easy to abuse forms, it is important that healthcare professionals have additional treatment options like ARYMO ER that are resistant to different methods of manipulation using a variety of tools," said Bob Radie, president and chief executive officer of Egalet. ***"ARYMO ER has physical and chemical properties expected to make abuse by injection difficult, which is important given it is the most common non-oral route of morphine abuse and the most dangerous. With our commercial organization in place, we are ready to launch ARYMO ER in the first quarter of 2017."***

The FDA approval of ARYMO ER triggered $40 million in new funding to Egalet from the second tranche of the senior secured debt financing previously announced on August 31, 2016. In connection with the second tranche, the note purchasers will also receive a royalty right, representing a right to receive an aggregate 1.5% royalty payment on net sales of ARYMO ER, as further described in Egalet's current report on form 8-K filed on September 1, 2016.

Emphasis added.

11

30.     The Jan. 2017 Form 8-K also contained the label for ARYMO ER approved by

the FDA attached as exhibit 99.2. The label states in relevant part:

Abuse Deterrence Studies

ARYMO ER is formulated with inactive ingredients that make the tablet more
difficult to manipulate for misuse and abuse.

To evaluate the ability of ARYMO ER to reduce the potential for misuse and
abuse, a series of abuse-deterrent in vitro laboratory physical manipulation,
chemical extraction, and syringeability studies was conducted. An oral
pharmacokinetic study and an oral clinical abuse potential study were also
conducted.

*In Vitro Testing*

In vitro physical and chemical manipulation studies were performed to evaluate
the ability of different methods to defeat the extended-release properties. The
results of this testing demonstrated that ARYMO ER tablets, in comparison to
morphine sulfate extended-release tablets, have increased resistance to cutting,
crushing, grinding or breaking using a variety of tools. ***When subjected to a
liquid environment, the manipulated ARYMO ER tablets form a viscous
hydrogel (i.e., a gelatinous mass) that resists passage through a hypodermic
needle.***

Emphasis added.

31.     As stated throughout the Jan. 2017 8-K and its exhibits, the FDA only granted an

intravenous abuse-deterrent label claim. The FDA did not approve the oral abuse-deterrent

labeling as requested by the Company.

32.     On the release of the news, the Company's share price declined from $8.38 per

share of Egalet stock on January 9, 2017, to close at $6.52 per share on January 10, 2017, a drop

of approximately 12%.

## SCIENTER ALLEGATIONS

33.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Egalet, their control over, and/or receipt and/or modification of Egalet's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Egalet, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

34.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about the oral-abuse deterrent labeling for ARYMO ER was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Egalet's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class

13

members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

35.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Egalet's oral-abuse deterrent labeling of ARYMO ER, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Egalet's common stock to be artificially inflated. Plaintiff and other Class members purchased Egalet's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

36.     At all relevant times, the market for Egalet's common stock was an efficient market for the following reasons, among others:

(a)     Egalet's common stock met the requirements for listing and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

(b)     Egalet communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

14

(c)     Egalet was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Egalet was reflected in and incorporated into the Company's stock price during the Class Period.

37.     As a result of the foregoing, the market for Egalet's common stock promptly digested current information regarding Egalet from all publicly available sources and reflected such information in Egalet's stock price. Under these circumstances, all purchasers of Egalet's common stock during the Class Period suffered similar injury through their purchase of Egalet's common stock at artificially inflated prices, and a presumption of reliance applies.

38.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**NO SAFE HARBOR; INAPPLICABILITY OF THE BESPEAKS CAUTION DOCTRINE**

39.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

40.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

41.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Egalet who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Egalet common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Egalet securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Egalet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 8, 2016, Egalet had 25,189,125 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

44.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

45.   Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b)   whether the Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)   whether the price of Egalet common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d)   whether the members of the Class have sustained damages and, if so, what

is the proper measure of damages.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

## Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants

48.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.      During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Egalet common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

50.      Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Egalet common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as

18

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Egalet as specified herein.

52.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Egalet's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Egalet and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Egalet common stock during the Class Period.

53.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual

Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Egalet's ARYMO ER's oral-abuse deterrent labeling and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Egalet's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Egalet's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by

Defendants during the Class Period, Plaintiff and the other members of the Class acquired Egalet's securities during the Class Period at artificially high prices and were or will be damaged thereby.

56.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Egalet's labeling of ARYMO ER, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Egalet common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

57.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

59.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Egalet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

62.     In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.     As set forth above, the Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

64.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

65.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2017

**O'KELLY & ERNST, LLC**

Ryan M. Ernst, Esquire (No. 202191)
Daniel P. Murray, Esquire (No. 313112)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
(302) 778-4000
(302) 295-2873
rernst@oelegal.com
dmurray@oelegal.com

*Liason Counsel to Plaintiff*


**LEVI & KORSINSKY LLP**

Nicholas I. Porritt (*Pro hac vice to be submitted*)
Adam M. Apton (*Pro hac vice to be submitted*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Counsel for Plaintiff*