**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE EGALET CORPORATION SECURITIES LITIGATION | COMPLAINT – Class Action<br>Case No. 2:17-cv-00617<br>JURY TRIAL DEMANDED |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Joseph Spizzirri, Abdul Rahiman, and Kyle Kobold (collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Egalet Corporation ("Egalet") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning Egalet; and (d) information readily obtainable on the Internet, and (e) interviews with confidential witnesses.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired shares of Egalet common stock between November 4, 2015, and January 9, 2017, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, against Egalet and certain of its top officials.

2. Egalet is a specialty pharmaceutical company, which purports to develop, manufacture and commercialize innovative treatments for pain and other conditions. Egalet revolves around its proprietary technology called Guardian Technology which it broadly applies to different classes of pharmaceutical products. Egalet describes its Guardian Technology as "a polymer matrix tablet technology that utilizes a novel application of the well-established manufacturing process of injection molding, which results in tablets that are hard and difficult to manipulate for misuse and abuse."

3. During the Class Period, a significant portion of Egalet's value was derived from the market's expectations that it would receive U.S. Food and Drug Administration ("FDA") approval and abuse-deterrent labeling for its lead product candidate, an abuse-deterrent ("AD"), extended-release ("ER"), oral morphine formulation that employed Guardian Technology, called ARYMO ER™ (formerly known as Egalet-001) (hereinafter, "ARYMO ER").

4. Throughout the Class Period, Defendants touted to the market that it was possible for Egalet to receive FDA approval to include intranasal abuse-deterrence language in ARYMO ER's label at the time the FDA approved ARYMO ER's new drug application ("NDA"). The truth, however, was later revealed to the market at the end of the Class Period when the FDA announced that although it was approving ARYMO ER, it was precluded from approving the intranasal abuse-deterrent labeling sought by Egalet. Specifically, the FDA stated as a result of one of ARYMO ER's competitors possessing three-year marketing exclusivity over the intranasal abuse-deterrent labeling sought by ARYMO ER that "***no other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application can be approved for that use at this time.***"

5. As noted previously, the expected value of ARYMO ER does not originate from the uniqueness of the active moiety (the molecule or ion responsible for the physiological or pharmacological action of the drug substance) or what and how the drug was intended to treat (here, long-term pain management through an oral morphine tablet). Rather, the expected benefit of ARYMO ER to patients and the greater population was expected to derive from having an FDA-approved ER oral morphine tablet whose labeling detailed the expected reduction of abuse of the underlying opioid through the intravenous, intranasal, and oral routes of abuse. Throughout the Class Period, various analysts followed the development of ARYMO ER and its potential labeling as a competitive advantage over both its generic and abuse-deterrent formulated competitors.

6. In support of its 505(b)(2) NDA for ARYMO ER, Egalet conducted various *in vitro* and clinical studies (in addition to any bioequivalence studies) of ARYMO ER. These Egalet-conducted studies, however, were not designed to demonstrate the safety and efficacy of the underlying moiety (morphine). Rather, these Egalet-conducted studies were singularly focused on demonstrating that the Guardian Technology used in ARYMO ER impeded the abuse of single-entity ER morphine through the oral, intravenous, *and* intranasal routes of abuse.

7. Accordingly, Egalet designed its studies in accordance with the FDA's industry guidance on the design of abuse-deterrent opioids so that ARYMO ER placed itself in the best position to receive FDA approval for the financially-valuable abuse-deterrent labeling it sought for *each route of abuse*: intravenous, intranasal, and oral. If the FDA fully approved ARYMO ER and all of its requested abuse-deterrent labeling, it would become the first ER morphine drug to contain abuse-labeling for each of these three routes of abuse – an extremely valuable

advantage over both the existing FDA-approved traditional opioids and the abuse-deterrent formulated opioids.

8. With each additional abuse-deterrent label ARYMO ER received, ARYMO ER and Egalet's projected revenues and inherent value would increase. Thus, investors directly correlated the success of ARYMO ER and Egalet's stock price to each abuse-deterrent label ARYMO ER could receive.

9. On December 15, 2015, Egalet announced that it had filed the 505(b)(2) NDA for ARYMO ER. ARYMO ER's 505(b)(2) NDA aimed to demonstrate its bioequivalence to a competitor's previously FDA-approved ER morphine sulfate drug, named MS Contin. As MS Contin has been FDA approved since 1987, there was little concern that the FDA would not find ARYMO ER's morphine sulfate component to be both safe and effective. The issue was whether ARYMO ER's abuse-deterrent formulation would result in FDA approval of ARYMO ER's abuse-deterrent label claims for the nasal, oral, and intravenous routes of abuse.

10. The published results of Egalet's ARYMO ER *in vitro* and clinical studies in support of abuse-deterrence labeling appeared extremely favorable for ARYMO ER to receive FDA approval for each of its requested abuse-deterrent labels, especially for the intranasal and intravenous routes of abuse. Egalet's clinical studies results combined with Defendants' consistent and optimistic message throughout the Class Period that ARYMO ER could and would receive intranasal abuse-deterrent labeling conditioned the market to believe that FDA approval of ARYMO ER for intranasal abuse-deterrent labeling was not only possible, but likely. In fact, on August 4, 2016, a panel of outside experts at the FDA's Joint Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee ("AADPAC") and the Drug Safety and Risk Management Advisory Committee ("DSaRM") voted 18 to 1 in favor (based on

the scientific data presented and without being tasked to evaluate whether any other drug's exclusivity prohibited such labeling) that, if approved, ARYMO ER should be labeled as an abuse-deterrent product by the nasal route of abuse. This event combined with Defendants' continued message that ARYMO ER's intranasal labeling was possible and likely, conditioned the market to believe that intranasal abuse-deterrent labeling was not merely a possibility, but rather an inevitability.

11. Throughout the Class Period, Defendants, however, knowingly and/or through deliberate recklessness made materially false and/or misleading statements concerning the possibility of ARYMO ER receiving the valuable intranasal abuse-deterrent labeling upon FDA approval of ARYMO ER's 505(b)(2) NDA. More specifically, Defendants continually touted to investors the favorable *in vitro* and clinical study results that Egalet relied upon in ARYMO ER's 505(b)(2) to support intranasal abuse-deterrent labeling while also representing to investors that ARYMO ER's "potential" to receive approval for this labeling upon the FDA's approval of ARYMO ER's 505(b)(2) NDA.

12. On January 9, 2017, the truth concerning Defendants' repeated omissions and misrepresentations was revealed to investors. On that day, Egalet issued a press release announcing that the FDA had approved the 505(b)(2) NDA for ARYMO ER and its requested intravenous abuse-deterrent labeling. This press release, however, failed to make clear that ARYMO ER neither received the intranasal nor the oral abuse-deterrent labeling.

13. The same day, the FDA issued a press release to explain its denial of ARYMO ER's request for intranasal abuse-deterrent labeling. In this press release, the FDA succinctly explained that Inspirion Delivery Technologies, LLC's ("Inspirion") MorphaBond product (an ER abuse-deterrent morphine tablet that was previously approved by the FDA and whose

progress was tracked by Egalet as one of its main expected competitors) possessed "marketing exclusivity for labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route due to physicochemical properties." Thus, the FDA concluded that "***[d]ue to MorphaBond's marketing exclusivity, no other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application can be approved for that use at this time.***" Emphasis added.

14. The market was shocked to learn that ARYMO ER was legally precluded from receiving the label as a result of MorphaBond's marketing exclusivity. Given Defendants' regular statements throughout the Class Period assuring the market that receiving intranasal abuse deterrent labelling was a near certainty, combined with their touting of the positive results from Company-sponsored clinical studies that otherwise would have supported ARYMO ER's intranasal abuse-deterrent labeling, the market naturally expected ARYMO ER to receive the valuable intranasal abuse-deterrent labeling.

15. In response to the news disclosed on January 9, 2017, Egalet's stock price initially declined $1.86 from a closing price of $8.38 per share of common stock on January 9, 2017, to close at $6.52 per share on January 10, 2017, a drop of approximately 22% on extremely high volume. As the market continued to digest the news, shares of Egalet common stock continued to fall the next trading day to a closing price of $5.99 per share on January 11, 2017. Thus, in two days, Egalet's stock price fell approximately 28.5% and over $60 million in market capitalization was erased. Since this news correcting Defendants' statements entered the market, Egalet's stock price has continued on a precipitous slide, reaching a record low of $2.03 per share on May 31, 2017.

16. As explained in substantially more detail herein, Defendants' knowingly and/or with deliberate recklessness made false and/or misleading statements concerning ARYMO ER's potential to receive intranasal abuse-deterrent labeling. Not only were Defendants acutely aware of the rules and regulations that governed when the FDA was permitted to grant exclusivity, but they also knew or with deliberate recklessness disregarded the fact that MorphaBond (one of Egalet's self-identified direct competitors for ARYMO ER) already possessed exclusivity that precluded ARYMO ER from receiving intranasal abuse-deterrent labeling.

17. Thus, as a result of Defendants' materially false and/or misleading statements and omissions during the Class Period, Lead Plaintiffs and other members of the Class purchased Egalet common stock at artificially inflated prices and thereby suffered significant losses and damages upon revelation of the truth.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

21. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

22. Lead Plaintiffs purchased Egalet common stock shares within the Class Period and, as a result, was damaged thereby.

23. Defendant Egalet is a Delaware corporation with its principal executive offices located at 600 Lee Road, Suite 100, Wayne, PA, 19087. Egalet common stock trades on the NASDAQ under the ticker symbol "EGLT."

24. Defendant Robert S. Radie ("Radie") has served as Egalet's Chief Executive Officer ("CEO"), President of Egalet, and a member of its Board of Directors since March 2012.

25. Defendant Stan J. Musial ("Musial") has served as Egalet's Executive Vice President since December 2015, Chief Financial Officer ("CFO") since April 2013, Principal Financial Officer, and Secretary since September 2013.

26. Defendant Jeffrey M. Dayno, M.D. ("Dayno") has served as Egalet's Chief Medical Officer ("CMO") since July 2014.

27. Defendants in Paragraphs 24-26 are collectively referred to herein as the "Individual Defendants."

28. Each of the Individual Defendants:

(a) directly participated in the management of Egalet;

(b) was directly involved in the day-to-day operations of Egalet at the highest levels;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information

alleged herein;

(d) was directly or indirectly involved in the oversight or implementation of Egalet's internal controls;

(e) knew of or with deliberate recklessness disregarded the fact that the false and misleading statements were being issued concerning Egalet; and/or

(f) approved or ratified these statements in violation of the federal securities laws.

29. Because of the Individual Defendants' positions within Egalet, they had access to undisclosed information about Egalet's business, operations, clinical studies, FDA applications, drugs studies, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Egalet's studies of ARYMO ER, ARYMO ER's 505(b)(2) NDA, all other documents pertaining to ARYMO ER's development and potential future marketing), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

30. As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to Egalet's development of ARYMO ER and its potential future marketing, its financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Egalet's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31. The Individual Defendants, because of their positions with Egalet, possessed the power and authority to control the contents of Egalet's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Egalet's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

32. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Egalet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Egalet's business, operations, management and the intrinsic value of its securities and (ii) caused Lead Plaintiffs and other shareholders to purchase shares of Egalet's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### I. BACKGROUND

***The Company***

33. Egalet is purportedly a specialty pharmaceutical company that focuses on the commercialization and development of abuse-resistant formulations of opioids and other pain care drugs. Egalet was founded around its proprietary Guardian Technology.

34. Egalet's proprietary Guardian Technology purports to be physicochemical deterrent using "a polymer matrix tablet technology that utilizes a novel application of the well-established manufacturing process of injection molding, which results in tablets that are hard and difficult to manipulate for misuse and abuse." According to Egalet, this approach provides it with the ability to design tablets with controlled-release profiles as well as physical and chemical properties that have been demonstrated to resist both common and rigorous methods of manipulation. The tablets manufactured with Egalet's Guardian Technology are claimed to have increased resistance to physical methods of manipulation (e.g. cutting, crushing, grinding or breaking) and chemical manipulation and attempts at extraction.

35. At the beginning of the Class Period, Egalet had two late-stage lead product candidates in development. The first lead product candidate was ARYMO ER (formerly known as Egalet-001). Egalet's second lead product was Egalet-002, an AD, ER, oral oxycodone formulation. Both of these lead product candidates employ Egalet's Guardian Technology to purportedly impede abuse.

36. In addition to its lead product candidates, Egalet augmented its pain portfolio by acquiring two FDA-approved products—SPRIX® (ketorolac tromethamine) Nasal Spray and OXAYDO® (oxycodone HCI, USP) tablets for oral use.

37. With the addition of SPIRX and OXAYDO, Egalet built its commercial organization ahead of the anticipated launch of its lead product candidates and marketed its approved products to the same target high-decile pain medicine prescribers to whom it expected to market ARYMO ER and Egalet-002, if approved.

38. As of February 29, 2016, Egalet had only 78 employees of which 52 were employed in the United States. Of these 78 employees, Egalet only had approximately 21 people in research and development during the Class Period. In addition to the 78 employees, Egalet also had 71 sales representatives that it contracted through a third-party entity, inVentiv Health.

***The Opioid Abuse Epidemic and the Market for Abuse-Deterrent Extended Release Opioid Medications***

39. Approximately 25 million people in the United States suffer from chronic pain. One way to address this pain is through long-term opioid therapy.

40. Given the pervasiveness of prescription opioids, the United States is currently suffering from an ongoing epidemic of prescription opioid abuse.

41. ER morphine is the commonly prescribed extended release opioid analgesic with over 6.4 million prescriptions filled in outpatient retail pharmacies in 2015 alone.

42. ER morphine is abused through all routes of administration (oral, nasal, and intravenous). Intranasal abuse of opioids carries a risk of death, or a life-threatening or resulting disability over 2.2 times more than oral ingestion. A study evaluating persons entering treatment for substance abuse over the past 30-days estimates that the relative rate of abuse for ER morphine by inhalation was 24%.

43. During the first four months of 2016, over 98.5% of the ER morphine product prescriptions were for products that did not possess any abuse-deterrent properties. In other words, a real need—and a large market—exists for abuse-deterrent opioids.

44. Throughout the Class Period, Egalet repeatedly highlighted the importance of abuse-deterrent formulated opioids and the broader societal need and support for these types of drug formulations. Throughout the Class Period, Defendants issued statements providing statistical support and updates on the developments at various levels of government that supported the development of these abuse-deterrent opioid drug products. Defendants' statements substantiate the materiality of Egalet's abuse-deterrent opioid drug candidates to its future success and the potential market size for these drug candidates. Furthermore, these documents and presentations often directly stressed the significance of Egalet's Guardian Technology and the abuse-deterrent properties of its lead drug candidate, ARYMO ER.

45. On the March 9, 2016 Conference Call (defined below in paragraph 135), Radie spoke about the fever pitch of activity at the time regarding the opioid-abuse epidemic, including focus by the presidential candidates, president, and the FDA. After emphasizing the severity of the issue, Radie went on to detail how ARYMO ER would help solve the problem:

> With the growing support for the development of abuse-deterrent formulations, the submission and acceptance of Egalet's NDA for ARYMO extended release, our abuse-deterrent extended release morphine come at a critical time. Given its abuse-deterrent profile, ARYMO ER could potentially disrupt the abuse cascade that can begin as unintentional misuse or in some cases deliberate abuse.
>
> The NDA submission for ARYMO ER in the fourth quarter marks a significant milestone for Egalet and as recently announced, the FDA has accepted the submission with a PDUFA date of October 14, 2016.
>
> In addition, if approved, this will be Egalet's first product developed using our proprietary Guardian Technology.

46. Throughout the Class Period, Egalet described a significant market opportunity for ARYMO ER even if it only captured a small percentage of the annual extended-release morphine retail prescriptions. In the January 11, 2016 and May 11, 2016 Investor Presentations (as defined later), Egalet estimated that a 3% to 6% market share represented a $216 to $325 market opportunity. Later, in the August 26, 2016 and November 14, 2016 Investor Presentations (as defined later), Egalet estimated that a 6% to 8% market share represented a $195 to $260 market opportunity.

***505(b)(2) NDAs***

47. In 1984, Congress passed The Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments") to the Food, Drug, and Cosmetic Act ("FDCA"), Pub. L. No. 98–417, 98 Stat. 1585 (1984). The Hatch-Waxman Amendments were intended to balance the competing interests in the pharmaceutical industry of inducing pioneering research and development of new drugs, and to enable competitors to bring low-cost, generic copies of those drugs to market.

48. The Hatch–Waxman Amendments requires drug manufacturers seeking to market a new drug to first obtain FDA approval via one of three different application pathways: (1) a full New Drug Application ("NDA") or 505(b)(1) NDAs; (2) an Abbreviated New Drug Application ("ANDA") or 505(b)(j) ANDA; or (3) an intermediate process known as a Section 505(b)(2) NDA.

49. The 505(b)(1) NDA is the full NDA process that requires the manufacturer to submit detailed safety and efficacy data for the drug, including, among other things, full reports of investigations which it conducted to show whether or not such drug is safe for use and whether such drug is effective in use (i.e., clinical trials); all components of the drug; the

methods used for the drug's manufacture, processing, and packing; examples for proposed labeling for the drug; and any patents claimed in relation to the drug. *See* 21 U.S.C. §§ 355(b)(1)(A), (B), (D), (F), (G). This path is used by drug manufacturers for new-branded drugs.

50. A drug manufacturer may also choose to file an ANDA pursuant to 21 U.S.C. § 355(j). The ANDA process facilitates approval of generic versions of pioneer drug products that have already been determined to be safe and effective. Rather than requiring generic manufacturers to conduct expensive and time consuming clinical trials, the ANDA process allows the manufacturer to rely on the clinical trials already performed in connection with the approval of the previously approved drug, provided that the generic manufacturer can show that its drug has the same relevant characteristics (including, *inter alia*, the same labeling, active ingredient, route of administration, dosage form, strength, and bioequivalency). In other words, an ANDA does not attempt to demonstrate safety or effectiveness; instead, the applicant's only goal is to establish that the generic product is equivalent to another drug that is already known to be safe and effective. This avenue is often used by drug manufacturers to introduce generic versions of previously-approved branded drugs.

51. A hybrid approach between a full NDA and ANDA is provided through a 505(b)(2) NDA. Through a 505(b)(2) NDA an applicant may receive approval for marketing a new drug although one or more of the investigations relied upon by the applicant for approval "were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted." As such, a sponsor of a drug submitted under 505(b)(2)NDA, may rely not only on its own studies, but also on published reports of studies (whether or not it has a right of reference), the FDA's own findings of safety and efficacy on other previously FDA-approved drugs, or some combination of

these. Thus, by relying on the information already known about the previously approved FDA drug, it reduces the time to bring a product to the market and increases competition.

52. Although a 505(b)(2) NDA must directly demonstrate that the proposed drug product is safe and effective (as required by a full NDA), a 505(b)(2) applicant, like an ANDA applicant, may rely on clinical studies that were previously submitted to the FDA in support of another drug that were not conducted or licensed by the 505(b)(2) applicant. The drug for which the borrowed studies were conducted is referred to as the "Reference Listed Drug" ("RLD"). A 505(b)(2) applicant may proffer these RLD-related clinical studies to satisfy the applicant's burden, in part or in its entirety, of proving the drug's safety and effectiveness.

53. As previously noted, a 505(b)(2) NDA may also include the applicant's own research supporting the basic safety and efficacy of the drug in addition to the research studies related to the RLD, or it may rely entirely on the studies conducted by outside entities on the RLD. Regardless, a 505(b)(2) applicant must submit information to the FDA that bears upon the safety and effectiveness of its drug product in light of the difference between the pioneer drug product and the applicant's modification of that drug product. Thus, a 505(b)(2) applicant can "bridge" the safety and efficacy of its proposed product to the RLD by proffering studies of the relative bioavailability and bioequivalence of the approved RLD and the proposed drug candidate.

54. In summary, the 505(b)(2) NDA is often used by applicants when the new drug product differs only slightly from the pioneer drug, such as a drug product innovation or change in drug strength. As such, drug manufactures often rely on a 505(b)(2) NDA when seeking to market drugs that are neither an entirely new nor a generic version of a branded drug.

***Marketing Exclusivity and the FDA's Exclusivity Review Process***

55. In addition to creating incentives for the development of generic drugs, the Hatch–Waxman Amendments also seek to encourage innovation of pioneer drugs and new drug products by providing incentives to their sponsors. One of these incentives, marketing exclusivity, was designed to promote a balance between new drug innovation and generic drug competition.

56. When the FDA grants marketing exclusivity, it confers substantial benefits on the drug as it not only provides exclusive marketing rights (which may or may not run concurrently with a patent), but it can prevent the issuance of requested labeling language sought by another applicant or even prevent the submission or effective approval of other ANDAs or 505(b)(2) NDAs. Thus, in contrast to a full NDA, for which the sponsor has conducted or obtained a right of reference to all the data essential to approval, the filing or approval of a 505(b)(2) application may be delayed due to patent or exclusivity protections covering an approved product.

57. Exclusivity is granted upon approval of a new drug or drug product if the statutory requirements are met. The length of time that FDA grants new drug exclusivity depends on the type of exclusivity sought and granted. There are four types of exclusivity that fall under the NDA statutory requirements: Orphan Drug Exclusivity; New Chemical Exclusivity; Pediatric Exclusivity; and "Other" Exclusivity. Depending on the type of exclusivity, the period may last for 5-years, 3- years, or 180-days. *See* 21 C.F.R. 314.108.

58. One type of "Other Exclusivity" is "new drug product exclusivity." New drug product exclusivity is described in 21 C.F.R. §314.108(b)(4). This provision essentially provides that if an applicant files a 505(b)(2) NDA application for a drug product that contains an active moiety that has previously received FDA approval, and the application includes new clinical

studies conducted or sponsored by the applicant that were "essential to the approval of the application," then upon the FDA's approval of the 502(b)(2) NDA, the FDA will not approve another 505(b)(2) application for the same "conditions of approval" for a period of three years from the date of approval (aka, a three-year exclusivity period).

59. 21 C.F.R. §314.108(a) defines a "new clinical investigation" as:

> an investigation in humans the results of which have not been relied on by FDA to demonstrate substantial evidence of effectiveness of a previously approved drug product for any indication or of safety for a new patient population and do not duplicate the results of another investigation that was relied on by the agency to demonstrate the effectiveness or safety in a new patient population of a previously approved drug product.

60. Furthermore, 21 C.F.R. §314.108(a) defines "essential to approval" as "with regard to an investigation, that there are no other data available that could support approval of the application."

61. Specifically, 21 C.F.R. §314.108(b)(4) explains when new drug exclusivity is granted:

> §314.108 New drug product exclusivity. . .
>
> 4) If an NDA:
>
> (i) Was submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act;
>
> (ii) Was approved after September 24, 1984;
>
> (iii) Was for a drug product that contains an active moiety that has been previously approved in another NDA under section 505(b) of the Federal Food, Drug, and Cosmetic Act; and
>
> (iv) Contained reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the applicant that were essential to approval of the application, for a period of 3 years after the date of approval of the application, the Agency will not approve a 505(b)(2) application or an ANDA for the conditions of approval of the NDA, or an ANDA submitted pursuant to an approved petition under section 505(j)(2)(C) of the Federal Food, Drug, and Cosmetic Act that relies on the information supporting the conditions of approval of an original NDA.

62. Furthermore, 21 U.S.C. § 355(c)(3)(E)(iii) also details this exclusivity. Specifically, it states:

> If an application submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b) of this section, is approved after September 24, 1984, and ***if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) of this section for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b)*** of this section if the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

Emphasis added.

63. Pursuant to 21 C.F.R. §314.108(b)(4) and 21 U.S.C. § 355(c)(3)(E)(iii), the FDA may not approve a second-in-time 505(b)(2) NDA that shares the "conditions of approval" with a first-in-time 505(b)(2) NDA. As such, exclusivity is triggered by an overlap in the "conditions of approval" between the first-in-time approved 505(b) drug and the second-in-time 505(b)(2) NDA and not from on overlap between the "new clinical investigation" supporting the first-in-time 505(b) NDA and the second-in-time 505(b)(2) NDA.

64. Furthermore, if a single-entity drug receives FDA approval under 505(b)(2) NDA and contains the same active moiety, the FDA must determine the scope of the initially approved drug's new clinical investigations that were "essential to approval" of the first-approved 505(b)(2) NDA drug. The scope of the "new clinical investigation" conducted or sponsored by the applicant that was essential to approval of the drug delineates the "conditions of approval."

Thus, any later in time 505(b)(2) NDA is barred for the "conditions of approval" of the first-in-time approved 505(b)(2) NDA.

65. If an applicant wishes to receive exclusivity as part of its Section 505(b)(2) NDA, an applicant must comply with the relevant provisions concerning the content and format of the NDA. Pursuant to 21 C.F.R. §314.50(j), a new drug product seeking exclusivity must submit as part of its 505(b)(2) NDA prior to its approval:.

(1) A statement that the applicant is claiming exclusivity.

(2) A reference to the appropriate paragraph under §314.108 that supports its claim.

(3) If the applicant claims exclusivity under §314.108(b)(2), information to show that, to the best of its knowledge or belief, a drug has not previously been approved under section 505(b) of the Federal Food, Drug, and Cosmetic Act containing any active moiety in the drug for which the applicant is seeking approval.

(4) If the applicant claims exclusivity under §314.108(b)(4) or (b)(5), the following information to show that the NDA contains "new clinical investigations" that are "essential to approval of the NDA or supplement" and were "conducted or sponsored by the applicant:"

66. Additionally, pursuant to 21 C.F.R. §314.50(c)(2)(i) an applicant must submit as part of the 505(b)(2) NDA the proposed text of a new drug product's labeling.

67. If the 505(b)(2) NDA is approved by the FDA and there are no conflicting exclusivities that would prevent the applicant's requested exclusivity, the exclusivity becomes effective on the date of the 505(b)(2) NDA approval.

68. Given the underlying policy reasons for the Hatch-Waxman Amendments, in 2012, the FDA's Center for Drug Evaluation and Research ("CDER") created an Exclusivity Board to "provide oversight and recommendations regarding exclusivity determinations made by the CDER, with a primary focus of clarity and consistency of decisions" (hereinafter, "Exclusivity Board"). The Exclusivity Board also "oversees certain exclusivity determinations,

including whether and what type of exclusivity should be granted and the proper scope of exclusivity grants."

69. After the FDA approves a 505(b)(2) NDA, the FDA sends a letter to the applicant alerting them to the fact that their 505(b)(2) NDA was approved. Although the FDA letter alerts the applicant of the 505(b)(2) NDA approval, the FDA does not send a letter to the application holder to indicate that a period of exclusivity attached to their application. The exclusivity, however, attaches at the time of FDA approval.

70. If exclusivity is granted to a particular drug/drug product, the FDA will eventually assign it an exclusivity code that details the scope of the exclusivity. The exclusivity code and its description will be listed with the drug's / drug product's information in the FDA-maintained publication entitled the *Approved Drug Products with Therapeutic Equivalence Evaluations*. This publication is commonly referred to as the "Orange Book" after the color of its cover (hereinafter, the "Orange Book"). Regardless of when the FDA lists the exclusivities in the Orange Book, a new drug product's three-exclusivity attaches at the time the FDA approves the drug product's 505(b)(2) NDA.

***Abuse-Deterrent Opioids: Test Design, Analysis, and Labeling***

71. In April 2015, CDER published a guide to assist sponsors who wish to develop opioid drug products with potentially abuse-deterrent properties entitled *Guidance for Industry, Abuse-Deterrent Opioids – Evaluation and Labeling* (the "April 2015 AD Opioid Guidance"). The introduction of the April 2015 AD Opioid Guidance states that it "explains [the] FDA's current thinking about the studies that should be conducted to demonstrate that a given formulation has abuse-deterrent properties. The guidance makes recommendations about how

those studies should be performed and evaluated and discusses how to describe those studies and their implications in product labeling."

72. The April 2015 AD Opioid Guidance details that there are seven types of abuse-deterrent products: Physical/chemical barriers; Agonist/antagonist combinations; Aversion; Delivery System; New molecular entities and prodrugs; Combination; and Novel Approaches.

73. Furthermore, the April 2015 AD Opioid Guidance discusses the three categories of premarket studies that are appropriate to gain a "full and scientifically rigorous understanding of the impact of a technology or technologies on a product's abuse potential":

(a) Category 1: Laboratory Manipulation and Extraction Studies - Laboratory-based *in vitro* manipulation and extraction studies whose goal "should be to evaluate the ease with which the potentially [AD] properties of a formulation can be defeated or compromised."

(b) Category 2: Pharmacokinetic Studies – clinical pharmacokinetic studies whose goal "should be to understand the in vivo properties of the formulation by comparing the pharmacokinetic profiles of the manipulated formulation with the intact formulation and with manipulated and intact formulations of the comparator drugs through one or more routes of administration."

(c) Category 3: Clinical Abuse Potential Studies – "For assessing the impact of potentially abuse-deterrent properties" with a preferred study design employing a randomized, double-blind, placebo-controlled and positive controlled crossover study whose population consists of a drug-experienced, recreational users.

74. The April 2015 AD Opioid Guidance also provides additional guidance concerning the studies' designs, measurements, data interpretations, and statistical analysis.

75. The FDA's final rule describing the "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products" (the "Physician Labeling Rule") proscribes a portion of what must be included in a drug's label. Section 9 of Physician Labeling Rule discusses information to be disclosed concerning a drug's dependence and abuse. Particularly relevant to the labeling of abuse-deterrent opioids is Section 9.2. Section 9.2 requires that labeling "state the types of abuse that can occur with the drug and the adverse reactions pertinent to them, and must identify particularly susceptible patient populations."

76. To address the Section 9.2 requirement, the April 2015 AD Opioid Guidance provide sponsors developing abuse-deterrent opioids information on how the sponsor should craft any proposed label language describing a drug product's abuse-deterrent properties.

77. More specifically, the April 2015 AD Opioid Guidance states that an abuse-deterrent opioids drug "labeling should reflect [the] product's abuse-deterrent properties, as supported by the data, but should include a caveat that abuse is still possible." The April 2015 AD Opioid Guidance further states that:

> premarket studies are intended to demonstrate properties that are predictive of a meaningful abuse-deterrent effect for a ***<u>particular route of administration</u>*** . . . [thus] [w]hen premarket data show that a product's abuse-deterrent properties can be expected to result in a meaningful reduction in that product's abuse, these data, together with an accurate characterization of what the data mean, should be included in product labeling.
>
> [ * * * ]
>
> Labeling language regarding abuse deterrence should describe the ***<u>product's specific abuse deterrent properties</u> as well as the <u>specific routes of abuse</u> that the product has been developed to deter. For example, a formulation that limits an abuser's ability to crush a tablet and to extract the opioid can be described as limiting manipulation for the purpose of snorting or injection if the data support such a statement.***

Emphasis added.

78. The April 2015 AD Opioid Guidance on Section 9.2 reproduced immediately above in paragraph 77 not only provides sponsors with the FDA's guidance on addressing Section 9.2 labeling requirements, but also provides a delineation of the scope of any abuse-deterrent labeling exclusivity that would be granted as a result of new abuse-deterrent drug product seeking abuse-deterrent labeling as part its 505(b)(2) NDA.

***<u>Egalet's Lead Product Candidate: ARYMO ER</u>***

79. ARYMO ER, formerly known as Egalet-001, is an abuse-deterrent ER oral morphine formulation whose active moiety is morphine and whose active ingredient is morphine sulfate. Egalet applied its Guardian Technology to ARYMO ER for the expected purpose of it becoming an FDA-approved ER morphine drug product with abuse-deterrent labeling for the intranasal, intravenous, and oral routes of abuse.

80. ARYMO ER's proposed indication is for the "management of pain severe enough to require daily, around-the-clock, long-term, opioid treatment and for which alternative treatment options are inadequate."

81. Egalet developed ARYMO ER under the 505(b)(2) regulatory pathway and selected MS Contin (NDA 019516, MS Contin (morphine sulfate extended-release tablets)) as ARYMO ER's RLD. Thus, Egalet sought to establish ARYMO ER's 15 mg, 30 mg and 60 mg doses were bioequivalent to MS Contin at these same strengths.

82. As discussed in further detail *supra* in paragraphs 51-53, when an applicant submits a 505(b)(2) NDA, the applicant may rely on clinical studies that were previously submitted to the FDA in support of another drug (in this case, the RLD) that were not conducted or licensed by the 505(b)(2) applicant to show the safety and effectiveness of the applicant

product. The applicant may also submit additional studies to bridge the safety and efficacy of the RLD to the applicant drug. While the ARYMO ER 505(b)(2) NDA was pending, Egalet clearly explained this by stating that the "[d]emonstration of bioequivalence of Arymo ER to reference listed drug MS Contin is a scientific bridge to safety and efficacy and a basis of approval of Arymo ER."

83. Furthermore, under a 505(b)(2) NDA, the applicant may conduct or sponsor studies in support of the drug's approval. In support of ARYMO ER's 505(b)(2) NDA, Egalet sponsored and/or conducted *in vitro* and clinical studies on ARYMO ER's abuse-deterrence.

84. Particularly, Egalet conducted Category 1 *in vitro* tests to study ARYMO ER's particle size reduction, extractability, and syringeability. Furthermore, Egalet sponsored and /or conducted Category 2 / 3 studies on ARYMO ER's pharmacokinetic profiles and abuse potential purportedly accordance with the April 2015 AD Opioid Guidance.

85. Egalet conducted a Category 2/3 intranasal human abuse liability clinical study designated as 067-EG-009 (the "067-EG-009 Study"). The objective of the 067-EG-009 Study was to compare "the relative abuse potential of Egalet-001 with MS Contin® and placebo after manipulation and intranasal (IN) administration."

86. On June 29, 2015, Egalet issued a press release announcing its top-line results for the 067-EG-009 Study ("June 29, 2015 Press Release"). In the June 29, 2015 Press Release, Radie announced that "[w]ith this data, we have successfully completed the clinical studies necessary to file our NDA for Egalet-001, which we plan to submit in the fourth quarter." The June 29, 2015 Press Release states:

> **Egalet Announces Positive Top-Line Results from Intranasal Human Abuse Liability Study of Abuse-Deterrent Morphine, Egalet-001**
>
> -- Egalet-001 met primary endpoint of reduced drug liking compared to MS Contin® with drug liking scores similar to placebo --

29 Jun, 2015, 06:00 ET from Egalet Corporation

WAYNE, Pa., June 29, 2015 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet") today announced positive results from a Category 3 intranasal human abuse liability (HAL) study of Egalet-001, an abuse-deterrent, extended-release, oral morphine formulation in late-stage clinical development for the management of pain severe enough to require daily, around-the-clock opioid treatment and for which alternative treatments are inadequate. The clinical HAL study [067-EG-009 Study] demonstrated that, in nondependent, recreational opioid users, the abuse potential of manipulated Egalet-001 taken intranasally was significantly lower than that for manipulated MS Contin (morphine sulfate controlled-release).

"With this strong intranasal HAL data combined with the previously announced positive oral HAL data, and the category 1 studies, Egalet-001 continues to demonstrate a very promising abuse-deterrent profile," said Bob Radie, president and chief executive officer at Egalet. "With this data, we have successfully completed the clinical studies necessary to file our NDA for Egalet-001, which we plan to submit in the fourth quarter."

This Category 3 abuse-deterrent intranasal HAL study was conducted in accordance with the April 2015 U.S. Food and Drug Administration (FDA) Guidance for Industry, Abuse-Deterrent Opioids – Evaluation and Labeling. It was a single-center, randomized, double-blind, double-dummy, active and placebo-controlled, five period crossover study which assessed the abuse potential of Egalet-001 versus MS Contin in 46 nondependent, recreational opioid users when taken intranasally. The primary objective was to compare drug liking after subjects snorted manipulated Egalet-001 versus manipulated MS Contin. Since Egalet-001 is an extremely hard tablet and difficult to reduce to small particle sizes amenable to snorting (based on the outcome of the first phase, physical tampering, of the Category 1 abuse-deterrent studies for Egalet-001), the manipulation procedure involved a multi-step process using both mechanical and electrical instruments to prepare the product to be dosed intranasally. In addition, the manipulated product was then sieved to yield particle sizes that would be small enough for the subjects to snort. Both of these outputs, the full particle sizes and the sieved/small particle sizes, were included and evaluated as separate arms in the study. In comparison, MS Contin was prepared via a single-step, mechanical manipulation process, which did not require sieving as all particle sizes were small enough to snort.

Top-line results from the study include:

- After maximal manipulation, Egalet-001 demonstrated a statistically significant reduction in drug liking (Emax; primary endpoint) compared to manipulated MS Contin ($p < 0.001$);

- This was seen in both of the Egalet-001 arms: manipulated and all particle sizes snorted as well as manipulated then filtered with only the smaller particle sizes snorted
- Egalet-001 was statistically superior to MS Contin on the secondary endpoints of 'overall drug liking' and 'take drug again' ($p < 0.001$ for both endpoints);
- On the measures of 'overall drug liking' and 'take drug again,' both of the Egalet-001 manipulated arms had scores similar to placebo; and
- The 'Abuse Quotient' (a pharmacokinetic indicator of abuse potential, with higher scores suggestive of greater abuse potential), which is defined as the Cmax/Tmax, for each of the treatment arms was as follows:
    - 37.2 for manipulated MS Contin
    - 9.2 for manipulated Egalet-001 (all particle sizes)
    - 2.3 for manipulated Egalet-001 (filtered/small particle sizes)
    - 5.5 for intact oral Egalet-001.

"This study demonstrates a very significant decrease in drug liking for Egalet-001 compared to MS Contin, when manipulated and snorted, both when using the full output of manipulated Egalet-001 as well as filtering it to obtain optimal particle size," said Jeffrey Dayno, MD, chief medical officer at Egalet. "It also shows the robustness of Egalet's differentiated Guardian™ Technology as the PK data reflect how difficult it is to access the API after manipulating and snorting Egalet-001. This study completes a full complement of abuse-deterrent studies, an important component of our NDA submission for Egalet-001 later this year."

Both the Category 3 oral HAL and intranasal HAL studies will be submitted for presentation at an upcoming scientific conference later this year.

87. After purportedly acquiring all the necessary clinical data for ARYMO ER's 505(b)(2) NDA, on December 15, 2015, Egalet announced that it filed its application with the FDA.

88. While touting ARYMO ER's abuse-deterrent characteristics, at no point did Defendants reveal that MorphaBond already possessed exclusivity on intranasal abuse-deterrent labeling. Thus, this was a grave and certain risk that Egalet would not receive the labeling it asked for--- thus minimizing the market for ARYMO ER considerably.

89. ARYMO ER's abuse-deterrent formulation is what differentiated it from the vast majority of the ER morphine products prescribed in the U.S. The type and number of abuse-

deterrent labeling it received would further differentiate it not only from the non-abuse deterrent formulations, but also the ER morphine products that possessed some abuse-deterrent labeling claims. Thus, the value of ARYMO ER, Egalet's future prospects, and its stock price were intrinsically tied to and directly correlated with the abuse-deterrent labeling ARYMO ER could receive if it was approved by the FDA.

90. Furthermore, Egalet sought to gain additional marketing value for ARYMO ER by differentiating it from the few other extended release morphine products that had already received FDA-approval for abuse-deterrent labeling. As part of this differentiation, Egalet sought to be the first product to receive an FDA-approved abuse-deterrent labeling for each route of abuse: nasal, intravenous, and oral. If achieved, this combined abuse-deterrent labeling would have been particularly valuable to ARYMO ER, Egalet, and investors alike.

91. Given the over 6.4 million ER morphine retail prescriptions annually in the U.S., Egalet saw a significant market opportunity for ARYMO ER even if it only captured a small percentage of this market share. Accordingly, Egalet estimated that a 6% to 8% market share of the retail extended-release morphine market translated to a $195 to $260 million market opportunity for ARYMO ER.

***<u>ARYMO-ER's Direct Competition: MorphaBond</u>***

92. Inspirion is a privately held specialty pharmaceutical company focused on developing and commercializing products with abuse deterrent features and benefits based on its purportedly novel, patent-protected abuse-deterrent technology platform, SentryBond.™

93. According to Inspirion, SentryBond is specifically designed to frustrate abuse via various methods of manipulation and routes of administration. SentryBond relies on its physiochemical properties to deter abuse.

94. On November 21, 2014 (over year before Egalet announced it filed the ARYMO ER 505(b)(2) NDA), Inspirion submitted its 505(b)(2) NDA for an extended-release orally administered tablet with an active moiety of morphine and an active ingredient of morphine sulfate for the strengths of 15, 30, 60, and 100 mg tablets. Inspirion called its proposed new drug product, MorphaBond.

95. MorphaBond's proposed indication was the same as ARYMO ER. Specifically, MorphaBond's proposed indication was "management of pain severe enough to require daily, around-the-clock, long-term, opioid treatment and for which alternative treatment options are inadequate." Similar to ARYMO ER and its application of its proprietary Guardian Technology to create an abuse-deterrent formulation of morphine sulfate in tablet form, MorphaBond employed Inspirion's proprietary SentryBond technology to morphine sulfate to create its own morphine sulfate abuse-deterrent formulation in tablet form.

96. MorphaBond's 505(b)(2) NDA (206544) sought approval for the indications and the 15, 30, 60, and 100 mg strengths that the FDA previously approved for MS Contin.

97. Like MorphaBond, ARYMO ER also selected MS Contin as its RLD for its 505(b)(2) NDA and sought approval for the 15, 30, and 60 mg strengths.

98. In contrast to the applicant that submitted the NDA for MS Contin, Inspirion sought the FDA's approval to include claims of intranasal abuse-deterrence on MorphaBond's label due to its physiochemical properties. To support FDA approval of this, Inspirion conducted Category 1 *in vitro* studies to evaluate the difficulty required to defeat the physical and chemical barriers for the drug to be manipulated or extracted.

99. More importantly, Inspirion conducted a Category 2/3 pharmacokinetic and human abuse liability ("HAL") study which assessed MorphaBond's abuse potential by the

intranasal route of administration ("Study M-ARER-002"). Study M-ARER-002 was a single-center, randomized, double-blind, double-dummy, placebo-controlled, single-dose, 4-way crossover study that included participants from 19-53 years of age who were non-dependent recreational opioid users. Study M-ARER-002 primary purpose was to compare the relative abuse potential of manipulated MorphaBond tablets versus manipulated MS Contin for intranasal administration. Accordingly, the primary analysis was the drug liking of crushed Morphabond versus crushed MS Contin.

100. Notably, Study M-ARER-002 was the ***only clinical study conducted*** on MorphaBond (excepting any bioavailability studies to bridge safety and efficacy) that Inspirion submitted in support of receiving FDA approval of MorphaBond's 505(b)(2) NDA. Study M-ARER-002 was specifically submitted by Inspirion for the purpose of achieving FDA approval for the intranasal abuse-deterrent labeling sought in MorphaBond's 505(b)(2) NDA.

101. Thus, MorphaBond's Study M-ARER-002 (which assessed MorphaBond's abuse potential by the intranasal route of administration) and ARYMO ER's 067-EG-009 Study (which assessed ARYMO ER's abuse potential by the intranasal route of administration) were the only Category 2/3 clinical studies conducted by and submitted by Inspirion and Egalet, respectively, in support of their respective 505(b)(2) NDA's to receive approval for intranasal abuse-deterrent labeling from the FDA. Notably, Study M-ARER-002 and the 067-EG-009 Study were extremely similar in both their design and scope. *Compare supra* paragraph 99 (detailing Study M-ARER-002) *and* paragraph 86 (detailing the 067-EG-009 Study).

102. MorphaBond's label describes in further detail both the *in vitro testing* and the clinical testing Inspirion conducted in support of receiving FDA approval and intranasal abuse-deterrent labeling. Based on both the positive outcomes on Study M-ARER-002 and the *in vitro*

studies, the FDA determined that MorphaBond's physicochemical properties were likely to deter intranasal abuse as compared to MS Contin.

103. On October 2, 2015, the FDA approved MorphaBond as the first single-entity ER morphine product with labeling describing intranasal abuse-deterrent properties.

104. On October 5, 2015, Inspirion issued a press release announcing that the FDA had approved MorphaBond's 505(b)(2) NDA application. (the "October 5, 2015 Press Release"). Notably, the October 5, 2015 Press Release stated:

> *"**The data from the clinical abuse potential study indicate that MorphaBond has properties that are expected to reduce misuse and abuse via the intranasal route of administration as the extended-release characteristics were largely maintained even after extensive manipulation of the formulation,: said Lynn R. Webster, MD, Principal Investigator, PRA Health Sciences, Salt Lake City, UT.*** "***Overall, the results indicate that MorphaBond has properties that are expected to reduce abuse or misuse via injection or insufflation;*** however, abuse by these routes is still possible," continued Dr. Webster.

Emphasis added.

105. MorphaBond's label, including its intranasal abuse-deterrent labeling was publicly available during October 2015. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2015/206544lbl.pdf (dated "10/2015").

106. After its approval, the CDER issued its Summary Review for MorphaBond. The Summary Review describes the FDA's reasoning for approving MorphaBond and its' intranasal abuse-deterrent labeling, stating that: "there was adequate data to support the Applicant's request to include the results of the assessment of the abuse-deterrent properties of Morphabond and to conclude that Morphabond is likely to deter abuse by the intranasal . . . routes of administration[.]"

107. It is clear that Inspirion's Study M-ARER-002 met the definition of a "new clinical investigation" pursuant to CFR § 314.108(a) because the FDA had not previously relied

upon it to approve an application. Study M-ARER-002 also easily met the definition of a "clinical investigation" as it was an experiment, and not a bioavailability experiment, where drug products were administered or provided to humans.

108. Notably, MorphaBond conducted only one new clinical investigation (excepting bioavailability studies) in support of its 505(b)(2) NDA, Study M-ARER-002. Given the lack of any additional non- bioavailability studies sponsored/conducted and submitted by Inspirion to the FDA, it is obvious that Study M-ARER-002 would be and was "essential to approval" of the MorphaBond 505(b)(2) NDA and its intranasal abuse-deterrence labeling.

109. Thus, as MorphaBond met all the requirements for receiving exclusivity pursuant to CFR § 314.108(a), MorphaBond was entitled to and would three-year marketing exclusivity for intranasal abuse-deterrent labeling if it was approved by the FDA.

110. As summarized *supra* in paragraph 64, the scope of a new clinical investigation conducted or sponsored by the applicant that was "essential to approval" of the drug delineates the "conditions of approval." The "conditions of approval" acts to define the scope of any exclusivity.

111. Accordingly, it rationally follows that the scope of MorphaBond's exclusivity would be defined by the delineations by the design parameters of Study M-ARER-002 and the April 2015 AD Opioids Guidance concerning the drafting of abuse-deterrent labeling in Section 9.2.

112. Study M-ARER-002 was designed to demonstrate and did demonstrate that MorphaBond's physiochemical properties were expected to reduce abuse of single-entity ER morphine by the intranasal route of administration. Study M-ARER-002's purpose was to

provide the scientific data necessary to approve Inspirion's requested intranasal abuse-deterrent labeling.

113. The April 2015 Opioid Guidance stated "[l]abeling language regarding abuse deterrence should describe **the *product's specific abuse deterrent properties*** as well as the ***specific routes of abuse*** that the product has been developed to deter." As MorphaBond sought approval for intranasal abuse-deterrent labeling, rationally, the scope of such exclusivity scope would be determined by its abuse-deterrent properties (here physiochemical properties) and the route of abuse that was the focus of Study M-ARER-002 (intranasal administration).

114. Predictably, the FDA defined MorphaBond's scope of exclusivity as "labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal rout of administration due to physiochemical properties."

115. Accordingly, in November 2016, the FDA updated the Orange Book to reflect the approval of MorphaBond's NDA (application number N206544). The Orange Book also lists MorphaBond's active ingredient (morphine sulfate), route of administration (tablet, extended release; oral), and approval date (October 2, 2015), among other information. Moreover the Orange Book lists "Patent and Exclusivity Information" for each strength of MorphaBond that the FDA approved as part of MorphaBond's 505(b)(2) NDA. The following image depicts MorphaBond's Patent Data and Exclusivity Data for its 15mg strength:

U.S. Department of Health and Human Services

FDA U.S. FOOD & DRUG ADMINISTRATION

A to Z Index | Follow FDA | En Español

Search FDA

Home | Food | Drugs | Medical Devices | Radiation-Emitting Products | Vaccines, Blood & Biologics | Animal & Veterinary | Cosmetics | Tobacco Products

Home > Drug Databases > Orange Book Home

## Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

SHARE | TWEET | LINKEDIN | PIN IT | EMAIL | PRINT

Home | Back to Product Details

Additional Information about Patents

- Patent information is published on or after the submission date as defined in 21 CFR 314.53(d)(5).
- Patent listings published prior to August 18, 2003, only identify method-of-use claims. The listed patents may include drug substance and/or drug product claims that are not indicated in the listing.
- As of December 5, 2016, an NDA holder submitting information on a patent that claims both the drug substance and the drug product (and is eligible for listing on either basis) is required only to specify that it claims either the drug substance or the drug product. Orange Book users should not rely on an Orange Book patent listing, regardless of when first published, to determine the range of patent claims that may be asserted by an NDA holder or patent owner.

### Patent and Exclusivity for: N206544

Product 001
MORPHINE SULFATE (MORPHABOND ER) TABLET, EXTENDED RELEASE 15MG

#### Patent Data

| Product No | Patent No | Patent Expiration | Drug Substance Claim | Drug Product Claim | Patent Use Code | Delist Requested |
|---|---|---|---|---|---|---|
| 001 | 7955619 | Aug 12, 2028 | | DP | | |

#### Exclusivity Data

| Product No | Exclusivity Code | Exclusivity Expiration |
|---|---|---|
| 001 | M-189 | Oct 2, 2018 |

View a list of all patent use codes
View a list of all exclusivity codes

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.
Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

FDA

Accessibility | Careers | FDA Basics | FOIA | No FEAR Act | Site Map | Nondiscrimination | Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
1-888-INFO-FDA (1-888-463-6332)
Contact FDA

FDA Archive | Combination Products | Advisory Committees | Regulatory Information | Safety

Emergency Preparedness | International Programs | News & Events | Training & Continuing Education | Inspections & Compliance

Federal, State & Local Officials | Consumers | Health Professionals | Science & Research | Industry

116. The Patent and Exclusivity Information for each of the other strengths of MorphaBond (30, 60, 100 mg) are materially identical to the information immediately above concerning the 15 mg strength (excepting the strength representations). Notably, each of the Orange Book's Patent and Exclusivity Information pages for each strength of MorphaBond provides an exclusivity code of "M-189" with an "Exclusivity Expiration" of October 2, 2018. This exclusivity code specifically corresponds to the scope of the exclusivity that the FDA granted to MorphaBond and is depicted as:

**M-189**

LABELING DESCRIBING THE EXPECTED REDUCTION OF ABUSE OF SINGLE-ENTITY EXTENDED-RELEASE MORPHINE BY THE INTRANASAL ROUTE OF ADMINISTRATION DUE TO PHYSICOCHEMICAL PROPERTIES

117. Having been the first-in-time FDA-approved 505(b)(2) NDA for this condition of approval, MorphaBond received three-year marketing exclusivity for intranasal abuse-deterrent labeling for single-entity extended release morphine due to physiochemical properties. The period of MorphaBond's intranasal marketing exclusivity began on the MorphaBond's FDA approval date of October 2, 2015 and will end on the three-year anniversary of its approval on October 2, 2018.

118. During the exclusivity period, the FDA was and is prohibited from approving any other 505(b)(2) NDA that seeks intranasal abuse-deterrent labeling for a single-entity ER morphine drug that employs physiochemical properties to deter abuse, including ARYMO ER.

## II. DEFENDANTS MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

***November 4, 2015 – Conference Call: Third Quarter 2015 Earnings Call***

119. On November 4, 2015, Egalet issued a press release announcing its financial results for the third quarter 2015 for the three-month period ended September 30, 2015. Later

that same day, Egalet held a conference call to discuss the third quarter 2015 financial results ("November 4, 2015 Conference Call").

120. During the question-and-answer session of the November 4, 2015 Conference Call, analysts inquired about the recent approval of MorphaBond and Defendants' expectations concerning ARYMO ER's abuse-deterrent labeling. More specifically, analyst Chiara Russo from Cantor Fitzgerald asked about Defendants' expectations for ARYMO ER's label. During the November 4, 2015 Conference Call, Russo inquired and Radie responded, in relevant part:

> **Chiara Russo**
>
> The next question is sort of going back to ARYMO, obviously the potential NDA approaches. And I was wondering, if you could comment sort of on what you guys think would be the best case scenario in terms of the strength of the label that you would like to see and the worst case scenario?
>
> **Robert Radie**
>
> I mean, I think that when we look at the data that we've generated. First, all of the bioequivalence studies are very straightforward, and if you will, up to middle, as it relates to the three dosage strengths that we plan to bring to market at 15, 30 and 60 milligrams. So that we think is very clear and dumb.
>
> We'll then focus the label on the abuse-deterrent studies. And I think everybody is aware of the strength of this product. We've been very transparent in putting information out from our Category 1 studies.
>
> ***We've announced in June of this year results from the intranasal human-abuse liability study and earlier in the year the oral human-abuse liability studies. All of those studies met their primary endpoints. And so we would expect that we would have claims for the ability for this product to likely deter-abuse from an injectability standpoint, from an oral standpoint and from an intranasal standpoint as well.***

Emphasis added.

121. The above statements referenced in paragraph 120 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling.

Furthermore, Egalet and Defendant Radie's statements concerning their opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling given MorphaBond's exclusivity. Specifically, Egalet and Defendant Radie made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use;" (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (iii) as a result, any claimed beliefs and expectations by Defendants concerning whether ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's intranasal abuse-deterrent labeling marketing exclusivity.

122. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors because ARYMO ER's value stemmed from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>December 15, 2015 – Press Release: Egalet Announces the Filing of its ARYMO ER NDA</u>***

123. On December 15, 2015, Egalet issued a press release announcing that it had filed its NDA for ARYMO ER with the FDA ("December 15, 2015 Press Release"). In the December 15, 2015 Press Release, Egalet and Defendant Radie explained to investors that ARYMO ER was Egalet's first NDA based on its Guardian Technology and that the purpose of the drug product was to deter opiate abuse. Furthermore, Egalet highlighted that it had undertaken a barrage of "abuse-deterrent studies" that were specifically conducted to "support abuse-deterrent label claims for intravenous injection, snorting and oral abuse."

124. Specifically, the December 15, 2015 Press Release stated:

> **<u>Egalet Submits New Drug Application to U.S. Food and Drug Administration for ARYMO™ ER (Morphine Sulfate) Extended-Release Tablets</u>**
>
> **--NDA includes comprehensive package of bioequivalence and abuse-deterrent data--**
>
> Dec 15, 2015
>
> WAYNE, Pa., Dec. 15, 2015 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, announced the company has submitted a new drug application (NDA) for ARYMO ER (morphine sulfate) extended-release tablets for the management of pain severe enough to require daily, around-the-clock opioid treatment and for which alternative treatments are inadequate. The submission is based on the pivotal pharmacokinetic studies that demonstrated bioequivalence of ARYMO ER 15 mg, 30 mg and 60 mg to equivalent doses of MS Contin (morphine sulfate controlled-release). ***In addition, the submission includes a comprehensive battery of abuse-deterrent studies (Category 1, 2 and 3) which were conducted to support abuse-deterrent label claims for intravenous injection, snorting and oral abuse.***
>
> "Given the need for treatment options for the millions of individuals living with chronic pain, combined with the importance of providing formulations that deter opioid abuse because of the prescription abuse epidemic here in the United States, the NDA submission of ARYMO ER represents an important milestone and is the first NDA from our proprietary Guardian Technology program," said Bob Radie, president and chief executive officer of Egalet. "We look

> forward to working with the FDA to bring to market ARYMO ER for people living with chronic pain."
>
> Morphine sulfate is an opioid agonist and a Schedule II controlled substance with an acknowledged abuse liability. The risk of accidental misuse and abuse of morphine was the focus of the development program for ARYMO ER, which demonstrated physical and chemical features that are resistant to both common and more rigorous methods of manipulation, based on Egalet's proprietary Guardian Technology.
>
> **Guardian™ Technology**
> Egalet's Guardian Technology was developed to deliver commonly abused prescription medications in an abuse-deterrent form. Egalet's proprietary Guardian Technology is a polymer matrix tablet technology that utilizes a novel manufacturing process, plastic injection molding, which results in tablets with controlled-release properties as well as physical and chemical features that have been demonstrated to resist both common and rigorous methods of manipulation. Guardian Technology results in tablets that are extremely hard, very difficult to chew, resistant to particle size reduction, and inhibit/block attempts at chemical extraction of the active pharmaceutical ingredient. In addition, the technology results in a viscous hydrogel on contact with liquid, making syringeability very difficult. These features are important to address the risk of accidental misuse (e.g., chewing) in patients with chronic pain, as well as intentional abuse using more rigorous methods of manipulation.

Emphasis added.

125. The above statements referenced in paragraph 124 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) and despite the "comprehensive battery of abuse-deterrent studies (Category 1, 2 and 3) which were conducted to support abuse-deterrent label claims for intravenous injection,

snorting and oral abuse" the studies would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use.

126. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

127. On news of Egalet filing its 505(b)(2) NDA, analyst Chiara Russo of Cantor Fitzgerald issued an analyst report entitled *Arymo NDA Filed Right on Schedule*. In this report Russo explained that she and Cantor Fitzgerald were bullish on Egalet securities in light of their belief that ARYMO ER has the "best-in class abuse deterrent technology" and that ARYMO ER "will come to market with one of the strongest AD labels, having language for all three categories." Russo's report stated, in relevant part:

> Investment Summary: Early this morning, EGLT announced the submission of a New Drug Application (NDA) for Arymo ER, its extended-release, abuse-deterrent formulation of morphine, right on track with guidance. Currently, the NDA has a standard review time of ~10 months; however, as Arymo was given Fast Track designation, EGLT could ask for Priority Review, shortening the review time to ~8 months. We believe that EGLT has best-in-class abuse deterrent technology and that Arymo will be approved with Category 1, 2 and 3 language in its label. We maintain our BUY rating and $22 price target.
>
> - **First Proprietary Product Goes in for Review**: While EGLT currently has two products on the market, Arymo would mark the first proprietary product developed and brought to market by EGLT. Arymo utilizes the EGLT Guardian technology, which consists of an extremely hard matrix that is produced via an injection molding technique. This technology makes Arymo extremely difficult to manipulate, having produced positive data in all three categories of Human Abuse Liability (HAL) studies.
>
> - **AB Labeling** - Category 1, 2, and 3: We believe that Arymo will come to market with one of the strongest AD labels, having language for all three

categories. Category 1 demonstrates that in vitro, the product cannot be crushed, dissolved or extracted in small enough amounts for injection. Category 2 relates to PK data, with the release profile remaining intact via oral or nasal routes of administration after manipulation. Category 3 studies are the actual clinical "real world" studies where recreational users are asked to assess "drug liking". These studies assess how attractive the formulation would be to abusers.

- **Mighty Morphine Market**: Even though the morphine market is highly generic, there are still over 7M RXs written each year; the largest RX base of all ER opioids. With its unique abuse-deterrent features, we believe that Arymo will be differentiated not just amongst the branded options but the generics as well. We model 2020 sales at $144M, or 4% market share.

***<u>January 11, 2016 – Investor Presentation: J.P. Morgan's Annual Healthcare Conference</u>***

128. On January 11, 2016, Defendant Radie presented at J.P. Morgan's Annual Healthcare Conference in San Francisco, California. In advance of this presentation Egalet filed a Form 8-K with the SEC attaching a copy of the slides to be presented at the conference as Exhibit 99.1 (the "January 11, 2016 Presentation").

129. The January 11, 2016 Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slides 15 and 17 of the January 11, 2016 Presentation stated:

## ARYMO™ ER: AD Morphine Could be on Market in '16*

- ✓ Hard matrix
- ✓ Resistant to particle size reduction & chemical extraction
- ✓ Forms viscous hydrogel on contact with liquid → can't draw up into syringe
- ✓ Reduces risk of accidental misuse via chewing
- ✓ Reduces risk of intential abuse via **IV injection** or snorting



- 7.1 MM morphine prescriptions
- Most prescribed ER opioid

**for the management of pain severe enough to require daily, around-the-clock, opioid treatment and for which alternative treatments are inadequate*

**NDA submitted 12/14/2105** → **PDUFA 4Q2016**

Egalet

© Copyright 2016. Egalet Corporation 15

## Strong Data Supports ARYMO™ ER NDA Filing

- Demonstrated BE at 15 mg, 30 mg and 60 mg to MS Contin
- Supportive Category 1 study
  - No household tools were able to grind ARYMO into small particles vs all tools able to defeat MS Contin
  - Very difficult to get into a syringe

**Broken coffee grinder**



- Positive Category 3 clinical human abuse potential (HAP) studies

| | Oral HAL Study | Intranasal HAP Study |
|---|---|---|
| **Drug liking (Emax)** | p < 0.007 | p < 0.001 |
| **Abuse Quotient (Cmax/Tmax)** | • 45.9 manipulated MS Contin<br>• 6.4 manipulated ARYMO | • 37.2 manipulated MS Contin<br>• 9.2 manipulated ARYMO<br>• 2.3 manipulated ARYMO (filtered)<br>• 5.5 intact oral ARYMO |

Egalet

© Copyright 2016. Egalet Corporation 17

130. Slide 18 of presentation touted ARYMO ER's potential labeling versus its competitors. Slide 18 of the January 11, 2016 Presentation clearly depicted that it was "potential" for ARYMO ER to receive an intranasal abuse-deterrent label from the FDA upon approval of its 505(b)(2) NDA:

## Potential ARYMO™ ER Label Vs. Competition

| Product | ARYMO ER | Embeda® | MorphaBond™ |
|---|---|---|---|
| Oral claim | ✓ | ✓ | ✗ |
| Intranasal claim | ✓ | ✓ | ✓ |
| Injection | ✓ | ✓ | ✓ |
| No alcohol interaction | ✓ | Black box | ? |

Egalet

© Copyright 2016. Egalet Corporation 18

131. The above statements referenced in paragraphs 129-130 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling due to MorphaBond's exclusivity. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

132. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER. For instance, on February 29, 2016, Chiara Russo of Cantor Fitzgerald issued a company update analyst report on Egalet. In this report, Russo reinforced their previous statements concerning their positive outlook for Egalet based on its prospective labeling. In her report, Russo stated:

> **Strength of Arymo ER Submission**: We maintain our conviction around EGLT's proprietary Guardian technology as best-in-class in abuse deterrence. Given the study data from the category 1, 2 and 3 abuse trials, as well as the absence of a food effect and alcohol dose dumping, Arymo ER should present one of the strongest abuse-deterrent data packages to date. This should, in our view, allow Arymo to come to market with one of the strongest abuse-deterrent labels.

***<u>March 9, 2016 – Conference Call: Fourth Quarter 2015 Earnings Call</u>***

133. On March 8, 2016, Egalet issued a press release announcing its financial results for the fourth quarter 2015 for the full year ended December 31, 2015. The next day, Egalet held a conference call to discuss the fourth quarter and year financial results ("March 9, 2016 Conference Call").

134. After Radie's opening remarks during the March 9, 2016 Conference Call, Radie turned the call over to Defendant Dayno to "speak a bit more about the data that went into submission and the expected review process." During his initial remarks and in response to Radie's prompt, Dayno stated:

> **Jeff Dayno**
>
> Thanks Bob. In the fourth quarter, we achieved a very significant milestone for Egalet. We submitted a new drug application or NDA for our lead program ARYMO ER, morphine sulfate extended-release tablets for the management of pain for [they are] enough to require daily around the clock long-term opioid treatment and for which alternative treatment options are inadequate.

The submission was based on pivotal pharmacokinetic studies that demonstrated bioequivalence of ARYMO ER to the reference drug MS Contin and ***a comprehensive program of abuse-deterrent studies consistent with the April 2015 U.S. FDA guidance for industry abuse-deterrent opioids evaluation and labeling.***

The clinical development program for ARYMO ER was designed to demonstrate bioequivalence to MS Contin. Our NDA submission included data from pivotal PK studies that demonstrated bioequivalence ARYMO ER 15 milligram, 30 milligram and 60 milligram to equivalent doses of MS Contin.

***In addition, the submission included a full complement of abuse-deterrent studies covering categories one, two and three to support abuse-deterrent label claims for intravenous injection, snorting and oral misuse and abuse.***

***There were three main data sets from the abuse-deterrent studies included in the NDA submission. First, a full battery of category one in-vitro physical and chemical manipulation studies was conducted and demonstrated that ARYMO ER is an extremely hard tablet and very resistant to particle size reduction, which is the first step in trying to manipulate a product to get it into an abusable form to either snort or inject.***

In fact after rigorous multi-step manipulation of ARYMO ER, only 4% to 5% of the yield includes particle sizes that are amenable to snorting as well as being very difficult to stabilize for purposes of injecting.

***Another aspect of Category 1 testing measures the amount of time, effort and resources that it takes to manipulate a product for the purpose of abuse. Using the alert scale or assessing level of effort resources required to tampering, we demonstrated that with both mechanical and electrical instruments, they took up to 10 times the level of effort to try and defeat ARYMO ER compared to MS Contin.***

***The results of this effort yielded a fine powder for MS Contin compared to either minimal breakdown or large particles for ARYMO ER depending on the instrument used.***

***Second, in the Category 2, 3, clinical human abuse potential or HAP study, after rigorous multi-set manipulation of ARYMO ER followed by intranasal administration, subjects reported statistically significant lower maximum drug liking or Emax as well as overall drug liking and take drug again compared to manipulated intranasal MS Contin.***

Third, in an oral clinical HAP study with ARYMO ER administered as an intact tablet or after multi-set manipulation, subjects reported statistically significant lower maximum drug liking compared to manipulated MS Contin, a positive result on the primary study endpoint.

> ***The cumulative results from the Category 1 and 2, 3, studies have demonstrated that ARYMO ER with its abuse-deterrent properties takes more time and effort to attempt to manipulate with less success in defeating the tablet and then after those maneuvers has lower potential for accidental misuse by chewing and abuse by oral intravenous and intranasal routes compared to MS Contin.***
>
> In addition, results from a study conducted with to be marketed products demonstrated that there was no evidence or a clinically relevant food effect for ARYMO ER in healthy subjects following a single dose oral administration and under no checks on blockade when dosed in the fed state as compared to a fasted state.
>
> Also in the presence of alcohol, the release of morpheme for ARYMO ER is slowed and there was no evidence of alcohol dose dumping as demonstrated in an in-vitro alcohol interaction study. This is contrary to the effects seen with some other abuse-deterrent morphine-based products in which the release of the opioid is accelerated in the presence of alcohol as is seen with Embeda.
>
> Given the data we've generated to date and the proposed abuse-deterrent profile we believe ARYMO ER if approved will be an important abuse-deterrent treatment option that could help to prevent legitimate patients from progressing from unintentional misuse by its chewing to abuse, as well as deter those individuals involved in recreational use and intentional abuse of opioid products.
>
> We've had productive interactions with the FDA throughout the course of this program as well as a successful pre-NDA meeting. ***The NDA acceptance letter stated that quote "no filing review issues were identified" end quote.***
>
> The review division informed us that the plan to hold an Advisory Committee Meeting to discuss the application. When we enquired to the reason for this, they said that moving forward this will be their approach with all opioid product candidates under review, consistent with the FDA opioid action plan.
>
> The target Prescription Drug User Fee Act or PDUFA goal date for ARYMO ER is October 14, 2016.

Emphasis added.

135. The above statements referenced in paragraph 134 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Dayno made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-

deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

136. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER was derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>March 11, 2016 – 2015 Form 10-K: Fourth Quarter and Full Year 2015</u>***

137. Two days after the March 9, 2016 Conference Call, Egalet filed its annual report on Form 10-K for the quarter and year ended December 31, 2015 ("2015 Form 10-K"). Radie and Musial signed the report as well as certified the accuracy of its contents pursuant to the Sarbanes-Oxley Act of 2002.

138. In the 2015 Form 10-K, Egalet discussed the key elements of its strategy. As to its strategy concerning ARYMO ER, Egalet stated the following:

> *Obtain FDA approval for ARYMO ER as an AD, ER morphine product for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.* In December of 2015, we submitted an NDA for ARYMO ER tablets based on the pivotal pharmacokinetic ("PK") studies that demonstrated bioequivalence of ARYMO ER 15 mg, 30 mg and 60 mg to equivalent doses of Purdue

> Pharmaceutical's ("Purdue") MS Contin (morphine sulfate controlled-release). ***In addition, the submission included a battery of AD studies (Categories 1, 2 and 3) which were conducted to support AD label claims for*** intravenous injection, ***snorting*** and oral ***abuse***. We are seeking FDA approval of ARYMO ER pursuant to Section 505(b)(2) ("Section 505(b)(2)") of the Federal Food, Drug and Cosmetic Act ("FFDCA"). The FDA has granted us Fast Track status with respect to ARYMO ER. In February 2016, the FDA accepted the submission and with the Prescription Drug User Fee Act ("PDUFA") goal date for a decision of October 14, 2016, we believe ARYMO ER could be on the market, if approved, before the end of 2016.

2015 Form 10-K, at 5 (emphasis added).

139. The 2015 Form 10-K further discussed the "Completed Abuse-Deterrent Studies" that Egalet conducted for ARYMO ER. Specifically, the 2015 Form 10-K states, in relevant part:

> *Completed Abuse-Deterrent Studies*
>
> In addition to the pivotal PK studies that demonstrated bioequivalence to MS Contin, the ARYMO ER NDA submission included a series of AD studies conducted in accordance with the April 2015 FDA AD Opioid Guidance**.** Below is a summary of certain findings from the AD studies:
>
> ·*Resistance to common forms of abuse*: Category 1 studies of ARYMO ER show that the formulation is unusually resistant to most common forms, and rigorous multi-step attempts, of manipulation of the product, including chewing, crushing, physical manipulation, and chemical extraction. These Category 1 studies suggest that the physio-chemical properties of ARYMO ER, such as its tablet bulk, density, hardness, ER properties, and gelling properties in various solvents, would deter attempts to abuse the product by any of the known routes of abuse.
>
> ·*High level of effort required*: In order to evaluate the degree of effort required to bypass or defeat the AD properties of a product, a laboratory investigation of ARYMO ER using the Assessing Labor, Effort and Resources Required for TamperingSM ("ALERRT") Scale was conducted. This investigation demonstrated that it takes a significant amount of time, effort, and resources to try to manipulate ARYMO ER compared to MS Contin to get it into an abusable form and, even following such manipulation, the output of such efforts either failed to defeat the product in any way or only yielded large, coarse particle sizes that would not be favorable for use via common routes of abuse.
>
> ***·Positive Category 2/3 intranasal results: Category 2/3 studies of ARYMO ER demonstrated that intranasal administration of manipulated ARYMO ER, in both a high volume version which included all particle sizes and a manipulated/sieved low volume version consisting of only small particles amenable to snorting, had significantly lower subjective drug liking and***

> ***physiologic effects compared to manipulated MS Contin administered intranasally. This was supported by a statistically significant decrease in the primary outcome of maximum drug liking. With regard tom the secondary outcomes of Overall Drug Liking and Take Drug Again Assessment ("TDAA"), both the high volume and low volume ARYMO ER arms of the study had scores similar to the placebo arm on both of these measures, with the exception of TDAA for high volume ARYMO ER which was greater than for placebo, but significantly lower than MS Contin. The PK parameters also demonstrated that manipulated ARYMO ER maintains many of its ER properties compared to manipulated MS Contin, and this resulted in a significantly lower abuse quotient for both the high volume and low volume ARYMO ER treatments compared to MS Contin.***
>
> ·*Positive Category 2/3 oral results*: Category 2/3 studies of ARYMO ER have demonstrated that, when administered by the oral route as intact or manipulated tablets, ARYMO ER had significantly lower subjective and physiologic effects compared to intact or manipulated MS Contin administered orally, respectively. This resulted in a statistically significant decrease in the primary outcome of maximum drug liking. ARYMO ER was associated with a delay in onset of effects and lower peak exposure compared to manipulated MS Contin. This suggests that, even after the more rigorous manipulation required to manipulate ARYMO ER that requires an increased level of effort compared to what it takes to defeat MS Contin, ARYMO ER maintains a higher proportion of its ER and AD properties.
>
> Together, we believe the results of these studies demonstrate that ARYMO ER, with its AD properties, has lower potential for accidental misuse via chewing and abuse via oral, intravenous, and intranasal routes compared to MS Contin.

2015 Form 10-K, at 12-13.

140. The above referenced above in paragraphs 138-139 identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet and Defendants Radie and Musial made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or

505(b)(2) application [to] be approved for that use"; and (ii) despite the battery of AD studies (Categories 1, 2 and 3) which were conducted to support AD label claims for ARYMO ER's intranasal abuse-deterrent labeling, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

141. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

142. The Form 10-K further discussed in a section entitled *Risks Related to Our Business and Strategy* the effects that exclusivity may have on Egalet's ability to have one of its drug candidates approved if the FDA approves a competitor's 505(b)(2) NDA before it approves Egalet's similar 505(b)(2) NDA. Although the 2015 Form 10-K discusses by way of example the potential effects on Egalet-002, ***it is silent as to any effect that MorphaBond's approval had on the intranasal abuse-deterrent labeling sought for ARYMO ER***. In relevant part, the 2015 Form 10-K states:

> ***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do.***
>
> We face and will continue to face competition from other companies in the pharmaceuticals, medical devices and drug delivery industries. Our product candidates, if approved, will compete with currently marketed oral opioids, transdermal opioids, local anesthetic patches, stimulants and implantable and external infusion pumps that can be used for infusion of opioids and local anesthetics. Products of these types are marketed or in development by Purdue

Pharma, Johnson & Johnson, Pfizer, Durect, Endo, Mallinckrodt, Zogenix, Elite Pharmaceuticals, Pain Therapeutics, Nektar, Collegium Pharmaceuticals, Inspirion, Teva, Actavis and others. Some of these companies and many others are applying significant resources and expertise to the challenges of drug delivery, and several are focusing or may focus on drug delivery to the intended site of action. Some of these current and potential future competitors may be addressing the same therapeutic areas or indications as we are. Many of our current and potential future competitors have significantly greater research and development capabilities than we do, have substantially more marketing, manufacturing, financial, technical, human and managerial resources than we do, and have more institutional experience than we do.

As a result of these factors, our competitors may obtain regulatory approval of their products more rapidly than we are able to or may obtain patent protection or other intellectual property rights that allow them to develop and commercialize their products before us and limit our ability to develop or commercialize our product candidates. Our competitors may also develop drugs that are safer, more effective, more widely used and less costly than ours, and they may also be more successful than us in manufacturing and marketing their products.

***Furthermore, if the FDA approves a competitor's 505(b)(2) application for a drug candidate before our application for a similar drug candidate, and grants the competitor a period of exclusivity, the FDA may take the position that it cannot approve our NDA for a similar drug candidate. For example, we believe that several competitors are developing extended-release oxycodone products, and if the FDA approves a competitor's 505(b)(2) application for an extended-release oxycodone product and grants exclusivity before our NDA for Egalet-002 is filed and approved, we could be subject to a delay that would dramatically reduce our expected market potential for Egalet-002. Additionally, even if our 505(b)(2) application for Egalet-002 is approved first, we may still be subject to competition from other oxycodone products, including approved products or other approved 505(b)(2) NDAs for different conditions of use that would not be restricted by any grant of exclusivity to us.***

In addition, competitors have developed or are in the process of developing technologies that are, or in the future may be, the basis for competitive products. Some of these products may have an entirely different approach or means of accomplishing similar therapeutic effects than our product candidates. Our competitors may develop products that are safer, more effective or less costly than our product candidates and, therefore, present a serious competitive threat to our product offerings.

The widespread acceptance of currently available therapies with which our product candidates will compete may limit market acceptance of our product candidates even if commercialized. Oral medication, transdermal drug delivery

> systems, such as drug patches, injectable products and implantable drug delivery devices are currently available

2015 Form 10-K, at 55 (emphasis added).

143. The emphasized statements referenced above in paragraph 142 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet and Defendants Radie and Musial omitted that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

144. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***April 5, 2016 – Form 8-K / Investor Presentation: Corporate Update April 2016***

145. On April 5, 2016, Egalet filed a Form 8-K that contained an investor presentation attached as Exhibit 99.1 to the report that it intended to "use time to time in conversations with investors and analysts beginning April 5, 2016" (the "April 2016 Investor Presentation").

146. The April 2016 Investor Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slides 9 and 11 of the April 2016 Investor Presentation stated:







147. Slide 12 of presentation touted ARYMO ER's potential labeling versus its competitors. Slide 12 of the April 2016 Investor Presentation clearly depicted that it was "potential" for ARYMO ER to receive an intranasal abuse-deterrent label from the FDA upon approval of its 505(b)(2) NDA:

## Potential ARYMO™ ER Label Vs. Competition

| Product | ARYMO ER | Embeda® | MorphaBond™ |
|---|---|---|---|
| Oral claim | ✓ | ✓ | ✗ |
| Intranasal claim | ✓ | ✓ | ✓ |
| Injection | ✓ | ✓ | ✓ |
| No Dose Dumping | ✓ | Black box | No language in label |

Egalet © Copyright 2016. Egalet Corporation 12

148. The above statements referenced in paragraphs 146-147 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

149. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>May 10, 2016 – Conference Call: First Quarter 2016 Earnings Call</u>***

150. On May 10, 2016, Egalet issued a press release announcing Egalet's financial results for the first quarter 2016 for the period ended March 31, 2016. Later the same day, Egalet held a conference call to discuss the first quarter 2016 financial results ("May 10, 2016 Conference Call").

151. During the opening remarks for the May 10, 2016 Conference Call, Defendant Radie discussed recent events that may potentially affect the market for abuse-deterrent opioids and also discussed Egalet's preparation for ARYMO ER's FDA advisory committee meeting. During his initial remarks, Radie stated:

> **Bob Radie**
>
> Thanks, Blair. Good morning everyone and welcome to our first quarter earnings conference call. There is not a day that goes by without a new story covering the issue of prescription drug abuse and misuse. In fact we see these stories hourly. We continue to hear from regulators and legislators on what needs to be done to deal with this growing problem. The support for abuse-deterrent formulations as part of the solutions continues from the FDA on Capitol Hill and at the state level.
>
> In February, the FDA rolled out a opioid action plan designed to establish framework to combat the issue of prescription abuse and misuse. Commissioner [indiscernible] at the Rx Summit for the conference held in Atlanta last month, "our action plan recognizes the importance of seeking new ways to formulate opioids to discourage tampering with the drugs in order to receive a faster high."
>
> Also during that same summit Congressman Hal Rogers advocated for doctors to prescribe abuse-deterrent formulations and importantly repairs to cover them. At the state level we have already seen 10 states pass legislation that supports the use and reimbursement of ADS. Just this year, Florida and West Virginia passed laws requiring healthcare insurance to cover ADS. In addition there are 18 states that

have similar legislation in the works. We continue to see momentum gaining in the field of ADF.

As Deputy Director of Regulatory Programs, Dr. Throckmorton has said the FDA plans to convert the market to all ADF, just a couple of weeks ago, [indiscernible] ER and abuse-deterrent Oxycodone was approved. So there are now six ADF available on the market. At Egalet we know there is not one solution for this issue of prescription abuse and misuse and the adequate treatment of those who legitimately suffer pain. It's a complex problem that requires a multi-faceted approach. We need physician education, patient education, safe disposal of medication and more.

We believe that abuse-deterrent formations need to be a part of the solution because they can make a difference both for those living with pain and our communities trying to deal with prescription abuse and misuse. So often the individual living with pain is left out of the discussion. We have to remember that these individuals need potent pain medications to allow them to live functional lives. Last month the group of pain experts during an event held by PRA Health Sciences in New York City reviewed this issue and agreed that ADF are an important piece of the puzzle. During the event our Chief Medical Officer Dr. Jeff Dayno discussed with other panelists the challenges faced within the field of pain medicine. Physicians in patients remarked on the stigma associated with pain and how no one would ever question the validity of any other disease but with pain that seems to be acceptable.

During the panel physicians also talked about how industry and FDA could work together to gather data to demonstrate the real potential benefit of ADF. We now have our first product developed using our guardian technology on file with the FDA. The new drug application or NDA or ARYMO ER, our abuse-deterrent extended release morphine was submitted in December and was accepted by the FDA in February. We are preparing for an advisory committee meeting to discuss our data. We anticipate the meeting will be as seen with other products around 60 days prior to our October 14, PDUFA date. The FDA indicated to us that they are having the advisory committee meeting not because of any specific review issue with our product but because they are looking to external advisors when evaluating any prescription opioids.

***Having met all primary and key secondary end points for the FDA guidance we look forward to discussing our data with the advisory committee. We believe the novelty of our guarding technology and the strength of our abuse-deterrent data generated from our category one, two and three studies will support a differentiated label for ARYMO ER.*** Given its abuse-deterrent profile, ARYMO ER if approved could potentially disrupt the abuse cascade that can begin as unintentional misuse or in some cases deliberate abuse.

Emphasis added.

152. During the question-and-answer session of the May 10, 2016 Conference Call, analyst Jason Butler of JMP Securities inquired about how the FDA would weigh the benefits of any specific abuse-deterrent product against its abuse-deterrent properties. Jason Butler inquired and Radie responded:

> **Jason Butler**
>
> Just following on from the comments you've have [sic] about the advisory committee meeting and FDA wanting to discuss all AD products. Can you help us understand how the FDA is going to assess the magnitude or benefit that any specific abuse-deterrent product has specific to its abuse-deterrent properties?
>
> **Bob Radie**
>
> One of the things the FDA has said consistently through this process, through the draft guidelines to the finalization of the guidelines is if they're going to look at the totality of the data generated by the sponsor. And I think that they've shown some consistency with that approach. And I certainly think that this week the last week the Kemp Pharm Ad Com is a great example of their look at the totality of the data and this is where we feel a lot of confidence based on the fact that as I said earlier in the call.
>
> ***We've met all the primary and key secondary endpoints from all of the various category one, two and three abuse-deterrent studies that we conducted. So that gives us a tremendous amount of confidence and the FDA showed some consistency in their review is that they want to see that these products meet the primary endpoint in the various studies that are done and key secondary endpoints as per the guidance that they spent a lot of developing, getting a lot of external expertise to develop those guidance and I think that that's what we're going to see is the sponsors regularly being held to those standards and we believe that ARYMO meet those standards put forth in the guidance.***

Emphasis added.

153. The above statements referenced in paragraphs 151-152 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Egalet and Defendant Radie's statements concerning their opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent

labeling were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Radie made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to received FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (iii) as a result, Defendants' beliefs and opinion statements concerning their expectations that ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling.

154. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***May 11, 2016 – Presentation: Bank of America/Merrill Lynch Health Care Conference***

155. On May 11, 2016, Egalet presented at the Bank of America/Merrill Lynch Health Care Conference in Las Vegas, Nevada. In advance of this presentation, Egalet filed a Form 8-K with the SEC attaching a copy of the slides to presented at the conference as Exhibit 99.1 (the "May 11, 2016 Presentation").

156. The May 11, 2016 Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slides 9 and 10 of the May 11, 2016 Presentation stated:






157. Slide 11 touted ARYMO ER's potential labeling versus its competitors. Slide 18 of the May 11, 2016 Presentation clearly depicted that it was "potential" for ARYMO ER to receive an intranasal abuse-deterrent label from the FDA upon approval of its 505(b)(2) NDA:



158. The above statements referenced in paragraphs 156-157 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose (that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

159. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>May 12, 2016 – Press Release: Egalet Human Abuse Potential Data at American Pain Society Annual Meeting Demonstrates Significantly Lower Intranasal Abuse Potential of ARYMO™ ER Compared to MS Contin®</u>***

160. On May 12, 2016, Egalet issued a press release announcing that data it presented at the American Pain Society Annual Meeting demonstrates that ARYMO ER significantly lowered intranasal abuse potential as compared to MS Contin (ARYMO ER's RLD) ("May 12,

2016 Press Release"). In the May 12, 2016 Press Release, Egalet and Defendant Dayno touted the positive results of the studies with Dayno stating "[t]he data support a strong, clinically relevant abuse-deterrent profile for ARYMO ER[.]"

161. The May 12, 2016 Press Releases stated, in relevant part:

**Egalet Human Abuse Potential Data at American Pain Society Annual Meeting Demonstrates Significantly Lower Intranasal Abuse Potential of ARYMO™ ER Compared to MS Contin®**

**- Additional data demonstrate ARYMO ER has no clinically relevant food effect or alcohol dose dumping –**

WAYNE, Pa., May 12, 2016 /PRNewswire/ -- Egalet Corporation, a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, presented data at the 35th Annual American Pain Society annual meeting demonstrating that ARYMO™ ER (morphine sulfate) extended-release tablets, an abuse-deterrent, oral morphine product candidate, had significantly lower drug liking scores compared to MS Contin® (morphine sulfate extended-release tablets) CII. The Category 2/3 intranasal human abuse potential (HAP) study showed no relevant food effect with ARYMO ER, while an in vitro dissolution study showed no evidence of alcohol dose dumping. Developed for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate, ARYMO ER was created using Egalet's proprietary Guardian™ Technology. The U.S. Food and Drug Administration (FDA) accepted the new drug application (NDA) for ARYMO ER and it is currently under review. The FDA Prescription Drug User Fee Act (PDUFA) goal date for a decision on ARYMO ER is October 14, 2016.

Highlights of the data from the three posters include:

- ***A Category 2/3 clinical intranasal HAP study of 46 subjects comparing the pharmacokinetic (PK) profile and abuse potential of ARYMO ER and MS Contin demonstrated that:***
  - ***A higher level of effort was initially required to physically manipulate ARYMO ER to prepare it for insufflation compared with the ease of crushing MS Contin into a fine powder;***
  - ***'Overall drug liking' was significantly reduced for ARYMO ER (51 on the 100-pt bipolar overall drug liking Visual Analog Scale [VAS]) compared to MS Contin (71; p < 0.0001) and was similar to placebo (50);***

  - ***The response to 'take drug again' was significantly lower for ARYMO ER (50 on the 100-pt bipolar take drug again VAS) compared to MS Contin (73; p < 0.0001) and was similar to placebo (50);***
  - ***the Abuse Quotient (AQ: Cmax or maximum plasma concentration/Tmax or time to Cmax), a PK indicator of abuse potential, was much lower for ARYMO ER (2.3 – 9.2) compared to MS Contin (37.2)***
- In a clinical food effect study, ARYMO ER in the fed state was bioequivalent to the product dosed in a fasted state; thus, no clinically significant interaction with food was observed with ARYMO ER
- In an in vitro alcohol interaction study, there was no evidence of dose dumping of ARYMO ER in the presence of various concentrations of ethanol; in fact, the release of morphine from ARYMO ER was slower with increasing concentrations of alcohol

> ***"The data support a strong, clinically relevant abuse-deterrent profile for ARYMO ER," said Jeffrey Dayno, MD, chief medical officer at Egalet.*** "The PK data demonstrate no significant food effect so that ARYMO ER can be taken without regard to food. The data also show no evidence of alcohol dose dumping, an important safety aspect of the product. ***These findings from our extensive abuse-deterrent development program support a robust profile for ARYMO ER based on both the pharmacokinetic and pharmacodynamic results from a Category 2/3 intranasal human abuse potential study."***

Emphasis added.

162. The above statements referenced in paragraph 161 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Egalet and Defendant Dayno's statements concerning their opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Dayno made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as

MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

163. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***June 21, 2016 – Form 8-K – Investor Presentation: Egalet Overview***

164. On June 21, 2016, Egalet filed a Form 8-K that contained an investor presentation attached as Exhibit 99.1 to the report that it intended to "use time to time in conversations with investors and analysts beginning June 21, 2016" (the "June 2016 Investor Presentation").

165. The June 2016 Investor Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slides 27 and 28 of the June 2016 Investor Presentation stated:

## ARYMO™ ER Could be on Market by Year-End*

- ✓ Hard matrix
- ✓ Resistant to particle size reduction & chemical extraction
- ✓ Forms viscous hydrogel on contact with liquid → can't draw up into syringe
- ✓ Reduces risk of accidental misuse via chewing
- ✓ Reduces risk of intential abuse via **IV injection** or snorting



- ➢ 7.2 MM morphine prescriptions
- ➢ Most prescribed ER opioid

**for the management of pain severe enough to require daily, around-the-clock, opioid treatment and for which alternative treatments are inadequate*

**NDA submitted 12/14/15** **PDUFA 10/14/16**

Egalet © Copyright 2016. Egalet Corporation 27

## Strong Data Supports ARYMO™ ER NDA Filing

- Demonstrated BE at 15 mg, 30 mg and 60 mg to MS Contin
- Strong Category 1 study
  - No household tools were able to grind ARYMO into small particles vs all tools able to defeat MS Contin
  - Very difficult to get into a syringe
- Positive Category 3 clinical human abuse potential (HAP) studies

| | Oral HAP Study | Intranasal HAP Study |
|---|---|---|
| Drug liking (Emax) | p < 0.007 | p < 0.001 |
| Abuse Quotient (Cmax/Tmax) | • 45.9 manipulated MS Contin<br>• 6.4 manipulated ARYMO | • 37.2 manipulated MS Contin<br>• 9.2 manipulated ARYMO<br>• 2.3 manipulated ARYMO (filtered)<br>• 5.5 intact oral ARYMO |

Egalet © Copyright 2016. Egalet Corporation 28

166. Slide 12 of presentation touted ARYMO ER's potential labeling versus its competitors. Slide 12 of the June 2016 Investor Presentation clearly depicted that it was

"potential" for ARYMO ER to receive an intranasal abuse-deterrent label from the FDA upon approval of its 505(b)(2) NDA:

**Potential ARYMO™ ER Label Vs. Competition**

| Product | ARYMO ER | Embeda® | MorphaBond™ |
|---|---|---|---|
| Oral claim | ✓ | ✓ | ✗ |
| Intranasal claim | ✓ | ✓ | ✓ |
| Injection | ✓ | ✓ | ✓ |
| No alcohol dose dumping | ✓ | Black box | No language in label |

Egalet © Copyright 2016. Egalet Corporation 29

167. The above statements referenced in paragraphs 165-166 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies' results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling

precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

168. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***June 28, 2016 – Press Release: Egalet Announces Upcoming FDA Advisory Committee Meeting***

169. On June 28, 2016, Egalet issued a press release announcing that the FDA had scheduled a meeting for August 4, 2016 with the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee to review ARYMO ER ("June 28, 2016 Press Release").

170. In the June 28, 2016 Press Release, Egalet reiterated that the ARYMO ER NDA included "a comprehensive battery of Category 1, 2 and 3 abuse-deterrent studies which were all conducted in accordance with the April 2015 AD Opioid Guidance to support abuse-deterrent label claims for ARYMO ER regarding intravenous injection, snorting and oral routes of misuse and abuse."

171. Specifically, the June 28, 2016 Press Release stated, in relevant part:

> **Egalet Announces FDA Advisory Committee Meeting will Take Place August 4, 2016 for Lead Abuse-Deterrent Candidate ARYMO™ ER (Morphine Sulfate) Extended-Release Tablets**
>
> NEWS PROVIDED BY
> Egalet Corporation
> 28 Jun, 2016, 09:11 ET
>
> WAYNE, Pa., June 28, 2016 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company

> focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, announced today that a joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and Drug Safety and Risk Management Advisory Committee of the U.S. Food and Drug Administration (FDA) has been scheduled for August 4, 2016, to review the new drug application (NDA) for ARYMO™ ER (morphine sulfate) extended-release tablets, an abuse-deterrent, oral morphine product candidate. ARYMO ER was developed for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.
>
> The FDA accepted the NDA in February for ARYMO ER which was developed using Egalet's proprietary abuse-deterrent Guardian™ Technology. The FDA Prescription Drug User Fee Act (PDUFA) goal date for a decision is October 14, 2016.
>
> ***The regulatory submission includes a comprehensive battery of Category 1, 2 and 3 abuse-deterrent studies which were all conducted in accordance with the FDA Guidance for Industry, Abuse-Deterrent Opioids – Evaluation and Labeling to support abuse-deterrent label claims for ARYMO ER regarding intravenous injection, snorting and oral routes of misuse and abuse.***

Emphasis added.

172. The above statements referenced in paragraph 171 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose (that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use; (ii) and despite the "comprehensive battery of abuse-deterrent studies (Category 1, 2 and 3) which were conducted to support abuse-deterrent label claims for intravenous injection, snorting and oral abuse" the studies would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal

abuse-deterrent labeling precluded any “other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use.”

173. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***August 4, 2016 – Joint Meeting of the FDA’s AADPAC and DSaRM***

174. On August 4, 2016 the FDA held a Joint Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee (“AADPAC”) and the Drug Safety and Risk Management Advisory Committee (“DSaRM”) (collectively, the “Advisory Committee”) (the meeting, the “August 4, 2016 Advisory Committee Meeting”) to discuss whether the clinical data supported approvability and abuse-deterrent labeling for ARYMO ER.

175. Egalet described the purpose of the meeting in its Sponsor Briefing Document submitted in support of the August 4, 2016 Advisory Committee Meeting (“the Sponsor Briefing Document”) as:

> The purpose of this joint Advisory Committee meeting is to provide a forum for the Committee members to discuss and provide guidance to the FDA on the approvability and abuse-deterrent labeling language for Arymo ER. This briefing document was prepared in order to provide the Advisory Committee members the data needed to assist in making these determinations and answering the questions posed by the FDA.

176. In the memorandum from Director Sharon Hertz, MD of the FDA Center For Drug Evaluation And Research Division Of Anesthesia, Analgesia, and Addiction Products to the Advisory Committee (among others) included at the beginning of the FDA’s Briefing

Document for the August 4, 2016 Advisory Committee Meeting (the "FDA Briefing Document"), Ms. Hertz explained the purpose of the meeting, in relevant part, as the following:

> At this joint meeting of AADPAC and DSaRM, we will be discussing a new drug application from Egalet US Inc., for an extended-release tablet formulation of morphine sulfate. Arymo ER was designed with properties intended to deter abuse based on its physicochemical properties. The proposed indication is the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.
>
> [* * *]
>
> Arymo ER has been formulated with physicochemical properties intended to deter abuse by the oral (chewing, crushing), intranasal, and intravenous routes. According to the Applicant, these properties are based on a polymer matrix tablet technology that utilizes a novel manufacturing process, plastic injection molding, which results in tablets with extended-release properties as well and physical and chemical features that are intended to resist manipulation.
>
> ***The results of the Applicant's in vitro physical and chemical manipulation studies and the in vivo clinical abuse potential studies will be presented during this meeting. You will be asked to discuss whether the Applicant has demonstrated abuse-deterrent properties for their product that would support labeling, whether the benefits of Arymo ER outweigh its risks, and whether it should be approved.***
>
> There has been much discussion at recent advisory committee meetings about whether any new extended-release opioid analgesics are necessary or should be approved. ***As long as a product meets the regulatory standards for approval, whether or not there is need for a new version of an opioid is not a criterion for not approving the product.***
>
> There has also been discussion about whether the evidence of efficacy for new products is sufficient to warrant approval for managing chronic pain. For products that are bioequivalent to an existing product, sponsors may choose to rely on the Agency's previous findings of efficacy and safety for the product. However, numerous clinical trials have been conducted in recent years for the purpose of demonstration the efficacy of novel extended-release opioid analgesics for chronic pain, and while only 12 weeks in duration, generally enroll a proportion, if not all, of the patients who have already been using opioids chronically. In these patients, the 12 weeks of the controlled study demonstrate that there is <u>ongoing</u> efficacy for the use of an opioid in those patients. In other words, the fact that patients are able to benefit with a reduction in pain intensity not only during the 12 weeks of the study, but for these 12 weeks beyond the prior period of weeks, months or longer that they had already been managing their pain with an opioid

> analgesic is evidence of efficacy beyond a 12-week duration. Opioid analgesic clinical trials are intended to demonstrate that the opioid, as delivered by the new formulation, is able to contribute to a reduction in pain. These clinical trials are not intended to suggest that patients with chronic pain are best managed through the use of an opioid alone. There is a substantial body of medical literature that clearly demonstrates that patients with chronic pain are generally best managed by interdisciplinary pain programs that integrate nonpharmacological modalities and pharmacological therapies[123] , , even though the availability of these programs has been on the decline in the US.[4]
>
> These are clearly difficult questions for which there are no easy answers. ***We are asking that you provide your expertise, your experience and your best insights in order to help us find a reasonable and responsible path forward. Your advice and recommendations will be essential in assisting us with addressing this complex and critical public health concern.*** We are grateful that you have agreed to join us for this important discussion and look forward to seeing you at the meeting.

Emphasis added.

177. As detailed in the Questions for the August 4, 2016 Advisory Committee Meeting, the Advisory Committee was first to discuss whether there was "sufficient data to support a finding that Arymo ER (morphine sulfate extended-release tablets) has properties that can be expected to deter abuse, commenting on support for abuse-deterrent effects for each of the three possible routes of abuse": oral, nasal, and intravenous. Thereafter, the Advisory Committee was asked to vote on whether if ARYMO ER was approved whether it should be "labeled as an abuse-deterrent product by the" oral, nasal and/or intravenous routes of abuse.

178. ***The Advisory Committee members, however, were not asked to evaluate or review whether any FDA-granted exclusivities or patents existed that could affect ARYMO ER's approval or labeling.*** Rather, the Advisory Committee was provided with a summary of the scientific data and asked to determine whether this data "demonstrate[s] abuse-deterrent properties for [ARYMO ER] that would support labeling, whether the benefits of Arymo ER outweigh its risks, and whether it should be approved." The Advisory Committee's vote was not

intended to displace the FDA's process for reviewing ARYMO ER's 505(b)(2) NDA, rather it served as non-binding guidance to the FDA on the questions proposed to the Advisory Committee.

179. In fact, none of the voting members of the Advisory Committee was an FDA employee. The Advisory Committee was comprised of outside professionals such as professors, doctors, and medical directors. The Advisory Committee members were simply not there to conduct a regulatory audit to ensure whether all of the statute, rules, and regulations applicable to new drugs and the FDA have technically been complied with so that ARYMO ER could be approved and receive each of its requested abuse-deterrent labeling. Rather, the Advisory Committee was asked whether the scientific data presented and the other defined constraints contained in the FDA Briefing Document warranted FDA approval of ARYMO ER and abuse-deterrent labeling for the intranasal, oral, and intravenous routes of abuse (in the event ARYMO ER was approved by the FDA).

180. Moreover, neither the FDA Briefing Document and the Sponsor Briefing Document, nor the transcript of the August 4, 2016 Advisory Committee Meeting contained any discussion on marketing exclusivity or its potential impact on ARYMO ER's abuse-deterrent labeling. Notably, there was no discussion of exclusivity (or its potential impacts) despite both the FDA Briefing Document and the Sponsor Briefing Document containing discussions on MorphaBond and its abuse-deterrent labeling. The FDA Briefing Document, the Sponsor Briefing Document, and the August 4, 2016 Advisory Committee Meeting discussions focused on the scientific data weighing in favor and against ARYMO ER's approval and labeling.

181. With this understanding, the Advisory Committee voted on each of the three questions presented to it.

***<u>August 4, 2016 – Press Release: Egalet Announces the Advisory Committee's Recommendations</u>***

182. Later the same day, Egalet issued a press release announcing the results of the Advisory Committee's vote (the "August 4, 2016 Press Release"). In this press release, both Egalet and Defendant Radie reported to investors the positive outcome of the Advisory Committee's vote on each of the labeling questions presented to the Advisory Committee. Furthermore, Egalet stated to investors that it anticipates "if approved, the label for ARYMO ER will describe the product's abuse-deterrent properties that are expected to reduce, but not totally prevent, abuse of the drug when the tablets are manipulated."

183. Specifically, the August 4, 2016 Press Release states, in relevant part:

> **Egalet Announces FDA Advisory Committees Recommend Approval of Abuse-Deterrent ARYMO™ ER (Morphine Sulfate) and Reports Second Quarter 2016 Financial Results**
>
> --Committees voted that if approved ARYMO ER should be labeled as an abuse-deterrent product by the intravenous, nasal and oral routes of abuse--
>
> --Company to discuss results of the FDA Advisory Committees meeting and the financial results during conference call today at 5:15 PM EDT--
>
> NEWS PROVIDED BY
> Egalet Corporation
> 04 Aug, 2016, 16:47 ET
>
> WAYNE, Pa., Aug. 4, 2016 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, today announced that the joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and Drug Safety and Risk Management Advisory Committee of the U.S. Food and Drug Administration (FDA) voted 18 to 1 to recommend approval of ARYMO™ ER (morphine sulfate). ARYMO ER was developed using Egalet's proprietary Guardian™ Technology for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

> The committees also voted:
>
> - 16 to 3 that if approved, ARYMO ER should be labeled as an abuse-deterrent product by the oral route of abuse;
> - 18 to 1 that if approved, ARYMO ER should be labeled as an abuse-deterrent product by the nasal route of abuse; and
> - 18 to 1 that if approved, ARYMO ER should be labeled as an abuse-deterrent product by the intravenous route of abuse.
>
> ***"The Committees' support of ARYMO ER labeling as an abuse-deterrent product by the intravenous, nasal and oral routes of abuse is an important step forward in the development of this product candidate," said Bob Radie, president and CEO of Egalet.*** "We believe ARYMO can offer patients, when appropriate, effective pain relief and can deter potential abuse. We will continue to work closely with the FDA over the next few months to bring this product to the market."
>
> ***Based on the committees' votes, Egalet anticipates, if approved, the label for ARYMO ER will describe the product's abuse-deterrent properties that are expected to reduce, but not totally prevent, abuse of the drug when the tablets are manipulated.*** The FDA is not bound by the recommendations of its advisory committees, but will consider their guidance during the review of the NDA for ARYMO ER. The FDA Prescription Drug User Fee Act (PDUFA) goal date for a decision is October 14, 2016.

Emphasis added.

184. The above statements referenced in paragraph 183 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Egalet's statements concerning its opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as it was not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Radie made false and/or misleading statements

and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (iii) as a result, Egalet's beliefs and opinion statements concerning its expectation that ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling.

185. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>August 4, 2016 – Conference Call: Second Quarter 2016 Earnings Call</u>***

186. Later that same day, Egalet held a conference call to discuss the second quarter 2016 financial results and the recent Advisory Committee vote (the "August 4, 2016 Conference Call").

187. During the opening remarks of the August 4, 2016 Conference Call, Defendant Radie discussed the positive outcome ARYMO ER received as a result of the vote at the August 4, 2016 Advisory Committee Meeting. Specifically, Radie stated:

> **Bob Radie**
>
> Thanks, Blair. Good evening everyone and welcome to our conference call to discuss results from the FDA Advisory Committee meeting and our second quarter earnings results.
>
> As you may have seen earlier today, a joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and Drug Safety and Risk Management Advisory Committee of the U.S. Food and Drug Administration or FDA met to review the new drug application or NDA for ARYMO ER, an extended release form of morphine sulfate, developed using our proprietary Guardian Technology. The panel voted 18 to 1 recommending approval of ARYMO ER for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.
>
> ***The panel voted in support of labeling ARYMO ER as an abuse deterrent product by all three routes of abuse; intravenous, nasal and oral.*** The vote was 18 to 1 for the intravenous route, ***18 to 1 for the nasal route***, and 16 to 3 for the oral route. ***We are encouraged by the outcome of today's FDA advisory committee meeting, and support for labeling ARYMO ER as an abuse deterrent product by the intravenous, nasal and oral routes of abuse.***
>
> The FDA typically follows the advice of its advisory panels, although it is not required to do so. We will continue to work with the FDA to complete the review process of the ARYMO NDA. The target action date of October 14, 2016 has been set by the FDA under the Prescription Drug User Fee Act or PDUFA. There is significant need for treatment options that help deter potential abuse, while still providing individuals with effective pain relief.

188. Later during the August 4, 2016 Conference Call, Defendant Radie expounded on his and Egalet's belief regarding ARYMO ER's potential abuse-deterrent labeling in the wake of the AADPC's vote. Specifically, Radie stated:

> **Bob Radie**
>
> Thanks, Stan. Today marks a significant milestone in the development of Egalet's first product coming out of our proprietary Guardian Technology. There is a substantial need to have more treatment options for physicians and patients living with chronic pain that are less likely to be abused.

> ***We are encouraged by the panel's support for ARYMO as an abuse deterrent morphine, and we are encouraged by their support for all three abuse deterrent claims of oral, intranasal, and IV. If approved, this would be the broadest label for an abuse deterrent extended release morphine product candidate.***

Emphasis added.

189. Also, during the August 4, 2016 Conference Call, Defendant Radie further discussed ARYMO ER's potential abuse-deterrent labeling, including the intranasal abuse-deterrent labeling. Specifically, Defendant Radie stated in response to a question from analyst Louise Chen at Guggenheim:

> **Louise Chen**
>
> Hi, thanks for taking my questions. I had a few here. The first question here is if your product is approved ARYMO, what do you expect to get in your label and how does that compare to the other products that are out there . . . ?
>
> **Bob Radie**
>
> So, let me start with the labeling question, and obviously as we stated in the opening, we look forward to continuing to work with the FDA over the coming weeks as we move closer to the October 14 PDUFA date. ***It is our hope and expectation that we will achieve abuse deterrent claims in the label for the*** intravenous routes, oral routes and ***intranasal routes of abuse.*** And my statement about this would then be the broadest set of claims; it revolves around the comparisons of the labels for the other two currently approved abuse deterrent extended release morphine products being Embeda and MorphaBond.
>
> Embeda has claims for intranasal and oral abuse but not an IV claim, and MorphaBond has an intranasal and IV claim, but not an oral claim. ***So if successful we would expect to be able to achieve all three of those claims in our label.***

Emphasis added.

190. The above statements referenced in paragraph 187-189 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Radie's and Egalet's statements concerning any of their opinions and beliefs that

ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as it was not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Radie made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling a MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (iii) it was impossible for ARYMO ER to receive all three sought abuse-deterrent labels as the FDA could not grant the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (iv) as a result, the Radie's and Egalet's expectations that ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling.

191. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given the value of ARYMO ER derived from the marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

192. In the wake of the news on August 4, 2016, multiple analysts issued reports updating their subscribers on the outcome of the August 4, 2016 Advisory Committee Meeting and its impact. Representatively, Louise Chen of Guggenheim Securities, LLC, issued a report that stated:

> **2Q16 positives that support our thesis**: 1) Positive FDA AdCom supports our view that Arymo's peak sales potential is underappreciated. The FDA Adcom supports abuse deterrence labeling for Arymo by oral, nasal, and intravenous routes of abuse. The panel also supported the approval of Arymo for pain management. 2) EGLT expects to achieve abuse deterrent claims for the oral, nasal, and intravenous routes of abuse; if EGLT gets this, Arymo would have a broader set of claims than the other two abuse deterrent morphine products on the market: Embeda (no IV claim) and Morphabond (no oral claim).

***<u>August 5, 2016 – Form 10-Q: Second Quarter of 2016</u>***

193. The next day, August 5, 2016, Egalet filed its quarterly report on Form 10-Q for the quarterly period ended June 30, 2016 ("2Q2016 Form 10-Q"). Radie signed the report and, along with Musial, certified the accuracy of its contents pursuant to the Sarbanes-Oxley Act of 2002.

194. In the 2Q2016 Form 10-Q, Egalet discussed the recent outcome of the Advisory Committee Meeting and added additional risk factors describing potential risks concerning any limitations imposed by the FDA upon approving a drug or the possible risk if the FDA did not grant abuse-deterrent labeling. These statements were misleading, however, as they omitted to disclose to investors that ARYMO ER was already precluded from receiving intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA given MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling. Defendants' inclusion of these risk factors and

the language is an acknowledgement of the materiality of intranasal abuse-deterrent labeling for ARYMO ER, Egalet, and investors.

195. Specifically, the 2Q2016 Form 10-Q stated:

> *Recent Developments*
>
> ***On August 4, 2016, at the joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA (the "Advisory Committees"), the Advisory Committees voted 18 to 1 to recommend approval of ARYMO ER. In addition, the Advisory Committees voted 16 to 3 that if approved, ARYMO ER should be labeled as an abuse-deterrent product by the oral route of abuse, 18 to 1 that if approved, it should be labeled as an abuse-deterrent product by the nasal route of abuse and 18 to 1 that if approved, it should be labeled as an abuse-deterrent product by the intravenous route of abuse. We intend to continue to work collaboratively with the FDA to complete the review process of ARYMO ER. The FDA will consider, but is not bound by, the Advisory Committees' recommendations as it continues its review of ARYMO ER.***

2Q2016 Form 10-Q, at 22 (emphasis added).

196. Additionally, the 2Q2016 Form 10-Q stated:

> ***If we fail to obtain the necessary regulatory approvals, or if such approvals are limited, we will not be able to commercialize our product candidates, and we will not generate product revenues.***
>
> Even if we comply with all FDA pre-approval regulatory requirements, the FDA may not determine that some or all of our product candidates are safe and effective, and we may never obtain regulatory approval for some or all of our product candidates. If we fail to obtain regulatory approval for some or all of our product candidates, we will have fewer commercial products, and correspondingly lower product revenues.
>
> Even if our product candidates receive regulatory approval, such approval may involve limitations on the indications and conditions of use or marketing claims for our products. On ***August 4, 2016, at the joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA (the "Advisory Committees"), the Advisory Committees voted 18 to 1 to recommend approval of ARYMO ER. In addition, the Advisory Committees voted 16 to 3 that if approved, ARYMO ER should be labeled as an abuse-deterrent product by the oral route of abuse, 18 to 1 that if approved, it should be labeled as an abuse-deterrent product by the nasal route of abuse and 18 to 1 that if approved, it should be labeled as an abuse-deterrent product by the intravenous route of abuse. Even though the***

> ***Advisory Committees recommended FDA approval of and abuse-deterrent labeling for ARYMO ER, the FDA is not bound by the Advisory Committees' recommendations as it continues its review of ARYMO ER. As a result, there is a risk that the FDA could determine not to approve ARYMO ER, or to approve ARYMO ER, but without abuse-deterrent labeling***. If we are not able to obtain FDA-approved labeling describing of ARYMO ER's abuse-deterrent features, then we may not be able to successfully commercialize ARYMO ER and, as a result, we may not generate any profits based on the sale of ARYMO ER, even if ARYMO ER is otherwise approved for marketing by the FDA.

2Q2016 Form 10-Q, at 32 (emphasis added).

197. Moreover, the 2Q2016 Form 10-Q stated:

> ***Our ability to market and promote our products in the United States by describing their abuse-deterrent features will be determined by the FDA-approved labeling for them.***
>
> The commercial success of our product candidates will depend upon our ability to obtain FDA approved labeling describing their abuse-deterrent features or benefits. Our failure to achieve FDA approval of product labeling containing such information will prevent or substantially limit our advertising and promotion of the abuse-deterrent features of our product candidates in order to differentiate them from other opioid products containing the same active ingredients. This would make our products less competitive in the market.
>
> The FDA has publicly stated that explicit claims that a product is expected to result in a meaningful reduction of abuse must be supported by randomized, double-blind, controlled clinical studies of the abuse potential of the drug and that explicit claims that a product has demonstrated reduced abuse in the community will be required to be supported by post-marketing data, including formal post-marketing studies evaluating the effect of abuse-deterrent formulations. Although we intend to conduct such studies, there can be no assurance that our product candidates in development will receive FDA-approved labeling that describes the abuse-deterrent features of such products. If the FDA does not approve labeling containing such information, we will not be able to promote such products based on their abuse-deterrent features, may not be able to differentiate such products from other opioid products containing the same active ingredients.
>
> [* * *]
>
> ***The FDA notified us upon acceptance of the ARYMO ER NDA, that it would require an Advisory Committee to discuss our ARYMO ER application. On August 4, 2016, the Advisory Committees voted to recommend approval of ARYMO ER and that, if approved, ARYMO ER should be labeled as an abuse-deterrent product by the oral, nasal and intravenous routes of abuse. However,***

> ***the FDA is not bound by the Advisory Committees' recommendations as it continues its review of ARYMO ER.*** If we are not able to obtain FDA-approved labeling describing all of ARYMO ER's abuse-deterrent features, then we may not be able to successfully commercialize ARYMO ER and, as a result, we may not generate any profits based on the sale of ARYMO ER even if ARYMO ER is otherwise approved for marketing by the FDA.

2Q2016 Form 10-Q, at 34 (emphasis added).

198. The above statements referenced in paragraph 195-197 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Defendants made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling a MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (iii) it was impossible for ARYMO ER to receive all three sought abuse-deterrent labels as the FDA could not grant the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

199. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>August 26, 2016 – Form 8-K / Investor Presentation: Egalet Advancing Next-Generation Abuse-Deterrent Opioids</u>***

200. On August 26, 2016, Egalet filed a Form 8-K that contained an investor presentation attached as Exhibit 99.1 to the report that Egalet intended to "use from time to time in conversations with investors and analysts beginning August 26, 2016" (the "August 2016 Investor Presentation").

201. The August 2016 Investor Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slide 8 of the August 2016 Investor Presentation stated:



202. Slide 9 of the presentation touted ARYMO ER's potential labeling versus its competitors. Slide 9 of the August 2016 Investor Presentation clearly depicted that it was "potential" for ARYMO ER to receive an intranasal abuse-deterrent label from the FDA upon approval of its 505(b)(2) NDA:


FDA Advisory Committee Supported Potential ARYMO™ ER Label

| Product | ARYMO ER | Embeda® | MorphaBond™ |
|---|---|---|---|
| Oral claim | ✓ | ✓ | ✗ |
| Intranasal claim | ✓ | ✓ | ✓ |
| Injection | ✓ | ✗ | ✓ |
| No alcohol dose dumping | ✓ | Black box | |



203. The above statements referenced in paragraphs 201-202 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies'

results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

204. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***October 13, 2016 – Press Release: Egalet Announces that the FDA will Not Meet the PDUFA Goal Date for ARYMO ER***

205. On October 13, 2016, Egalet issued a press release announcing that the FDA would not meet its October 14, 2016 prescription drug user fee act ("PDUFA") date for ARYMO ER ("October 13, 2016 Press Release").

206. Specifically, the October 13, 2016 Press Release stated, in relevant part:

> **Egalet Notified that FDA Will Not Meet PDUFA Goal Date for ARYMO ER**
>
> No additional scientific information or data requested by FDA
>
> NEWS PROVIDED BY
> Egalet Corporation
> 13 Oct, 2016, 18:05 ET
>
> WAYNE, Pa., Oct. 13, 2016 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, today announced that the U.S. Food and Drug Administration (FDA) will not meet the previously announced October 14 prescription drug user fee act (PDUFA) date for ARYMO™ ER (morphine sulfate).
>
> ***"Today we were informed that the FDA has identified no particular issue with our application for ARYMO ER and that the Agency is working on the product***

> ***label," said Bob Radie, president and chief executive officer." "The FDA indicated that they need more time as they have done with other abuse-deterrent opioid NDAs, and confirmed that no additional scientific information or data is needed for our application.*** We will continue to work closely with the FDA to bring this important product to those living with chronic pain and the healthcare professionals who treat them."
>
> ***On August 4, 2016 an FDA Advisory Committee voted 18 to 1 for approval of ARYMO ER and the Committee recommended ARYMO ER should be labeled as an abuse-deterrent product by the intravenous, nasal and oral routes of abuse.*** ARYMO ER is being developed for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. If approved, ARYMO ER would be the first product developed using Egalet's proprietary Guardian™ Technology—a physical and chemical barrier approach to abuse-deterrence that results in tablets that are difficult to manipulate for the purpose of misuse and abuse.

Emphasis added.

207. The above statements referenced in paragraph 206 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2)

application [to] be approved for that use; and (iii) ARYMO ER's proposed intranasal abuse-deterrent labeling was the source of the FDA's delay.

208. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

209. For example, on October 13, 2017, Louise Chen, an analyst at Guggenheim Securities, LLC, issued a report concerning the materiality of the intranasal abuse-deterrent labeling claims, stating, in relevant part:

> Arymo ER Market Potential is Bigger than Competitors: Arymo abuse deterrent claims for oral, nasal, and intravenous routes of abuse give it a bigger set of claims than the other two abuse deterrent morphine products on the market. . . We think this will give Egalet a competitive advantage, especially in light of the FDA and CDC's emphasis on abuse deterrent opioids and rising media attention on this topic. Therefore, we believe our peak sales estimate of $200MM+ could be conservative and is underappreciated by the Street.

***<u>November 4, 2016 – Conference Call: Third Quarter 2016 Earnings Call</u>***

210. On November 4, 2016, Egalet issued a press release announcing the its financial results for the third quarter 2016 for the three-month period ended September 30, 2016 ("November 4, 2016 Press Release").

211. Later that same day, Egalet held a conference call to discuss the third quarter 2016 financial results (the "November 4, 2016 Conference Call").

212. During the opening remarks of the November 4, 2016 Conference Call, Defendant Radie discussed the positive outcome ARYMO ER received as a result of the August 4, 2016 Advisory Committee Meeting vote. Specifically, Radie stated:

> **Bob Radie**
>
> Thank you, Blair. Good evening everyone and welcome to our conference call to discuss our third quarter earnings. The most important even in the third quarter

> was a very successful joint meeting of the anesthetic and analgesic drug products advisory committee and drug safety and risk management advisory committee of the FDA that met to review the new drug application or NDA, for ARYMO ER an extended release form of morphine sulfate.
>
> The panel voted 18 to 1 recommending approval of ARYMO ER for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. The panel voted in support of labeling ARYMO ER as an abuse deterrent product by all three routes of abuse, intravenous, nasal and oral.
>
> ***We were encouraged by the outcome of the FDA advisory committee meeting and support for labeling ARYMO ER as an abuse deterrent product.*** As previously announced, we were informed by the FDA on October 13 that the agency would not be able to meet the October 14 PDUFA goal date.
>
> The FDA indicated that they needed more time highlighting a pattern of approval delays with ADF opioids, that there were no particular issues with our application for ARYMO ER and that we do not need to submit any additional scientific data or additional information. Importantly, they indicated that they are working on the drug label for ARYMO ER.
>
> We continue to interact with the FDA as they complete the review process of the ARYMO NDA. There is significant need for treatment options that help deter common routes of misuse and abuse, especially with 98% of the extended release morphine market in easily abusable forms, while still providing effective relief for individuals living with severe pain. Despite the FDA delay we are planning for success and we still expect to commercialize in the first quarter of 2017.
>
> Also during the third quarter data from the ARYMO ER category three oral and intranasal abuse deterrent studies were the subject of two separate publications in pain medicine. In addition, this data, plus other data on the Guardian Technology and OXAYDO was presented at PAINWeek.

Emphasis added.

213. The above statements referenced in paragraph 212 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Egalet and Defendant Radie's statements concerning their opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and

misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Radie made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as the FDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use; and (iii) as a result, Defendants' beliefs and statements concerning their expectations that ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's intranasal abuse-deterrent labeling marketing exclusivity.

214. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>November 14, 2016 – Form 8-K – Investor Presentation: Egalet Overview</u>***

215. On November 14, 2016, Egalet filed a Form 8-K that contained an investor presentation attached as Exhibit 99.1 to the report that it intended to "use time to time in

conversations with investors and analysts beginning November 14, 2016" (the "November 2016 Investor Presentation").

216. The November 2016 Investor Presentation touted Egalet's Guardian Technology and ARYMO ER's reductions in oral, intra-nasal, and injection abuse. Specifically, Slide 8 of the November 2016 Investor Presentation stated:




217. The above statements referenced in paragraph 216 were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Specifically, Egalet made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; and (ii) despite the positive results of Egalet's abuse-deterrent studies for ARYMO ER, the studies'

results would still not allow ARYMO ER to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use."

218. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

***<u>November 15, 2016 – Presentation: Stifel 2016 Healthcare Conference</u>***

219. On November 15, 2016, presented at the Stifel 2016 Healthcare Conferernce ("Stifel Conference").

220. During his remarks at the Stifel Conference, Defendant Radie discussed that Egalet conducted ARYMO ER's testing in accordance with the April 2015 AD Guidance, the positive outcome ARYMO ER received as a result of the August 4, 2016 Advisory Committee Meeting vote, and recent discussions with the FDA regarding ARYMO ER's labeling. Specifically, Radie stated:

> We've conducted the full battery of abuse-deterrent studies required per FDA guidance, which involved a series or categories of studies. Some of those are called Category 1, there in vitro study done in independent laboratories where you're assessing the ability to manipulating grind the product using household tools. And they graduate to Category 3 studies which are known as human abuse potential studies. And we've done a whole battery of those studies and presented all of that data at an advisory committee meeting which took place on the 4 August of this year.
>
> ***And at that advisory committee meeting we received very strong support 18 to 1 vote in favor of approval of ARYMO with abuse-deterrent labeling, and then similarly they asked three other questions in addition to approval of the advisors, they asked, does it – does the data suggest it would deter abuse the intravenous, the nasal and the oral route, and all of those votes were overwhelmingly positive in favor of ARYMO***. So a very positive experience for us, a positive for the product.

> And we are waiting for final action from the FDA. Original PDUFA date was the 14 of October. We received a call from the FDA on the 13 of October, mentioning that they needed more time that they were not going to make that date. ***It's important to note that they did not request any additional data from the company, any additional scientific information and instead basically led us to recognize if there were a patent approved abuse-deterrent products missing their PDUFA date and that this product was likely to meet that patent just based on the complexities of the FDA's process to approve opioids.***
>
> So beyond that we don't really have a lot more visibility, except to say again that they've requested no additional information ***and that we know from their statement was that they're actively working on our label, which we believe are all very positive sign***s and should conclude to depending – the approval of ARYMO here in the near future. We are confident to the point, where we're moving forward with all of our plans to watch this product in the first quarter similar to when our PDUFA date was October 14. So all the wheels are in motion including manufacturing of validation batches that would go to – become commercial supply, as well as gearing up our existing commercial organization in preparation for that launch.

Emphasis added.

221. The above statements referenced in paragraph 220 and identified in emphasis were materially false and misleading because they misrepresented and failed to disclose adverse facts pertaining to ARYMO ER's ability to receive the intranasal abuse-deterrent labeling. Furthermore, Egalet and Defendant Radie's statements concerning their opinions and beliefs that ARYMO ER could and/or would receive intranasal abuse-deterrent labeling were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and misrepresented and failed to disclose adverse facts pertaining to the likelihood of ARYMO ER receiving intranasal abuse-deterrent labeling. Specifically, Egalet and Defendant Radie made false and/or misleading statements and/or omitted to disclose that: (i) ARYMO ER could not and would not receive an intranasal abuse-deterrent label upon approval of ARYMO ER's 505(b)(2) NDA as the FDA as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use"; (ii) despite the positive results of Advisory Committee's vote on whether ARYMO ER should

receive intranasal abuse-deterrent labeling if it was approved, ARYMO ER was unable to receive FDA approval for the intranasal abuse-deterrent labeling as MorphaBond's marketing exclusivity for intranasal abuse-deterrent labeling precluded any "other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application [to] be approved for that use; (iii) ARYMO ER's proposed intranasal abuse-deterrent labeling was the source of the FDA's delay; and (iv) as a result, Defendants' beliefs and statements concerning their expectations that ARYMO ER could and/or would receive the intranasal abuse-deterrent labeling were not honestly held and lacked a reasonable basis given MorphaBond's intranasal abuse-deterrent labeling marketing exclusivity.

222. As explained in more detail herein, the ability and probability of Egalet receiving the intranasal abuse-deterrent labeling for ARYMO ER was material to investors given that the value of ARYMO ER derived from its marketing prospects and/or exclusivity for each of the abuse-deterrent labels approved by the FDA for ARYMO ER.

## III. THE TRUTH IS REVEALED AND INVESTORS SUSTAIN SIGNIFICANT DAMAGES

223. On January 9, 2017 at 2:51 p.m. ET, Egalet issued a press release announcing that the FDA approved ARYMO ER's 505(b)(2) NDA ("January 9, 2017 Press Release"). Notably, Egalet failed to mention in that ARYMO ER did not receive intranasal abuse-deterrent labeling. Specifically, the January 9, 2017 Press Release stated:

> **Egalet Receives FDA Approval for ARYMO™ ER (morphine sulfate) C-II, an Extended-Release Morphine Product Formulated with Abuse-Deterrent Properties for Treatment of Chronic Pain**
>
> --Approval triggers $40 million from second tranche of secured debt financing--
> --Conference call to be hosted Monday, January 9, at 8:15 PM EST--
>
> Jan 9, 2017

WAYNE, Penn., Jan. 9, 2017 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, today announced that the U.S. Food and Drug Administration (FDA) has approved ARYMO™ ER (morphine sulfate) extended-release (ER) tablets C-II for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

[* * *]

ARYMO ER is the first approved product developed using Egalet's proprietary Guardian™ Technology—a physical and chemical barrier approach to abuse deterrence without the use of an opioid antagonist—creating tablets that are difficult to manipulate for the purpose of misuse and abuse. Results from *in vitro* testing demonstrated that ARYMO ER tablets, in comparison to non-abuse-deterrent morphine sulfate extended-release tablets, have increased resistance to cutting, crushing, grinding or breaking using a variety of tools. Due to its physical and chemical properties, ARYMO ER is expected to make abuse by injection difficult.

"Given the need for treatments for the millions of Americans living with chronic pain, the growing problem of prescription abuse and the fact that we know diversion is a huge problem, it is important that we have more abuse-deterrent treatment options, like ARYMO ER, if and when these pain treatments end up in the wrong hands," said Nathaniel Katz, M.D., neurologist and pain specialist as well as founder and president of Analgesic Solutions.

ARYMO ER has been approved in three dosage strengths: 15 mg, 30 mg and 60 mg. The U.S. commercial launch, utilizing Egalet's established commercial infrastructure, is planned for the first quarter 2017.

"With the majority of ER opioids in easy to abuse forms, it is important that healthcare professionals have additional treatment options like ARYMO ER that are resistant to different methods of manipulation using a variety of tools," said Bob Radie, president and chief executive officer of Egalet." ARYMO ER has physical and chemical properties expected to make abuse by injection difficult which is important given it is the most common non-oral route of morphine abuse and the most dangerous. With our commercial organization in place, we are ready to launch ARYMO ER in the first quarter of 2017."

The FDA approval of ARYMO ER triggered $40 million in new funding to Egalet from the second tranche of the senior secured debt financing previously announced on August 31, 2016. In connection with the second tranche, the note purchasers will also receive a royalty right, representing a right to receive an aggregate 1.5% royalty payment on net sales of ARYMO ER, as further described in Egalet's current report on form 8-K filed on September 1, 2016.

224. Moreover, on January 9, 2017, the FDA announced its approval of ARYMO ER ("January 9, 2017 FDA Press Release"). Notably, the FDA also announced that ARYMO ER could not receive intranasal abuse labeling. Specifically, the FDA stated that as MorphaBond already possessed marketing exclusivity for "the expected reduction of abuse of single-entity extended-release morphine by the intranasal route due to physicochemical properties" that "no other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application can be approved for that use at this time." The January 9, 2017 FDA Press Release stated:

> **Impact of Exclusivity on Approval of Arymo ER**
>
> **[1-9-17]** Today, the FDA approved Arymo ER (morphine sulfate extended-release tablets), a new extended-release opioid with abuse-deterrent properties. Arymo ER is approved to treat pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. Arymo ER is formulated to give it physicochemical properties expected to make abuse by injection difficult. However, abuse by the intravenous, intranasal, and oral routes is still possible.
>
> Expanding access to abuse-deterrent opioids to discourage misuse and abuse is part of the FDA's Opioid Action Plan, and the pharmaceutical industry has shown significant interest in the development of abuse-deterrent products. Technology is progressing rapidly, and these medications hold promise as their abuse-deterrent qualities continue to improve and as they become more widely available.
>
> ***As the FDA reviews new drug applications, the agency works through various issues that may arise, including exclusivity. Another product, MorphaBond (morphine sulfate extended-release tablets), has marketing exclusivity for labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route due to physicochemical properties. Due to MorphaBond's marketing exclusivity, no other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application can be approved for that use at this time.***
>
> Because the science of abuse deterrence is still evolving and the agency does not yet know which technologies will ultimately prove most effective in deterring opioid abuse, the agency believes that it is in the interest of public health to encourage development of multiple abuse-deterrent alternatives while continuing to promote and protect innovation.

> The details of the FDA's scientific review of the clinical evidence that supported the approval of Arymo ER are available in the FDA Review Summary, which will be posted to Drugs@FDA following approval. Additional information about Arymo ER is available in the briefing materials from the August 4, 2016, joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee.

Emphasis added.

225. Also, on January 9, 2017, the CDER published its "Summary Review" for ARYMO ER's NDA (Application number: 208603Oris1s000") (the "CDER Summary Review"). In the CDER Summary Review, the FDA discussed its review of ARYMO ER and further explained its decision to approve ARYMO ER while also discussing its reasoning why the FDA did not grant ARYMO ER its sought intranasal abuse-deterrent labeling.

226. Specifically, the CDER stated the following regarding the FDA's decision not to grant ARYMO ER's intra-nasal abuse-deterrent labeling:

> Arymo ER will be the second single-entity extended-release morphine product with abuse-deterrent (AD) properties on the US market. Morphabond (NDA 206544) was the first,approved on October 2, 2015, with labeling that describes in vitro data supporting that Morphabond has physiochemical properties expected to make abuse via injection difficult, and clinical data from a human abuse potential study and in vitro data that support the conclusion that Morphabond has physicochemical properties that are expected to reduce abuse by the intranasal route of administration. Morphabond qualified for 3-year exclusivity, which will expire on October 2, 2018, 3 years after the date of approval. This exclusivity is currently reflected in the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), with Exclusivity Code M-189, described as "labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due to physicochemical properties".
>
> As described below and during the August 4, 2016, joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee, a clinical abuse potential study demonstrated that Arymo ER has properties that can be expected to reduce abuse by the intranasal route. ***However, because the scope of Morphabond's exclusivity is for labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due***

***to physicochemical properties, a 505(b)(2) application (or ANDA) for a single-entity extended-release morphine product generally could not be approved for this same condition of approval until the expiration of Morphabond's 3-year exclusivity, i.e., until October 2, 2018. Thus, the Applicant has sought approval for Arymo ER without this exclusivity-protected condition of approval, and the drug will not be approved with this exclusivity-protected condition of approval.*** The Agency determined, however, that Arymo ER (1) could be approved with labeling stating that in vitro data demonstrate that Arymo ER has physiochemical properties that make abuse by injection difficult, and (2) otherwise meets the requirements for approval.

CDER Summary Review, at 3 (emphasis added).

227. Furthermore, the CDER Summary Review explained:

<u>Abuse Deterrence Properties for Intranasal Route of Administration</u>

As described in the review, the Applicant conducted a new clinical investigation that supports an expected reduction of abuse of Arymo ER by the intranasal route of administration due to physicochemical properties. As discussed above, Morphabond has 3 years of exclusivity, which is reflected in the Orange Book with code M-189, described as "labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due to physicochemical properties." [4] This exclusivity expires on October 2, 2018, 3 years after the date of Morphabond's approval. During this 3-year period, any subsequent 505(b)(2) application (or ANDA) that includes labeling describing the expected reduction of abuse of single-entity ER morphine by the intranasal route of administration due to physicochemical properties will be blocked from approval. Such exclusivity, however, does not block the approval of a subsequent 505(b)(2) application (or ANDA) that is not seeking approval of any exclusivity-protected condition(s) of approval (i.e., the condition(s) of approval for which new clinical investigations were essential). Arymo ER is not being approved for any exclusivity-protected condition of approval, including Morphabond's exclusivity-protected conditions of approval, i.e., Arymo ER is not being approved with labeling describing an expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due to physicochemical properties. As currently labeled, Arymo ER is both safe and effective, and otherwise meets all the requirements for approval described in subsections (c) and (d) of section 505 of the Federal Food, Drug, and Cosmetic Act.

There are no other unresolved relevant regulatory issues.

[4] An application for a drug containing a previously approved active moiety is eligible for 3-year exclusivity if the approval of the application is supported by at

> least one (1) new (2) clinical investigation (other than a bioavailability study) (3) that is conducted or sponsored by the applicant and is (4) essential to the approval of the application. See sections 505(c)(3)(E)(iii) and 505(j)(5)(F)(iii) of the FD&C Act. The approval of an NDA or supplement to an NDA includes approval of labeling submitted in the NDA or supplement. 21 CFR 314.50.

CDER Summary Review, at 16-17.

228. Additionally, in the subsection on ARYMO ER's labeling, the CDER Summary Report stated, in relevant part:

> **12. Labeling**
>
> The proposed proprietary name, Arymo ER, was found acceptable. Carton and container labels were reviewed and the final labels found acceptable from a medication error prevention perspective. Labeling recommendations from the patient labeling team were implemented. OPDP has provided comments that were incorporated into the labeling. Labeling comments from the Division of Pediatric and Maternal Health were incorporated into the product labeling.
>
> The labeling regarding the evaluation of the abuse-deterrent properties of Arymo ER is reproduced below from Section 9.2 of the package insert with comments regarding the selection of the language. ***Because of the exclusivity for Morphabond, as described above, there is no mention of the clinical pharmacology or human abuse potential studies of Arymo ER included in the labeling.***

CDER Summary Review, at 17 (emphasis added).

229. Later the same day, Egalet held a conference call to discuss the FDA's approval of ARYMO ER's 505(b)(2) NDA ("January 9, 2017 Conference Call"). During the call, Radie conceded for the first time that Egalet was excluded from including intranasal abuse-deterrent properties in ARYMO ER's label until the expiration of MorphaBond's exclusivity in October 2018.

230. Moreover, Radie admitted, in response to a question by analyst Chiara Russo of Cantor Fitzgerald, that MorphaBond's exclusivity was not a "surprise." Specifically, Chiara Russo inquired "the exclusivity around the intranasal data, was that a surprise to you?". In

response, Radie admitted "***we had considered it***, but we couldn't predict any ***definitive*** outcome based on previous exclusivity findings in this class" (emphasis added).

231. In response to the news disclosed on January 9, 2017, as set forth *supra* in paragraphs 223-230, Egalet's stock price initially declined $1.86 from a closing price of $8.38 per share of common stock on January 9, 2017, to close at $6.52 per share on January 10, 2017, a drop of approximately 22% on extremely high volume. As the market continued to digest the news, shares of Egalet common stock continued to fall the next trading day to a closing price of $5.99 per share on January 11, 2017. Thus, in two days, Egalet's stock price fell approximately 28.5% and over $60 million in market capitalization was erased. Since this news correcting Defendants' statements entered the market, Egalet's stock price has continued on a precipitous slide, reaching a record low of $2.03 per share on May 31, 2017.

## IV. RELEVANT POST-CLASS PERIOD STATEMENTS

232. On January 10, 2017, an article entitled *FDA's Approval of New Abuse-Deterrent Opioid Raises Questions* published on the website of the Regulatory Affairs Professionals Society ("January 10, 2017 RAPS Article") reported a conversation with the FDA spokesman concerning why the FDA approved ARYMO ER to include intravenous abuse-deterrent labeling. The January 10, 2017 RAPS Article stated in relevant part:

> An FDA spokesman told Focus on Tuesday: "The labeling for Arymo ER and MorphaBond conveys that each drug is expected to deter intravenous abuse. This labeling is not protected by 3-year exclusivity. The studies which assessed abuse-deterrence for the intravenous route of abuse were in vitro studies. In vitro studies may not form the basis for eligibility of 3-year exclusivity – new clinical studies must be conducted for a drug to be considered eligible for 3-year exclusivity, and in vitro studies are not clinical studies."

233. In response to the news on January 9, 2017, analysts that followed Egalet and ARYMO ER's abuse-deterrent labeling issued reports analyzing the import of this news on the Company and their outlooks for it. Representatively, Chiara Russo of Cantor Fitzgerald issued a

Company Update on Egalet that stated "[o]ur enthusiasm following the approval to ARYMO ER this afternoon was tempered as the label, which we expected to include abuse-deterrent (AD) claims in oral, intranasal, and IV routes of abuse, only included IV."

234. Approximately two weeks later Russo published a report entitled *Slowing the Roll: Three Approved Products, Matching Ramp to Label.* In this analyst report, Russo succinctly explained the impact of the FDA not approving ARYMO ER's requested labeling on the Company's revenues, stating "[w]e are tapering our launch expectations around ARYMO as we see a more difficult commercial path given the ARYMO label." Later in the same report, Russo explained the changes to Cantor Fitzgerald's model assumptions in response to the January 9, 2017 news stating "***[w]e have tapered our ARYMO launch revenues significantly as we believe that the label will not be as differentiating in the market place give[n] the single route of abuse deterrence compared to our original assumption of all three route***" (emphasis added).

235. After the revelation of the truth on January 9, 2017, the first periodic filing with the SEC was Egalet's Form 10-K for the quarter and year ended December 31, 2016 that was filed with the SEC on March 13, 2017 ("2016 Form 10-K"). The 2016 Form 10-K was signed and certified under SOX by Radie.

236. The 2016 Form 10-K included risk factors that were not previously included in 2015 Form 10-K. These risk factors serve as a post-Class Period admission of the significance and materiality of the intranasal abuse-deterrence labeling to Egalet, ARYMO ER, and investors.

237. The 2016 Form 10-K states, in relevant part:

> ***If we fail to obtain the necessary regulatory approvals, or if such approvals are limited, we will not be able to commercialize our product candidates, and we will not generate product revenues.***

> Even if we comply with all FDA pre-approval regulatory requirements, the FDA may not determine that some or all of our product candidates are safe and effective, and we may never obtain regulatory approval for some or all of our product candidates. If we fail to obtain regulatory approval for some or all of our product candidates, we will have fewer commercial products, and correspondingly lower product revenues. Even if our product candidates receive regulatory approval, such approval may involve limitations on the indications and conditions of use or marketing claims for our products.
>
> Further, later discovery of previously unknown problems or adverse events could result in additional regulatory restrictions, including withdrawal of products. The FDA may also require us to perform lengthy Phase 4 post-approval clinical efficacy or safety trials. These trials could be very expensive. The FDA may also require us to amend our label based on outcomes of on-going Phase 4 commitment for OXAYDO. In addition, the FDA may not approve the labeling claims, including claims regarding abuse deterrence, that we believe are necessary or desirable for the successful commercialization of our products and product candidates. For example, the FDA approved label for ARYMO ER contains abuse-deterrent claims for the intravenous route of abuse, but the FDA did not approve the inclusion of abuse-deterrent claims for the oral and intranasal routes of abuse. The intranasal abuse-deterrent claim was blocked by another company's exclusivity.

2016 Form 10-K, at 34 (underlined emphasis added).

238. The 2016 Form 10-K further states, in relevant part:

> ***Our ability to market and promote our products in the United States by describing their abuse-deterrent features will be determined by the FDA-approved labeling for them.***
>
> The commercial success of our products and product candidates, if approved, will depend upon our ability to obtain FDA approved labeling describing their abuse-deterrent features or benefits. Our failure to achieve FDA approval of product labeling containing such information, or containing such information for all potential routes of abuse, will prevent or substantially limit our advertising and promotion of the abuse-deterrent features of our products and product candidates, if approved, to differentiate them from other opioid products containing the same active ingredients. This may make our products and if approved, our product candidates, less competitive in the market.
>
> The FDA has publicly stated that explicit claims that a product is expected to result in a meaningful reduction of abuse must be supported by randomized, double-blind, controlled clinical studies of the abuse potential of the drug and that explicit claims that a product has demonstrated reduced abuse in the community will be required to be supported by post-marketing data, including formal post-marketing studies evaluating the effect of abuse-deterrent formulations. Although

we intend to conduct such studies, there can be no assurance that our product candidates in development will receive FDA-approved labeling that describes the any or all of the abuse-deterrent features of such products. If the FDA does not approve labeling containing such information, we will not be able to promote such products based on some or all of their abuse-deterrent features, may not be able to differentiate such products from other opioid products containing the same active ingredients. For example, the FDA approved abuse-deterrent labeling for ARYMO ER for the intravenous route of abuse, but did not approve the inclusion of abuse-deterrent claims for the oral and intranasal routes of abuse. The intranasal abuse-deterrent claim was blocked by another company's exclusivity.

In addition, recent public comments from FDA and members of Congress have highlighted the importance of addressing the opioid abuse epidemic. Given the changing legislative and regulatory environment, it is difficult to predict how existing laws and regulations may affect the future approval and continued marketing of opioids, including those that fulfill current abuse-deterrent FDA guidance.

Because the FDA closely regulates promotional materials and other promotional activities, even if the FDA initially approves product labeling that includes a description of the abuse-deterrent characteristics of our product, the FDA may object to our marketing claims and product advertising campaigns. This could lead to the issuance of warning letters or untitled letters, suspension or withdrawal of our products from the market, recalls, fines, disgorgement of money, operating restrictions, injunctions or criminal prosecution. Any of these consequences would harm the commercial success of our products.

2016 Form 10-K, at 35 (underlined emphasis added).

239. Moreover, the 2016 Form 10-K states, in relevant part:

***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do.***

We face and will continue to face competition from other companies in the pharmaceutical, medical devices and drug delivery industries. Our approved products compete and our product candidates, if approved, will compete with currently marketed oral opioids, transdermal opioids, local anesthetic patches, stimulants and implantable and external infusion pumps that can be used for infusion of opioids and local anesthetics. Products of these types are marketed or in development by Purdue Pharma, Johnson & Johnson, Pfizer, Durect, Endo, Mallinckrodt, Zogenix, Elite Pharmaceuticals, Pain Therapeutics, Nektar, Collegium Pharmaceuticals, Inspirion, Teva, Actavis and others.Some of these companies and many others are applying significant resources and expertise to the challenges of drug delivery, and several are focusing or may focus on drug delivery to the intended site of action. Some of these current and potential future

> competitors may be addressing the same therapeutic areas or indications as we are. Many of our current and potential future competitors have significantly greater research and development capabilities than we do, have substantially more marketing, manufacturing, financial, technical, human and managerial resources than we do, and have more institutional experience than we do.
>
> As a result of these factors, our competitors may obtain regulatory approval of their products more rapidly than we are able to or may obtain patent protection or other intellectual property rights that allow them to develop and commercialize their products before us and limit our ability to develop or commercialize our product candidates. Our competitors may also develop drugs that are safer, more effective, more widely used and less costly than ours, and they may also be more successful than us in manufacturing and marketing their products.
>
> <u>Furthermore, if the FDA approves a competitor's 505(b)(2) application for a drug candidate before our application for a similar drug candidate, and grants the competitor a period of exclusivity, the FDA may take the position that it cannot approve our NDA for a similar drug candidate or that our label cannot reflect certain claims because they are barred by exclusivity. For example, while the FDA approved label for ARYMO ER contains an abuse-deterrent claim for the intravenous route of abuse, the FDA did not approve the inclusion of abuse-deterrent claims for the oral and intranasal routes of abuse. The intranasal abuse-deterrent claim was blocked by another company's exclusivity, which expires in October 2018</u>. We also believe that several competitors are developing extended-release oxycodone products, and if the FDA approves a competitor's 505(b)(2) application for an extended-release oxycodone product and grants exclusivity before our NDA for Egalet-002 is filed and approved, we could be subject to a delay that would dramatically reduce our expected market potential for Egalet-002. In addition, even if our 505(b)(2) application for Egalet-002 is approved first, we may still be subject to competition from other oxycodone products, including approved products or other approved 505(b)(2) NDAs for different conditions of use that would not be restricted by any grant of exclusivity to us.

2016 Form 10-K, at 58 (underlined emphasis added).

## V. DEFENDANTS ACTED WITH SCIENTER

240. Given the admitted significance of receiving abuse-deterrent labeling for ARYMO ER, Defendants' knowledge of Hatch-Waxman exclusivity provisions, and Defendants' admissions of following MorphaBond, Defendants knew or with deliberate recklessness disregarded MorphaBond's intranasal abuse-deterrent labeling exclusivity.

241. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Egalet, as well as the above-identified statements made by the Individual Defendants were materially misleading and/or omitted to state material facts; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.

242. The Defendants' scienter is indicated by the below-detailed facts, which give rise to a cogent and compelling inference of scienter.

243. Throughout the Class Period, Defendants knew or with deliberate recklessness disregarded that obtaining the intranasal abuse-deterrent labeling for ARYMO ER was impossibility or so unlikely that it was not a reasonable belief.

244. Given that ARYMO ER's value is derived from the abuse-deterrent labeling and not from the active compound, Defendants actively followed ARYMO ER's current and expected abuse-deterrent opioid competition and were also well-versed and knowledgeable concerning the processes and regulatory framework for achieving abuse-deterrent labeling and marketing exclusivity.

245. The market and the investing public, however, could not be expected to have known that MorphaBond's exclusivity would prevent ARYMO ER from receiving the intranasal abuse-deterrent labeling. To have discovered this, investors would have had to piece together numerous documents and statements through an in-depth investigation, have sophisticated knowledge and an understanding of the FDA regulatory framework applicable to 505(b)(2) NDAs and Hatch-Waxman exclusivity, and would have had to have a high level knowledge regarding MorphaBond, the FDA's approval of MorphaBond, and its label. Furthermore,

Defendants continued touting throughout the Class Period regarding the positive results of ARYMO ER's clinical studies (especially as to intranasal abuse), the Advisory Committee's vote, and Defendants' continued optimistic statements that ARYMO ER could receive and they expected ARYMO ER to receive the intranasal abuse-deterrent labeling was so strong that it overcame any other message that may have possibly been available in the market, if there was even any conflicting information at all. The fact that the market was not aware of the truth concerning Defendants' false and/or misleading statements and omissions concerning ARYMO ER's ability to receive intranasal abuse-deterrent labeling is substantiated by the abnormal volume and the material drop in the per share price of Egalet's common stock in response to the news announced on January 9, 2017.

246. As detailed below in paragraphs 247-378, Defendants' knew and/or with deliberate recklessness disregarded the FDA's regulatory landscape on 505(b)(2) NDAs, Hatch-Waxman exclusivity, and the information on MorphaBond when they represented it was "potential" for ARYMO ER to receive intranasal abuse-deterrent labeling.

***Defendants Knew or with Deliberate Recklessness Disregarded MorphaBond's Marketing Exclusivity Precluded Approval of ARYMO ER's Intranasal Abuse-Deterrent Labeling***

247. Throughout the Class Period, Defendants knew or with deliberate recklessness disregarded that obtaining the intranasal abuse-deterrent labeling for ARYMO ER was impossibility or so unlikely that it was not a reasonable belief. This is substantiated by FDA precedent, Defendants' own knowledge concerning the FDA's rules and regulations (especially as they apply to 505(b)(2) NDA's and Hatch-Waxman exclusivity), and Defendants' knowledge concerning MorphaBond, its 505(b)(2) NDA, and its labeling,

248. Notably, as further supported below, Radie admitted during the January 9, 2017 Conference Call, in response to a question by analyst Chiara Russo of Cantor Fitzgerald, that MorphaBond's exclusivity was not a "*surprise*." Specifically, Chiara Russo inquired "the exclusivity around the intranasal data, was that a surprise to you?". In response, Radie admitted "***we had considered it***, but we couldn't predict any ***definitive*** outcome based on previous exclusivity findings in this class" (emphasis added).

**FDA Precedent Establishes Defendants' Knew or with Deliberate Recklessness Disregarded that MorphaBond's Intranasal Abuse-Deterrent Labeling Exclusivity Attached upon Approval of its 505(b)(2) NDA**

249. The FDA has long equated the scope of the three-year new clinical study exclusivity with the extent of the approved labeling for a drug. In this case, the labeling of MorphaBond described intranasal abuse deterrence due to the product's physicochemical properties. Further, the FDA has consistently reasoned for nearly three decades that the three-year exclusivity associated with an approved product applies even where a later-filed 505(b)(2) application does not reference that product. This longstanding policy had been favorably subject to judicial review as of the date the ARYMO ER 505(b)(2) application was filed.

250. The Hatch-Waxman Amendments and related legislation have provided for a number of different incentives for both brand-name and generic drug companies in the form of "regulatory exclusivities." Sometimes termed "marketing exclusivities," these incentives consist of a period of time during which the FDA affords an approved drug protection from competing applications for marketing approval. The grant of regulatory exclusivity can prevent the issuance of requested labeling language sought by the applicant or even prevent the submission or effective approval of other ANDAs or 505(b)(2) NDAs.

251. Congress has established fifteen distinct regulatory exclusivities applicable to drugs, each with varying requirements to obtain and resulting benefits. JOHN R. THOMAS, PHARMACEUTICAL PATENT LAW 454-455 (3d ed. 2015). One such exclusivity is a "new drug product exclusivity," sometimes termed "new clinical study exclusivity." *Id.* at 461. This exclusivity applies to products that incorporate an active moiety that the FDA previously approved. However, in order to encourage improvements upon drugs that are already known, the Hatch-Waxman Amendments establish a three-year exclusivity for an NDA or 505(b)(2) NDA that contains reports of new clinical studies conducted by the sponsor that are essential to FDA approval of that application. 21 U.S.C. § 355(c)(3)(iv) (with respect to 505(b)(2) NDAs).

252. The Hatch-Waxman Amendments impose four pertinent requirements that an investigation must fulfill in order to qualify for new clinical study exclusivity. First, the study must be new, in that it could not have been previously used for another FDA drug approval. Second, the study must be a clinical study on humans, as compared to a preclinical study, and not a bioavailability or bioequivalence study. Third, the study must have been "conducted or approved" by the applicant. Finally, the study must be "essential to the approval" of the application or supplement. The FDA has defined the term "essential to the approval" as meaning "that there are no other data available that could support approval of the application." 21 C.F.R. § 314.108(a).

253. If an NDA or 505(b)(2) NDA fulfills these requirements, then the FDA will award new clinical study exclusivity that endures for three years commencing on the "date of approval of the application." 21 U.S.C. § 355(c)(3)(E)(iii). The three-year exclusivity applies to the "conditions of approval of such drug." *Id*.

254. The FDA has engaged in the consistent practice of applying pertinent three-year exclusivity to 505(b)(2) NDAs for nearly three decades, even where those applications do not reference the product awarded the exclusivity. In addition, as the Hatch-Waxman Amendments compel, prohibit the FDA from approving a 505(b)(2) NDA if it previously approved a drug for the same "conditions of approval." Not only had both practices been applied by the FDA for many years, they were both judicially confirmed as of the filing date of the ARMYO ER 505(b)(2) NDA. *See Veloxis Pharms., Inc. v. FDA*, 109 F.Supp.3d 104 (D.D.C. 2015).

255. On July 10, 1989, the FDA issued proposed regulations that spoke to this precise issue. Dep't of Health and Human Services, FDA, *Abbreviated New Drug Application Regulations*, 54 FED. REG. 29972 (July 10, 1989). Herein, the FDA explained:

> [W]hen exclusivity attaches to an active moiety or to an innovative change in an already approved drug, the submission or effective date of approval of ANDA's and 505(b)(2) applications for a drug with that active moiety or innovative change will be delayed until the innovator's exclusivity has expired . . . regardless of the specific listed drug product to which the ANDA or 505(b)(2) application refers.

*Id*. at 28897.

256. The FDA has applied this policy on several occasions. In 1999, the FDA assessed a 505(b)(2) application filed by Dey Laboratories with respect to DUONEB, an inhalation product for nebulization that combined ipratropium and albuterol in a single product. As the FDA explained to Dey:

> This combination has previously been approved as the Combivent Inhalation Aerosol, developed and marketed by another sponsor. This application is a 505(b)(2) application, referencing the albuterol inhalation solution and ipratropium solution products, but not the Combivent Inhalation Aerosol, which is still under exclusivity . . . .

FDA, Center for Drug Evaluation and Research, Administrative Documents, Application No. 20950 at 2 (May 27, 1999), (available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2001/20950_DuoNeb_admindocs.pdf).

257. The FDA was well aware that Dey's 505(b)(2) application did not reference the COMBIVENT product. Yet the FDA explained to Dey that, with respect to its application, "a full approval would likely not be possible now, due to pertinent exclusivity for Combivent—which expires in October 1999." *Id*. at 2.

258. The FDA confirmed this policy in 2010. In that case, Labopharm Inc. possessed a regulatory exclusivity for RYZOLT (tramadol hydrochloride ER tablets) (NDA 021745). Cipher Pharmaceuticals Inc. ("Cipher") subsequently filed a 505(b)(2) NDA with respect to its tramadol hydrochloride ER capsules (NDA 022370). Even though the Cipher 505(b)(2) NDA did not reference RYZOLT, the FDA observed that it could be delayed by the RYZOLT exclusivity if it was "seeking the same conditions of approval as are protected for Ryzolt." *See* Memorandum from Division of Anesthesia and Analgesia Products to Office of Generic Drugs re: Scope of Three-year Exclusivity Granted to Ryzolt (tramadol hydrochloride) extended release tablets (May 7, 2010) at 3.

259. The FDA again acted identically in the highly publicized COLCRYS (colchicine) matter. In that case, Mutual Pharmaceutical Co. ("Mutual") enjoyed a three-year exclusivity for the use of colchicine for acute gout flares that expired on July 30, 2012. Prior to that date, Mutual filed a citizen petition requesting in part that the FDA refrain from approving 505(b)(2) applications filed by other enterprises that did not reference its colchicine product COLCRYS. The FDA denied the request. FDA Letter to Gary L. Veron, Esq., Docket No. FDA-2010-P-0614 (May 25, 2011) (available at https://www.regulations.gov/document?D=FDA-2010-P-0614-0072). In doing so, however, the FDA expressly recognized that the three-year exclusivity would nonetheless apply. As the agency explained:

> FDA denies Mutual's request that any 505(b)(2) application for a single-ingredient oral colchicine product must necessarily cite Colcrys as its listed drug, irrespective of whether

> the proposed product shares the same strength, pharmacokinetic (PK) profile, or other characteristics such as dosage form or conditions of use. . . .
>
> FDA grants in part Mutual's request regarding labeling requirements for single-ingredient oral colchicine products. . . . [T]he labeling for a single-ingredient colchicine product seeking approval for prophylaxis of gout flares must inform healthcare providers that the lower dose colchicine regimen evaluated in the AGREE trial is adequate to treat an acute gout flare that may occur during chronic colchicine use, and thus the approval of such a product must await expiration of Colcrys' 3-year exclusivity for acute gout flares on July 30, 2012.

*Id*. at 3

260. The FDA discussed the issue again in 2015, this time in a case directly relating to MorphaBond. Here, the FDA issued a memorandum titled *Whether 3-Year Exclusivity for Embeda (Morphine Sulfate /Naltrexone Hydrochloride) ER Capsules (NDA 022321) blocks the approval of MorphaBond (Morphine Sulfate) ER Tablets (NDA 206544)*. In this document, the FDA considered whether an NDA with respect to EMBEDA ER Capsules ("Embeda") and its associated 3-year marketing exclusivity would preclude the FDA from approving the 505(b)(2) NDA associated with MorphaBond. The FDA concluded that the regulatory exclusivity associated with Embeda did not apply to the 505(b)(2) NDA for MorphaBond. The FDA reasoned that the NDA for Embeda was tied to its combination of two active ingredients, in contrast to the single active ingredient (morphine sulfate) of MorphaBond.

261. In reaching this conclusion, the FDA addressed the outcome in the event two separate drugs used the identical single-entity drug:

> Thus, in the case of an application submitted for a single entity drug that contains a single active moiety that has been previously approved (a non-NCE), if the application contains reports of new clinical investigations essential to approval of the application that were conducted or sponsored by or for the applicant, section 505(c)(3)(E)(iii) bars FDA from approving a 505(b)(2) NDA for such drug (i.e., another single entity drug containing that active moiety) for the exclusivity-protected conditions of approval for a period of 3 years. This exclusivity, however, does not bar FDA from approving a 505(b)(2) NDA for a drug containing a different active moiety. Neither does it block a 505(b)(2) NDA that does not otherwise seek approval for the exclusivity-protected conditions of

> approval (i.e., the conditions of approval for which new clinical investigations were essential).

262. The FDA further discussed the outcome when a single-entity drug seeks approval for a drug with the same active moiety to which exclusivity attached. The agency stated:

> If the 505(b)(2) application for a single-entity drug seeks approval for the same drug (active moiety) to which exclusivity has attached, then the second aspect of the scope inquiry applies. To determine whether the 505(b)(2) NDA is barred, FDA must also determine what exclusivity protected change was approved in the supplement. To do so, FDA examines the conditions of approval supported by the new clinical investigations (other than bioavailability studies) that were essential to approval of the supplement. If the 505(b)(2) NDA for a single-entity drug is for the same drug for the same exclusivity-protected change approved in the supplement, it will be blocked.

263. Although the agency discussed this in the context of a supplemental NDA, this logic applies where the first-approved drug received exclusivity through a 505(b)(2) NDA.

264. The U.S. District Court for the District of Columbia confirmed the FDA's longstanding practice in *Veloxis Pharmaceuticals, Inc. v. FDA,* 109 F.Supp.3d 104 (D.D.C. 2015). That litigation involved the 505(b)(2) NDA application of Veloxis for ENVARSUS XR, a tacrolimus formulation used for kidney transplant patients. The FDA had delayed final approval of ENVARSUS XR in view of the three-year exclusivity enjoyed by ASTAGRAF XL. Veloxis then filed a civil suit against the FDA, in part asserting that the ASTRAGRAF XL three-year exclusivity was inapplicable because the ENVARSUS XR 505(b)(2) NDA had not referenced that drug. *Id*. at 110-11.

265. The D.C. District Court readily rejected the arguments of Veloxis. Observing that the "plaintiff goes to great lengths to avoid the plain meaning" of the Hatch-Waxman Act (id. at 117) Judge Walton concluded that the longstanding FDA policy of tying the scope of the three-year exclusivity to a drug's conditions to approval comported with the statutory language. Further, Judge Walton ruled that agency practice was appropriate whether or not the subsequent application formally referenced the product subject to the three-year regulatory exclusivity.

**MorphaBond's 505(b)(2) NDA Approval and Labeling Substantiates Defendants' Scienter**

266. As previously detailed, on November 21, 2014, Inspirion submitted a 505(b)(2) NDA for an extended-release orally administered tablet with an active moiety of morphine and an active ingredient of morphine sulfate. The proposed product, identified under the trademark MorphaBond, was to be made available in dosages of 15, 30, 60, and 100 mg. The proposed indication for MorphaBond was the "management of pain severe enough to require daily, around-the-clock, long-term, opioid treatment and for which alternative treatment options are inadequate."

267. In filing its 505(b)(2) NDA for MorphaBond, Inspirion relied upon the FDA's previous safety and efficacy findings with respect to a third-party product, MS Contin (NDA 019516, morphine sulfate extended-release tablets). Inspirion conducted a clinical bioavailability study to "bridge" the safety and efficacy of MS Contin with MorphaBond. It also conducted a clinical study (Study M-ARER-002) to demonstrate that MorphaBond was less susceptible to abuse through intranasal manipulation.

268. On October 2, 2015, the FDA approved MorphaBond as the first single-entity extended release morphine product with labeling describing intranasal abuse-deterrent properties.

269. MorphaBond's labeling was consistent with FDA guidance published earlier in 2015 with respect to abuse-deterrent opioids. *See* FDA, April 2015 AD Opioid Guidance, at 22-25.

270. The FDA assigned exclusivity code M-189 to MorphaBond, which provided: "Labeling describing the expected reduction of abuse of single-entity morphine by the intranasal route of administration due to physicochemical properties." MorphaBond was entitled to a three-

year new clinical study exclusivity that commenced on the date of approval, October 2, 2015, and will expire on October 2, 2018.

271. On December 15, 2015, Egalet Corporation filed a 505(b)(2) NDA for its orally-administered tablet with an active moiety of morphine and an active ingredient of morphine sulfate. The proposed product, identified under the trademark ARYMO ER, was to be made available in dosages of 15, 30, and 60 mg. As with the MorphaBond 505(b)(2) NDA, the ARYMO ER application referenced a third-party product, MS Contin (NDA 019516, morphine sulfate extended-release tablets). The ARYMO ER 505(b)(2) NDA did not reference the MorphaBond approved NDA.

272. Egalet knew or deliberately disregarded that the FDA would not and could not approve the intranasal abuse-deterrent labeling requested as part of ARYMO ER's 505(b)(2) NDA until the three-year exclusivity associated with MorphaBond expired. In particular, as noted above, the MorphaBond 505(b)(2) NDA relied upon the FDA's previous safety and efficacy findings with respect to MS Contin. MorphaBond's sponsor, Inspirion, conducted a ***single*** non-bioavailability clinical study (Study Study M-ARER-002) in order to demonstrate that its product was less susceptible to abuse and to support its requested intranasal abuse-deterrent labeling.

273. Egalet (having knowledge concerning FDA law and regulation that also followed MorphaBond) would have been able to discern this state of affairs from an Inspirion's October 5, 2015 Press Release, which explained that "[t]he data from the clinical abuse potential study indicate that MorphaBond has properties that are expected to reduce misuse and abuse via the intranasal route of administration as the extended-release characteristics were largely maintained even after extensive manipulation of the formulation" was conducted (*supra* paragraph 104).

274. Egalet would have also consulted the label for MorphaBond, which discussed its abuse-deterrent properties and would have also been publicly available during October 2015. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2015/206544lbl.pdf (dated "10/2015").

275. In view of this publicly available information, Egalet, with knowledge of FDA law and practice would comprehend that MorphaBond would obtain a three-year exclusivity based upon the condition of approval of intranasal-abuse deterrence at the time its NDA was approved. The only plausible basis for MorphaBond's three-year exclusivity was Inspirion's clinical intranasal abuse study, Study M-ARER-002. This inference would have been obvious in view of Defendants' numerous statements recognizing MorphaBond and its conditions of approval in its publicly available statements, including, in part:

(a) Radie's acknowledgement during November 4, 2015 Confrence Call that:

> "This is a product [MorphaBond] that we've anticipated coming to the marketplace, as we modeled the market potential for ARYMO. We think that our product has some key differentiating features over MorphaBond. And we know, for example, that this product is crushable using electrical tools. We noted in the approval and their label that they do not have an oral claim

(b) statements released on August 4, 2016 observing that as "of June 30, 2016, the FDA has approved six ER/LA opioid analgesic products with labeling language regarding their abuse-deterrent properties. These include products with physical chemical barriers (reformulated OcyContin®, Hysingla® ER, MorphaBond™, and Xtampza™ ER) . . . ."); and

(c) Radie's statement during November 4, 2016 Conference Call stating:

> ours was the first advisory committee meeting where the FDA in their pre-meeting briefing book actually put the label section 9.2 of each of the approved ADF product, that was the first time that they had done that in an effort to share with the advisers kind of that evolutionary process around these label.).

276. The FDA's issuance of its April 2015 AD Opioid Guidance, which called for labeling of products with abuse-deterrent properties, would have also alerted Egalet that the FDA be awarded three-year exclusivity in such cases.

277. Moreover, the April 2015 AD Opioid Guidance would also have alerted Egalet that the FDA the scope of such abuse-deterrent labeling exclusivity would be based on this guidance. The April 2015 AD Opioid Guidance clearly states that: "[l]abeling language regarding abuse deterrence should describe the ***product's specific abuse deterrent properties*** as well as the ***specific routes of abuse*** that the product has been developed to deter."

278. Because Egalet took the same approach as Inspirion to obtain intranasal abuse-deterrent labeling, it was clear to Egalet that MorphaBond's three-year exclusivity would apply to the ARYMO ER 505(b)(2) NDA. Even before Egalet filed its 505(b)(2) NDA, a reasonable person with knowledge of FDA law and practice would have had to deliberately and recklessly disregarded its import, or had an unreasonable belief that ARYMO ER could possibly still get intranasal abuse-deterrent labeling despite publicly available information.

279. The FDA approved ARYMO ER on January 9, 2017. Predictably, with that approval, the FDA issued a statement titled "Impact of Exclusivity on Approval of Arymo ER," which is available at https://www.fda.gov/Drugs/DrugSafety/ucm535708.htm. The FDA explained:

> Another product, MorphaBond (morphine sulfate extended-release tablets), has marketing exclusivity for labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route due to physicochemical properties. Due to MorphaBond's marketing exclusivity, no other single-entity extended-release morphine product submitted in an abbreviated new drug application or 505(b)(2) application can be approved for that use at this time.

**An Expert in the Field of FDA Law Corroborates that Defendants' Knew or with Deliberate Recklessness Disregarded MorphaBond's Exclusivity Impact on ARYMO ER**

280. John R. Thomas ("Thomas") has been a professor of law at Georgetown University, Washington, D.C., since 2002. In that capacity, that capacity, he has taught courses in patent law, contract law, patent licensing, and food and drug law.

281. Thomas has been admitted both to the bar of the state of Maryland and to the patent bar Thomas had practiced patent law full-time as an associate attorney at the Finnegan, Henderson law firm in Washington, D.C., and on a part-time basis with Vossius & Partner in Munich, Germany. Additionally, Thomas holds a Bachelor of Science degree from Carnegie Mellon University, a Juris Doctor degree magna cum laude from the University of Michigan, and a Master of Laws degree in Patent and Intellectual Property Law with highest honors from the George Washington University.

282. Along with Professor Roger E. Schechter, Thomas is the co-author of the treatise PRINCIPLES OF PATENT LAW published by Thomson Reuters/West Publishing. Thomas also published the text PHARMACEUTICAL PATENT LAW with the Bureau of National Affairs, with a third edition published in 2015. Along with former Chief Judge Randall R. Rader of the Federal Circuit and Martin Adelman of George Washington University, Thomas was the co-author of a patent law casebook. Professor Roger Schechter of George Washington University and Thomas have also co-authored an intellectual property hornbook and copyright law treatise. Thomas has also published numerous law review articles and book chapters on intellectual property law.

283. Thomas has reviewed the substance and documents referenced above in paragraphs 249-279.

284. Based upon his review, it is Thomas's opinion that Egalet would have been well aware that that ARYMO ER would be precluded from receiving intranasal abuse-deterrent labeling as a result of the three-year exclusivity applicable to MorphaBond. Specifically, Egalet would have known MorphaBond three-year exclusivity attached at the time MorphaBond was approved by the FDA given the publicly available content of its label regardless of when the FDA listed such exclusivity in the Orange Book.

**Defendants are and were Knowledgeable of the Applicable FDA Law and MorphaBond**

285. As substantiated below by Defendants' own statements, Defendants' knew or with deliberate recklessness disregarded:

(a) the applicable FDA regulatory framework that granted MorphaBond's exclusivity upon the FDA's approval of MorphaBond's 505(b)(2) NDA on October 2, 2015; and

(b) the relevant content of MorphaBond's 505(b)(2) NDA and statements concerning based on the public availability of this information as least as early as October 2015, the content of MorphaBonds's labeling (especially Section 9.2) including the design and results of Inspirion's *in vitro* tests and its Study M-ARER-002 in support of receiving intranasal abuse-deterrent labeling available as least as early as October 2015,.

***Defendants' Were Well-Versed on the Pertinent Law Applicable to 505(b)(2) NDAs and the Granting and Impact of Hatch-Waxman Exclusivity***

286. Defendants knowledge or deliberate and reckless disregard to the FDA regulatory framework that prevented ARYMO ER from receiving intranasal abuse-deterrent language from

the October 2, 2015 FDA approval of MorphaBond's 505(b)(2) NDA is substantiated by Defendants' own statements.

287. First, the 2015 Form 10-K discussed the FDA's approval process and the requirements for labeling exclusivity. The 2015 Form 10-K was signed by Defendants Radie and Musial. Additionally, the Form 10-K also contained SOX certifications signed both Defendants Radie and Musial.

288. The 2015 Form 10-K discussed explained 505(b)(2) NDAs as well as marketing exclusivity to investors. Specifically, the 2015 Form 10-K stated:

> *Exclusivity*
>
> Upon NDA approval of a new chemical entity ("NCE"), which is a drug that contains no active moiety that has been approved by the FDA in any other NDA, that drug receives five years of marketing exclusivity during which FDA cannot receive any ANDA seeking approval of a generic version of that drug or any Section 505(b)(2) NDA, discussed in more detail below, that relies on the FDA's findings regarding that drug. ***A drug may obtain a three-year period of exclusivity for a change to the drug, such as the addition of a new indication to the labeling or a new formulation, during which the FDA cannot approve an ANDA or any Section 505(b)(2) NDA, if the supplement includes reports of new clinical studies (other than bioavailability studies) essential to the approval of the supplement.***
>
> An ANDA may be submitted one year before NCE exclusivity expires if a Paragraph IV certification is filed. If there is no listed patent in the Orange Book, there may not be a Paragraph IV certification, and, thus, no ANDA may be filed before the expiration of the exclusivity period.
>
> *Section 505(b)(2) NDAs*
>
> Most drug products obtain FDA marketing approval pursuant to an NDA or an ANDA. A third alternative is a special type of NDA, commonly referred to as a Section 505(b)(2) NDA, which enables the applicant to rely, in part, on the FDA's findings of safety and effectiveness in the approval of a similar product or published literature in support of its application.
>
> Section 505(b)(2) NDAs often provide an alternate path to FDA approval for new or improved formulations or new uses of previously approved products. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant and for which the applicant has not obtained a right of reference. If the Section 505(b)(2) applicant can establish that reliance on the FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may

> also require companies to perform additional studies or measurements to support the change from the approved product. ***The FDA may then approve the new product candidate for all, or some, of the label indications for which the referenced product has been approved, as well as for any new indication sought by the Section 505(b)(2) applicant.***
>
> To the extent that the Section 505(b)(2) applicant is relying on the FDA's findings of safety and effectiveness for an already approved product, the applicant is required to certify to the FDA concerning any patents listed for the approved product in the Orange Book to the same extent that an ANDA applicant would. Thus approval of a Section 505(b)(2) NDA can be stalled until all the listed patents claiming the referenced product have expired, until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, listed in the Orange Book for the referenced product has expired, and, in the case of a Paragraph IV certification and subsequent patent infringement suit, until the earlier of 30 months, settlement of the lawsuit or a decision in the infringement case that is favorable to the Section 505(b)(2) applicant. ***As with traditional NDAs, a Section 505(b)(2) NDA may be eligible for three-year marketing exclusivity, assuming the NDA includes reports of new clinical studies (other than bioavailability studies) essential to the approval of the NDA.***

2015 Form 10-K, at 22-23 (emphasis added).

289. Furthermore, the 2015 Form 10-K explained both listings in the Orange Book and Hatch-Waxman exclusivity:

> *Orange Book Listing*
>
> In seeking approval for a drug through an NDA, applicants are required to list with the FDA each patent whose claims cover the applicant's product. Upon approval of a drug, each of the patents listed in the application for the drug is then published in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book. Drugs listed in the Orange Book can, in turn, be cited by potential generic competitors in support of approval of an abbreviated new drug application ("ANDA"). An ANDA provides for marketing of a drug product that has the same active ingredients in the same strengths and dosage form as the listed drug and has been shown through bioequivalence testing to be therapeutically equivalent to the listed drug. Other than the requirement for bioequivalence testing, ANDA applicants are not required to conduct, or submit results of, preclinical or clinical tests to prove the safety or effectiveness of their drug product. Drugs approved in this way are commonly referred to as "generic equivalents" to the listed drug, and can often be substituted by pharmacists under prescriptions written for the original listed drug. The ANDA applicant is required to certify to the FDA concerning any patents listed for the approved product in the FDA's Orange Book. Specifically, the applicant must certify that: (i) the required patent information has not been filed; (ii) the listed patent has expired; (iii) the listed patent has not expired, but will expire on a particular date and approval is sought after patent expiration; or (iv)

> the listed patent is invalid or will not be infringed by the new product. The ANDA applicant may also elect to submit a section viii statement certifying that its proposed ANDA label does not contain (or carves out) any language regarding the patented method-of- use rather than certify to a listed method-of-use patent. If the applicant does not challenge the listed patents, the ANDA application will not be approved until all the listed patents claiming the referenced product have expired. A certification that the new product will not infringe the already approved product's listed patents, or that such patents are invalid, is called a Paragraph IV certification. If the ANDA applicant has provided a Paragraph IV certification to the FDA, the applicant must also send notice of the Paragraph IV certification to the NDA and patent holders once the ANDA has been accepted for filing by the FDA. The NDA and patent holders may then initiate a patent infringement lawsuit in response to the notice of the Paragraph IV certification. The filing of a patent infringement lawsuit within 45 days of the receipt of a Paragraph IV certification automatically prevents the FDA from approving the ANDA until the earlier of 30 months, expiration of the patent, settlement of the lawsuit, or a decision in the infringement case that is favorable to the ANDA applicant. The ANDA application also will not be approved until any applicable non- patent exclusivity listed in the Orange Book for the referenced product has expired
>
> *Exclusivity*
>
> Upon NDA approval of a new chemical entity ("NCE"), which is a drug that contains no active moiety that has been approved by the FDA in any other NDA, that drug receives five years of marketing exclusivity during which FDA cannot receive any ANDA seeking approval of a generic version of that drug or any Section 505(b)(2) NDA, discussed in more detail below, that relies on the FDA's findings regarding that drug. ***A drug may obtain a three-year period of exclusivity for a change to the drug, such as the addition of a new indication to the labeling or a new formulation, during which the FDA cannot approve an ANDA or any Section 505(b)(2) NDA, if the supplement includes reports of new clinical studies (other than bioavailability studies) essential to the approval of the supplement.*** An ANDA may be submitted one year before NCE exclusivity expires if a Paragraph IV certification is filed. If there is no listed patent in the Orange Book, there may not be a Paragraph IV certification, and, thus, no ANDA may be filed before the expiration of the exclusivity period.

2015 Form 10-K, at 22 (emphasis added).

290. As noted above, Defendants were acutely aware of the process for receiving exclusivity as well as the protections it afforded. In the 2015 Form 10-K, Egalet further discussed the materiality of intellectual property to its business, the patents it has licensed that are listed in the Orange Book, its vehement protection of its intellectual property, and the cadre

of technical personnel, advisors, consultants and other contractors it utilized. These statements further support Defendants' sophistication and knowledge concerning the particularities of ARYMO ER's intellectual property, including by extension any FDA-granted marketing exclusivity that may be granted as part of a 505(b)(2) NDA. Specifically, the 2015 Form 10-K states:

> **Intellectual Property**
>
> We regard the protection of patents, designs, trademarks and other proprietary rights that we own as critical to our success and competitive position. As of February 29, 2016, we owned fourteen issued patents within the United States, and an additional 70 issued foreign patents covering our product candidates or technology platform. The terms of the issued U.S. patents, extend to various dates between 2018 and 2033. We have acquired three U.S. patents, four pending U.S. patent applications and two pending Canadian patent applications directed to processes of manufacture, devices, and compositions related to SPRIX. One of these U.S. patents is listed in the Orange Book and expires in 2018. The term of our overall domestic and foreign patent portfolio related to our ARYMO ER and Egalet-002 product candidates and our Guardian Technology platform, excluding possible patent extensions, extends to various dates between 2022 and 2033, if pending patent applications in each of our patent families issue as patents.
>
> We have also licensed five Orange Book listed patents that cover OXAYDO and Acura Pharmaceuticals' Aversion Technology and these patents expire between 2023 and 2025.
>
> As of February 29, 2016, we owned ten pending patent applications under active prosecution in the United States, and an additional 34 pending foreign patent applications covering our product candidates and technology platform. We have one pending patent application in the United States and eleven pending foreign patent applications relating to ARYMO ER. The types of protection that may be afforded by any patents that may issue from these applications include, but are not limited to, composition of matter, process of manufacturing or method of use. Our patents provide protection in jurisdictions that include the United States, Canada, Brazil, Mexico, Europe, Eurasian, India, Hong Kong, Australia, New Zealand, Republic of Korea, China and Japan.
>
> Our policy is to patent the technology, inventions and improvements that we consider important to the development of our business, but only in those cases in which we believe that the costs of obtaining patent protection is justified by the commercial potential of the technology, and typically only in those jurisdictions that we believe present significant commercial opportunities to us. Otherwise, we

> publish the invention such that it becomes prior art in order for us to secure freedom to operate and to prevent a third party from patenting the invention before us. Our Guardian Technology and products related thereto are not in-licensed from any third party, and we own all of the rights to our product candidates.
>
> We also rely on trademarks and trade designs to develop and maintain our competitive position. We have trademarks for Egalet Guardian Technology and ARYMO ER in the United States, Canada and the European Union, and SPRIX in United States and Mexico.
>
> We also depend upon the skills, knowledge and experience of our scientific and technical personnel, as well as that of our advisors, consultants and other contractors. To help protect our proprietary know-how that is not patentable, we rely on trade secret protection and confidentiality agreements to protect our interests. To this end, we generally require our employees, consultants and advisors to enter into confidentiality agreements prohibiting the disclosure of confidential information and, in some cases, requiring disclosure and assignment to us of the ideas, developments, discoveries and inventions important to our business. Additionally, these confidentiality agreements require that our employees, consultants and advisors do not bring to us, or use without proper authorization, any third party's proprietary technology.

2015 Form 10-K, at 17.

291. Additionally, the 2015 Form 10-K also alerted investors of some the potential risks faced by Egalet in seeking approval for its drug candidates under Section 505(b)(2) as discussed in a section entitled *Risks Related to Our Business and Strategy*. In this section, Egalet discussed the effects that exclusivity could have on its ability to have one of its drug candidates approved by the FDA if the FDA approved a competitor's 505(b)(2) NDA before it approves Egalet's similar 505(b)(2) NDA. Egalet notably recognizes that approved products or other approved 505(b)(2) NDAs that have exclusivity will prevent labeling if the sought condition of use is the same as the approved product. In relevant part, the 2015 Form 10-K states:

> ***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do.***
>
> We face and will continue to face competition from other companies in the pharmaceuticals, medical devices and drug delivery industries. Our product

candidates, if approved, will compete with currently marketed oral opioids, transdermal opioids, local anesthetic patches, stimulants and implantable and external infusion pumps that can be used for infusion of opioids and local anesthetics. Products of these types are marketed or in development by Purdue Pharma, Johnson & Johnson, Pfizer, Durect, Endo, Mallinckrodt, Zogenix, Elite Pharmaceuticals, Pain Therapeutics, Nektar, Collegium Pharmaceuticals, Inspirion, Teva, Actavis and others. Some of these companies and many others are applying significant resources and expertise to the challenges of drug delivery, and several are focusing or may focus on drug delivery to the intended site of action. Some of these current and potential future competitors may be addressing the same therapeutic areas or indications as we are. Many of our current and potential future competitors have significantly greater research and development capabilities than we do, have substantially more marketing, manufacturing, financial, technical, human and managerial resources than we do, and have more institutional experience than we do.

As a result of these factors, our competitors may obtain regulatory approval of their products more rapidly than we are able to or may obtain patent protection or other intellectual property rights that allow them to develop and commercialize their products before us and limit our ability to develop or commercialize our product candidates. Our competitors may also develop drugs that are safer, more effective, more widely used and less costly than ours, and they may also be more successful than us in manufacturing and marketing their products.

***Furthermore, if the FDA approves a competitor's 505(b)(2) application for a drug candidate before our application for a similar drug candidate, and grants the competitor a period of exclusivity, the FDA may take the position that it cannot approve our NDA for a similar drug candidate. For example, we believe that several competitors are developing extended-release oxycodone products, and if the FDA approves a competitor's 505(b)(2) application for an extended-release oxycodone product and grants exclusivity before our NDA for Egalet-002 is filed and approved, we could be subject to a delay that would dramatically reduce our expected market potential for Egalet-002. Additionally, even if our 505(b)(2) application for Egalet-002 is approved first, we may still be subject to competition from other oxycodone products, including approved products or other approved 505(b)(2) NDAs for different conditions of use that would not be restricted by any grant of exclusivity to us.***

In addition, competitors have developed or are in the process of developing technologies that are, or in the future may be, the basis for competitive products. Some of these products may have an entirely different approach or means of accomplishing similar therapeutic effects than our product candidates. Our competitors may develop products that are safer, more effective or less costly than our product candidates and, therefore, present a serious competitive threat to our product offerings.

> The widespread acceptance of currently available therapies with which our product candidates will compete may limit market acceptance of our product candidates even if commercialized. Oral medication, transdermal drug delivery systems, such as drug patches, injectable products and implantable drug delivery devices are currently available

2015 Form 10-K, at 55 (emphasis added).

292. Furthermore, on June 21, 2016, the Company presented at the JMP Securities Life Sciences Conference ("JMP Conference"). During the JMP Conference, Defendant Radie presented an update of Egalet's products, including ARYMO ER. Defendant Radie explained that in developing ARYMO ER that Defendants were well aware of the content of the April 2015 AD Guidance and that Defendants took this it into account. Specifically, Radie stated:

> I mentioned positive tailwinds for those working in this space. And I just point to a couple of here, the FDA issued guidance, final guidance for sponsors like Egalet to what are the ways that studies ***that we can do as we develop these products to actually achieve abuse-deterrent claims in the label***. And that guidance was finalized in April of last year. So there's now a clear path forward for the types of work and the data that's expected to achieve abuse-deterrent claims. Since then, not since then, but over that time the FDA is now approved six different products. So they're not only talking about it, but they're walking the talk and we can talk more about those products, as we go through this.
>
> [* * *]
>
> I mentioned on October 14 PDUFA date, this product also deters abuse via snorting, it's very difficult to crush. Our data packages three doses where we showed bioequivalence to a reference drug MS Contin at 15, 30 and 60 milligrams, those three doses make up about 90% of all of the prescriptions written for extended release morphine***. And then we've done the battery of abuse-deterrent studies required in that guidance,*** I mentioned earlier by the FDA . . . .

Emphasis added.

293. On July 12, 2016, the Company presented at the Cantor Fitzgerald's 2nd Healthcare Conference ("Cantor Conference"). During the Cantor Conference, Musial presented an update of Egalet's products, including ARYMO ER. Defendant Musial explained that in developing ARYMO ER that Defendants were well aware of the content of the April 2015 AD

Guidance and that the Defendants took it into account. During the Cantor Conference, Musial stated in relevant part:

> Additionally, the FDA and other legislative bodies have been very supportive of abuse-deterrent opioids. We had President Obama's $1.1 billion abuse-deterrent plan earlier this year, we have state legislators that are making patient access reimbursement more attainable. ***Obviously the FDA has been very supportive by issuing the recipe book or the final guidance. They have now approved six opioids with abuse-deterrent claims in our label. And recently there's been two very positive ad coms for both Teva's drug, as well as Pfizer's drug. And we will have an ad com in August*** [the August 4, 2016 Advisory Committee Meeting] ***and we have benefitted obviously from the learnings of seeing these other add coms go before us.***

Emphasis added.

294. Also, in the CDER Summary Review, the FDA discussed its review of ARYMO ER and further explained its decision to approve ARYMO ER while also discussing its reasoning why the FDA did not grant ARYMO ER its sought intranasal abuse-deterrent labeling.

295. Specifically, the CDER stated the following regarding the FDA's decision not to grant ARYMO ER's intranasal abuse-deterrent labeling:

> Arymo ER will be the second single-entity extended-release morphine product with abuse-deterrent (AD) properties on the US market. Morphabond (NDA 206544) was the first,approved on October 2, 2015, with labeling that describes in vitro data supporting that Morphabond has physiochemical properties expected to make abuse via injection difficult, and clinical data from a human abuse potential study and in vitro data that support the conclusion that Morphabond has physicochemical properties that are expected to reduce abuse by the intranasal route of administration. Morphabond qualified for 3-year exclusivity, which will expire on October 2, 2018, 3 years after the date of approval. This exclusivity is currently reflected in the Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), with Exclusivity Code M-189, described as "labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due to physicochemical properties".
>
> As described below and during the August 4, 2016, joint meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee, a clinical abuse potential study demonstrated that Arymo ER has properties that can be expected to reduce

> abuse by the intranasal route. ***However, because the scope of Morphabond's exclusivity is for labeling describing the expected reduction of abuse of single-entity extended-release morphine by the intranasal route of administration due to physicochemical properties, a 505(b)(2) application (or ANDA) for a single-entity extended-release morphine product generally could not be approved for this same condition of approval until the expiration of Morphabond's 3-year exclusivity, i.e., until October 2, 2018. <u>Thus, the Applicant has sought approval for Arymo ER without this exclusivity-protected condition of approval, and the drug will not be approved with this exclusivity-protected condition of approval</u>.*** The Agency determined, however, that Arymo ER (1) could be approved with labeling stating that in vitro data demonstrate that Arymo ER has physiochemical properties that make abuse by injection difficult, and (2) otherwise meets the requirements for approval.

CDER Summary Review, at 3 (emphasis added).

296. Thus, here the CDER substantiated that Egalet did not even seek approval of ARYMO ER without the condition of approval supporting intranasal labeling. This statement serves as admission by Defendants that at the time they submitted the 505(b)(2) NDA for ARYMO ER that it could not be approved on the basis of its 067-EG-009 Study and receive the intranasal abuse-deterrent labeling it sought.

***<u>Defendants' Closely Followed MorphaBond and Therefore Knew or with Deliberate Recklessness Disregarded MorphaBond's Intranasal Labeling Exclusivity</u>***

297. Throughout the Class Period, Defendants closely followed MorphaBond's approval, the product's labeling, the details of the only clinical study (Study M-ARER-002) that Inspirion submitted in support of MorphaBond's 505(b)(2) NDA and intranasal abuse-deterrent labeling, and MorphaBond's progress towards commercialization.

298. The paragraphs *infra* in 299-330 establish not only that Defendants' admitted that they followed the progress of MorphaBond, but were aware of its labeling and clinical studies.

*May 7, 2016 – Conference Call: First Quarter 2015 Earnings Call*

299. On May 7, 2015, Egalet issued a press release announcing its financial results for the first quarter 2015 for the period ended March 31, 2015. Later the same day, Egalet held a conference call to discuss the first quarter 2015 financial results ("May 7, 2015 Conference Call").

300. During the May 7, 2015 Conference Call, Radie confirmed that he and Egalet were aware of MorphaBond, and attempted to downplay their knowledge about the product and its potential effect on ARMYO ER. Specifically, Defendant Radie stated in response to a question from analyst Annabel Samimy from Stifel Nicolaus:

> **Annabel Samimy**
>
> Okay. Great, and if I can move on to the other products, the abuse deterrent products, can you just talk a little bit about how you see the competitive environment shaping up right now that obviously, since this new developments on the morphine side and new developments on the oxycodone side, so maybe you can just layout the landscape for us a little bit?
>
> **Bob Radie**
>
> Sure Annabel. So, as I think we've always believed on the morphine side, there just generally is -- looks to be less players in that space. We like, you have read that Pfizer has been talking at least towards the end of last year about reintroducing EMBEDA to the marketplace. So, we're not aware at this point of that product resurfacing or being commercially made available. We do continue to monitor that. We are expecting that product to be reintroduced into the marketplace, and other than that, it appears that, there really aren't other significant players. ***I think there was a product filed by Inspirion [ph]. We don't know a lot about that product, nor do we know, but you know, that they've stated publically that they don't have plans to commercialize that on their own.***
>
> ***So, to be determined when that product comes to market and we don't -- we'll obviously keep a close eye on its profile, but I think that, at least as it relates to competition and the environment for Egalet-001, we know that we have a highly differentiated product. We know that this is a large market, 7.1 million prescriptions, the most all of the extended release opioids is written from working related products***. So we think that there is an opportunity for our differentiated product to be on the market and obviously we think that our approach is very different than the Pfizer EMBEDA approach which is, as you know, an agonist-antagonist approach and, I think there's a lot of information in the marketplace that says that physicians prefer, if given options, the sort of physical chemical barrier approach to abuse deterrents versus adding another active pharmaceutical ingredient to the.

Emphasis added.

*November 4, 2015 – Conference Call*

301. During the November 4, 2015 Conference Call, Defendant Radie discussed MorphaBond's labeling in contrast to ARYMO ER. Radie's statements during this call further establish his and Egalet's knowledge or reckless disregard for MorphaBond's intranasal abuse-deterrent label exclusivity as he acknowledged not only the approval of MorphaBond's NDA, but he also discussed specific aspects of MorphaBond's label. Furthermore, Defendant Radie's statements confirm that he and Egalet were closely following the approval of MorphaBond and its potential effect on the market and ARMYO ER. Specifically, Defendant Radie stated in response to a question from analyst Louise Chen from Guggenheim Partners, LLC:

> **Louise Chen**
>
> So I had a few here. First question I had was you mentioned business development. I'm curious what you are seeing in terms of opportunities there and what interests you? And then secondly, is there any update on licensing your products outside the U.S.? I know you're very focused on U.S. pipeline advancements, but just curious what you're thinking there? And then the last thing is we get a lot of questions on this, so I'll ask it to you***, it's just on the MorphaBond approval and what you think of that for the market landscape?***
>
> [* * *]
>
> **Robert Radie**
>
> ***And the last question I think was around MorphaBond. This is a product that we've anticipated coming to the marketplace, as we modeled the market potential for ARYMO. We think that our product has some key differentiating features over MorphaBond.*** And we know, for example, that this product is crushable using electrical tools.
>
> ***We noted in the approval and their label that they do not have an oral claim***. And I think everyone is aware that we actually have reported out on very positive human abuse liability study for ARYMO, Category 3 study, so we would anticipate submitting that as a key part of our label and getting an oral claim. ***And we also note that there is no alcohol interaction data in the label.*** And we believe that there maybe an opportunity for us to differentiate ARYMO in regards to that product as well.

> We don't really have a lot of visibility in terms of Inspirion's plans. We've heard that they are planning to commercialize this product on their own, but it's our understanding that that might be sometime in the second half of 2016, and again that's a bit speculative on our part.

Emphasis added.

*<u>January 11, 2016 – Investor Presentation: J.P. Morgan's Annual Healthcare Conference</u>*

302. As reproduced in paragraph 130, slide 18 of the January 11, 2016 Presentation clearly stated that MorphaBond had intranasal labeling. Slide 18 serves as Defendants' own admission that they were aware of MorphaBond's labeling and its content.

*<u>March 9, 2016 – Conference Call</u>*

303. During the March 9, 2016 Conference Call, Defendant Radie discussed the potential extension of exclusivity for one of Egalet's other products, SPRIX. Radie's statements further establish his and Egalet's knowledge of the FDA's rules and regulations regarding exclusivity. Specifically, Defendant Radie stated in response to a question from analyst Chiara Russo from Cantor Fitzgerald:

> **Chiara Russo**
>
> Okay. Awesome and then my question is about the SPRIX, I know you guys have toyed with the idea of doing some lifecycle expansion on the SPRIX product. Is there any updates on your thoughts around that?
>
> **Bob Radie**
>
> Yeah, sure, really nothing we can provide you at this point in time. Suffice to say that we're spending a fare amount of time and effort looking at ways that we could extend the exclusivity period for this product.
>
> It's obviously in our best interest to do so and as soon as we have a bit more visibility on our path to doing that and what it might mean we'll be reporting that out to more publically.

304. As Egalet's prospects were heavily reliant upon developing abuse-deterrent drugs by employing its Guardian Technology, Defendants closely followed developments both in the political landscape and regulatory developments

305. During the March 9, 2016 Conference Call, Defendant Radie acknowledged that he and Egalet were closely following all the developments concerning prescription drug abuse with focus on opioid abuse and misuse. Specifically, Defendant Radie stated: "[w]e're obviously keeping very close track to all of the activities as we outlined in the beginning of our earnings call here, just really a form of activities around this whole area of prescription drug abuse and misuse particularly about opioids."

*March 11, 2016 – 2015 Form 10-K*

306. Defendants further recognized in Egalet's 2015 Form 10-K, that "[i]f approved, ARYMO ER would compete against branded and generic, long-acting morphine products labeled for the treatment of moderate to severe pain" and listed included MorphaBond among ARYMO ER's prospective competitors stating "Inspirion Delivery Technologies' MorphaBond received FDA approval in October of 2015 and it is expected to become commercially available by the end of 2016." 2015 Form 10-K, at 18-19.

307. Egalet's 2015 Form 10-K further substantiates that it was following which abuse-deterrent products were receiving FDA approval as well as content of the labeling, including notably, MorphaBond and Embeda. Specifically, the 2015 Form 10-K states:

> *Approved AD products*: As of February 27, 2015, there are five products approved with AD language in the product label: Purdue Pharmaceutical's products OxyContin, Hysingla™ ER and Targiniq ER™, Pfizer's product ***Embeda®*** and ***Inspirion's product MorphaBond™***. In addition, our product OXAYDO has data from an intranasal human abuse potential study in its label, performed prior to when the FDA AD Guidance was issued, that demonstrates how OXAYDO was designed to discourage abuse via snorting—the most common route of abuse of oxycodone-based products.

2015 Form 10-K, at 9 (emphasis added).

*April 5, 2016 – April 2016 Investor Presentation*

308. As reproduced in paragraph 147, slide 12 of the April 2016 Investor Presentation clearly stated that MorphaBond had intranasal labeling.

309. Slide 10 serves as Defendants' own admission that they were aware of MorphaBond's labeling and its content.

*May 10, 2016 – Conference Call*

310. During the May 10, 2016 Conference Call, Defendant Radie discussed the FDA's movement to abuse-deterrent formulations of opioids, acknowledged that MorphaBond had been approved by the FDA, and acknowledged that Egalet no longer believed that MorphaBond was being commercialized. Radie's statements further establish that both he and Egalet closely followed any developments concerning the FDA's evaluation of opioids and issues surrounding their abuse and that they closely followed the development of abuse-deterrent opioid drugs and their labeling. Notably, Defendant Radie's statements substantiate that Radie and Egalet were acutely aware of the labeling MorphaBond received. Specifically, Defendant Radie stated in response to a question from an unidentified analyst:

> **Unidentified Analyst**
>
> I just want to ask Stan, if you've noticed any change in tune with the FDA with regard to removing non-abuse-deterrent formulations off the market and I know that they want mostly abuse-deterrent formulations on but you've to go through a whole process to I guess petition to get the generics. So can you just tell me how -- is that process is changing at all or if there is an increased urgency to get these [indiscernible] formulations off.
>
> **Bob Radie**
>
> I think that as we said earlier, we continue to hear Dr. Throckmorton say very vocally that the plan is to move towards all opioids being in an ADF form and certainly as we engage expert regulatory council the feedback that we're getting from them is that we have never been closer to that point. I don't think any of us know exactly when that moment is going to come, but one of the things that i think is an interesting phenomenon is that I'll use ARYMO as an example. ***If***

> ***ARYMO is approved and we certainly are anticipating that, it's going to be the first time that the agency has you know multiple choices, so in this case with [indiscernible] approvals and marketing we know MorphaBond has recently been approved although we don't believe that product is still being commercialized, but with the approval of ARYMO it would be the first time that the FDA would say that there were three of abuse-deterrent extended release forms of long acting morphine available on the market.***
>
> If Pfizer's product, I know they're having an Ad Com coming up in a few weeks here. If Pfizer's product gets approved with Oxycodone with [indiscernible] ER and ***then that product it will be the first time that the FDA has three extended release Oxycodone abuse-deterrent products with label claims available on the market*** and I think that we're starting to get to the point where there's critical mass that's not been the case up to now. ***Really hasn't been that critical mass of options and choices for physicians and so I think it's going to get more interesting as more of these products get approved and there are many more in development which could I think put the FDA in a more comfortable place to start to think about the best way to make that transition but all signals and all indicators coming directly from the agency would indicate that that's where they're moving towards.***

Emphasis added.

*May 11, 2016 – Presentation: Bank of America/Merrill Lynch Health Care Conference*

311. As reproduced in paragraph 157, slide 11 of May 11, 2016 Presentation clearly states that MorphaBond had intranasal labeling.

312. Slide 10 serves as Defendants' own admission that they were aware of MorphaBond's labeling and its content.

*June 9, 2016 – Presentation: Jefferies 2016 Healthcare Conference*

313. On June 9, 2016, Musial presented an update of Egalet's products, including ARYMO ER at the Jefferies 2016 Healthcare Conference ("Jefferies Conference). During his presentation, Musial explained that in developing ARYMO ER that Defendants were well aware of the content of the April 2015 AD Guidance and that the Defendants took it into account. Moreover, Musial discussed potential labels for ARYMO ER and existing labels for Embeda and MorphaBond. During the Jefferies Conference, Musial stated in relevant part:

> So we've completed all of the requisite studies. We filed our NDA in December of last year and we have a PDUFA date of October this year. To develop ARYMO, we conducted bioequivalent studies ***and a thorough battery of abuse deterrent studies, which follow the FDA guidance***. We demonstrated bioequivalence to the reference listed drug MS Contin at 15, 30 and 60 milligrams. We had very strong Category 1 test results and we showed statistically significant abuse deterrent results in Category 3, human abuse potential studies.
>
> As I said all of those data went into the NDA package. It was accepted by the FDA in February and is on file as we speak. When we look at the other approved morphine – extended-release morphine products, we think the novelty of our Guardian Technology in the strength of our abuse deterrent data can support a differentiated label. When you look at Pfizer drug EMBEDA, which is an agonist/antagonist drug, they have a black boxed warning around alcohol dose dumping. We don't believe we'll have that with our product. That product is available today and is being promoted by Pfizer.
>
> ***The other product is MorphaBond. It was approved or gotten approved by its sponsor Inspirion, which is a private company. It does not have any oral claims in its label. And although approved in October 2015, we haven't seen the product launch as of yet.*** Similar to the immediate-release market, the market for extended-release opioids is significant. The morphine market actually has more annual prescriptions than oxycodone. So again when you just look at branded average pricing single-digit penetration, this can be a very large market opportunity again for Egalet.

Emphasis added.

_June 21, 2016 – June 2016 Investor Presentation and the JMP Conference_

314. As reproduced in paragraph 166, slide 12 of June 2016 Investor Presentation clearly states that MorphaBond had intranasal labeling.

315. Slide 12 serves as Defendants' own admission that they were aware of MorphaBond's labeling and its content.

316. Furthermore, during the JMP Conference, Radie admitted that Defendants were knowledgeable about MorphaBond's label and also acknowledge that they were following Embeda:

> ***There are two other abuse-deterrent extended release morphines available of commercial – I'm sorry approved.*** One of which is currently being commercialized Embeda, MorphaBond, it was approved in February, but we're not really sure what the sponsors commercialization plans are at this point. Embeda is a Pfizer drug; it's a different approach to abuse-deterrence using an agonist antagonist approach, which we believe our technology has some

> significant advantages over. ***MorphaBond is a chemical physical barrier approach like ours, although they did not seek an oral claim.*** So we think if they do start commercializing we'll have advantages, but I want to caveat all just to say that 98.5% of the extended release morphine market is a non-abuse deterrent forms.

Emphasis added.

*July 12, 2016 –Investor Presentation at Cantor Fitzgerald's 2nd Healthcare Conference*

317. On July 12, 2016, during the Cantor Conference, Musial presented an update of Egalet's products, including ARYMO ER. Defendant Musial explained that in developing ARYMO ER that Defendants were well aware of the content of the April 2015 AD Guidance and that the Defendants took it into account. Moreover, Musial discussed potential labels for ARYMO ER and the existing labels for Embeda and MorphaBond. During the Cantor Conference, Musial stated in relevant part:

> Our regulatory pathway for this product was a bioequivalence pathway so we showed bioequivalence at 15 milligrams, 30 milligrams, 60 milligrams against the reference drug, MS Contin. Additionally, ***we followed all of the FDA guidance and interacted with them regularly with regards to all of our Category 1 and Category 3 abuse-deterrent studies.*** We've shown statistical significance in all of these studies and really have a robust package that we've put forth to the FDA.
>
> ***What I'm showing on this slide is the comparison to the two other extended-release morphine products that are approved. So we have Pfizer's EMBEDA product that has claims for oral, intranasal and injection. You may recall that Pfizer's product is an agonist/antagonist so it's a chemical barrier to entry, it's not a physical/chemical barrier***. They have a black box warning around alcohol dose dumping. We don't see that with our product, we also don't have a food effect with our product. Most recently, EMBEDA did about 22,000 scripts in the first quarter. So we're very encouraged by their traction and look to that as a surrogate for our launch.
>
> ***There's a private company called Inspiron, where the MorphaBond product was approved in October of last year. We still haven't seen that product launched. We're not sure what the commercial plans are for that product, but we know it doesn't have oral claims its label.***

Emphasis added.

*August 4, 2016 – Sponsor Briefing for the Joint Meeting of the FDA's AADPAC and DSaRM*

318. In support of their Application for ARYMO ER, Egalet drafted and submitted to the FDA a "Sponsor Briefing Document" for the FDA's August 4, 2016 Advisory Committee Meeting

319. Egalet described the purpose of the Sponsor Briefing Document as:

> The purpose of this joint Advisory Committee meeting is to provide a forum for the Committee members to discuss and provide guidance to the FDA on the approvability and abuse-deterrent labeling language for Arymo ER. This briefing document was prepared in order to provide the Advisory Committee members the data needed to assist in making these determinations and answering the questions posed by the FDA.

320. In relevant part, Egalet acknowledged in the Sponsor Briefing Document that MorphaBond had already been approved by the FDA:

> 2.3 Role of Abuse-Deterrent Technology One approach to combat opioid abuse is the development of opioid formulations with abusedeterrent features. ***As of June 30, 2016, the FDA has approved six ER/LA opioid analgesic products with labeling language regarding their abuse-deterrent properties.*** These include products with physical chemical barriers (reformulated OxyContin®, Hysingla® ER, ***MorphaBond***™, and Xtampza™ ER) as well as combination agonist/antagonist opioid products (Embeda® and Targiniq™ ER).

Emphasis added.

321. Furthermore, Egalet acknowledged that at the time of the August 4, 2016 Advisory Committee Meeting that there were only two FDA-approved abuse deterrent extended-release morphine products: MorphaBond and Embeda. Specifically, the Sponsor Briefing stated:

> **2.5 Description and Utilization of Currently-Approved Abuse-Deterrent ER Morphine Products**
>
> Currently, two abuse-deterrent ER morphine products are approved in the U.S.:
>
> - **Embeda** is a morphine sulfate and naltrexone hydrochloride combination tablet that uses an agonist/antagonist mechanism for abuse deterrence. Embeda is formulated to release sequestered opioid antagonist upon physical manipulation. This abuse-deterrent feature is expected to reduce the potential

for abuse by oral ingestion, insufflation, and IV injection. Embeda was approved in 2009, removed from the market in 2011 for stability issues, and reintroduced to the market in late 2015. Product considerations include: o Dose-dumping in the presence of alcohol, which is included as a boxed warning in the product label, related to the risk of overdose and death

  - Potential for acute opioid withdrawal following ingestion of chewed or crushed product (Ruan et al., 2010)
  - Ability to syringe the product, exposing abusers to the health risks of IV injection

- **MorphaBond** is a morphine sulfate tablet with physical and chemical barriers that is not currently marketed. Data on the oral human abuse potential and extent of its resistance to small volume extraction could not be found in the public domain.

322. Moreover, Egalet explained that during the process of developing ARYMO ER that it "consulted with experts in the development of abuse-deterrent opioids to ensure the appropriate methods were used to evaluate Arymo ER."

323. Defendants' statements in the Sponsor Briefing Document further substantiate their knowledge or deliberate and reckless disregard when making the identified false and/or misleading statements alleged herein.

*August 4, 2016 – FDA Briefing Document*

324. For the August 4, 2016 Advisory Committee Meeting, the FDA prepared the FDA Briefing Document for the Advisory Committee. The FDA Briefing Document was made available to Defendants.

325. The FDA Briefing Document discussed the currently approved ER opioid products that currently contained labeling language concerning the studies conducted to support their abuse-deterrent properties, including MorphaBond. The FDA Briefing Document states, in relevant part:

> There are six approved extended-release/long-acting opioid analgesic products with labeling language describing studies conducted in support of abuse-deterrent properties; OxyContin (oxycodone extended-release tablets), Targiniq

> (oxycodone and naloxone extended-release tablets), Embeda (morphine sulfate and naltrexone extended-release capsules), Hysingla ER (hydrocodone extended-release tablets), Morphabond (morphine sulfate extended-release tablets), and Xtampza ER (oxycodone extended-release capsules). In the background package you will find the abuse-deterrent labeling language for each of these products. You will see that over time, we have endeavored to make the labeling language align more closely to the recommendations put forth in the 2015 guidance mentioned above. The language regarding the abuse-deterrent properties of Embeda, OxyContin, Targiniq ER, and Hysingla was approved prior to the issuance of the final guidance, and Morphabond and Xtampza ER following the final guidance.
>
> [* * *]
>
> Morphabond, an extended-release formulation of morphine sulfate, approved in 2015, is the second extended-release morphine product with abuse-deterrent labeling. Morphabond has physicochemical properties expected to make abuse via injection difficult. Data from human abuse potential studies as well as in vitro data also support that these properties are expected to reduce abuse by the intranasal route of administration.

FDA Briefing Document at 2.

326. The FDA Briefing Document also reproduced MorphaBond's Section 9.2 abuse-deterrent labeling. MorphaBond's Section 9.2 labeling discussed both Inspirion's *in vitro* studies and Study M-ARER-002, including their results and design. Specifically, the FDA Briefing Document states, in relevant part:

> **Opioids with Abuse-Deterrent Labeling: Section 9.2 Drug Abuse**
>
> Based on feedback from previous advisory committee meetings where abuse-deterrent opioid analgesics were discussed, included here are excerpts from the labels of approved opioids analgesics with abuse-deterrent labeling, specifically Section 9.2, which describes the in vitro and in vivo studies conducted to support the abuse-deterrent properties. The products are listed in the order in which they were approved.
>
> **MORPHABOND (morphine sulfate) extended-release tablets [NDA 206544]**
>
> Approval Date: October 2, 2015
>
> *<u>Abuse Deterrence Studies</u>*

MORPHABOND is formulated with inactive ingredients that make the tablet more difficult to adulterate for misuse and abuse while maintaining extended-release characteristics even if the tablet is subjected to physical manipulation, and/or chemical extraction. To evaluate the ability of the abuse-deterrent technology to reduce the potential for abuse of MORPHABOND, a series of in vitro laboratory manipulation, extraction, and syringeability, studies was conducted. An in vivo clinical abuse potential study was also conducted. The results of these studies are summarized below. Overall, the results indicate that MORPHABOND has properties that are expected to reduce abuse or misuse via injection or insufflation; however, abuse by these routes is still possible.

In Vitro Testing

MORPHABOND has been tested in vitro using methods of manipulation that drug abusers commonly use for preparation of extended-release opioids for administration by various routes, including oral consumption, intranasal insufflation, injection, and smoking.

Abusers may manipulate extended-release opioids in order to prepare the tablets for oral, intranasal, or intravenous administration. ***The laboratory test data demonstrated that, relative to morphine sulfate extended-release tablet, MORPHABOND has increased resistance to cutting, crushing, or breaking using a variety of tools***. When subjected to a liquid environment the manipulated MORPHABOND formulation forms a viscous material that resists passage through a needle.

*Clinical Studies*

***A randomized, double-blind, double-dummy, placebo-controlled, single-dose four-way crossover study in 25 non-dependent recreational opioid users with a history of intranasal drug abuse was performed to determine the relative bioavailability and abuse potential of crushed intranasal MORPHABOND 60 mg tablets compared with crushed intranasal morphine sulfate extended-release tablet 60 mg tablets, and intact orally administered MORPHABOND 60 mg tablets. The intact oral tablets were included as a reference for evaluating abuse potential after manipulation and administration via an unintended route.***

***Drug liking was measured on a 100 mm bipolar visual analog scale (VAS) where 50 represents a neutral response of neither liking nor disliking, 0 represents maximum disliking, and 100 represents maximum liking. Response to whether the subject would take the study drug again was also measured on a bipolar scale of 0 to 100 where 50 represents a neutral response, 0 represents the strongest negative response ('definitely would not take drug again') and 100 represents the strongest positive response ('definitely would take drug again').***

***Intranasal administration of crushed MORPHABOND was associated with statistically significantly lower drug liking ($E_{max}$) scores ($P < 0.0001$), and significantly lower willingness to take the drug again ($E_{max}$) scores ($P = 0.034$),***

***compared to crushed extended-release morphine (Table 2). Drug liking and take drug again scores for crushed intranasal MORPHABOND were not significantly different from those of MORPHABOND taken orally intact. These data are consistent with the similar relative bioavailability after crushed intranasal and intact oral administration of MORPHABOND that support retention of its extended release properties when manipulated compared to morphine sulfate extended-release tablets***

| **Table 2.** | **Summary of Maximum Drug Liking ($E_{max}$) and Take Drug Again ($E_{max}$) Following Administration of MORPHABOND, morphine sulfate extended-release tablet, and Placebo in Recreational Opioid Users (n=25)** | | | | |
|---|---|---|---|---|---|
| | | **Crushed Intranasal MORPHABOND 60 mg** | **Crushed Intranasal morphine sulfate extended-release tablet 60 mg** | **Placebo** | **Crushed Intranasal morphine sulfate extended-release tablet vs. Crushed Intranasal MORPHABOND Difference of LS Means (95% CI)** |
| Drug Liking ($E_{max}$) | Mean (SEM) | 71.7 (2.87) | 85.3 (2.42) | 54.3 (1.63) | 13.65 (7.80, 19.51) |
| | Median (Range) | 72 (50-100) | 85 (56-100) | 51 (50-80) | |
| Take Drug Again ($E_{max}$) | Mean (SEM) | 66.4 (3.76) | 76.4 (4.17) | 49.1 (2.21) | 9.96 (0.77, 19.14) |
| | Median (Range) | 64.0 (38-100) | 75.0 (17-100) | 50.0 (0-64) | |

***Figure 1 demonstrates a comparison of peak drug liking scores for crushed MORPHABOND compared to crushed extended-release morphine in subjects who received both treatments intranasally. Seventy-six percent of subjects (n = 19) experienced some reduction in $E_{max}$ of Drug Liking VAS with crushed MORPHABOND compared with crushed extended-release morphine, 48%; (n = 12) experienced at least a 30% reduction in $E_{max}$ and 32% (n = 8) experienced at least a 50% reduction in $E_{max}$ of drug liking.***

**Figure 1. Percent Reduction Profiles for $E_{max}$ of Drug Liking for MORPHABOND vs. Morphine Sulfate ER Tablets (n=25), Following Intranasal Administration**




> *Summary*
>
> The in vitro data demonstrate that MORPHABOND has physiochemical properties expected to make abuse via injection difficult. ***The data from the clinical study, along with support from in vitro data, also indicate that MORPHABOND has physicochemical properties that are expected to reduce abuse by the intranasal route of administration.*** However, abuse by intranasal, intravenous, and oral routes is still possible. Additional data, including epidemiological data, when available, may provide further information on the impact of the current formulation of MORPHABOND on the abuse liability of the drug.

FDA Briefing Document, at 21-22 (emphasis added).

327. Thus, Defendants were not only aware of the content of MorphaBond's label, but also the design and results of the studies conducted by Inspirion for MorphaBond's 505(b)(2) NDA.

*August 4, 2016 – Conference Call*

328. During the August 4, 2016 Conference Call, Defendant Radie discussed the labeling potential for ARYMO ER's labeling, including intranasal abuse-deterrent labeling. Moreover, Defendant Radie admitted he was aware of the MorphaBond's labeling as he and the Defendants' have compared the labels of the only other "two currently approved abuse deterrent

extended release morphine products," Embeda and MorphaBond. Specifically, Defendant Radie stated in response to a question from analyst Louise Chen at Guggenheim:

> **Louise Chen**
>
> Hi, thanks for taking my questions. I had a few here. ***The first question here is if your product is approved ARYMO, what do you expect to get in your label and how does that compare to the other products that are out there . . . ?***
>
> **Bob Radie**
>
> So, let me start with the labeling question, and obviously as we stated in the opening, we look forward to continuing to work with the FDA over the coming weeks as we move closer to the October 14 PDUFA date. ***It is our hope and expectation that we will achieve abuse deterrent claims in the label for the intravenous routes, oral routes and intranasal routes of abuse. And my statement about this would then be the broadest set of claims; it revolves around the comparisons of the labels for the other two currently approved abuse deterrent extended release morphine products being Embeda and MorphaBond.***
>
> Embeda has claims for intranasal and oral abuse but not an IV claim, and ***MorphaBond has an intranasal and IV claim, but not an oral claim. So if successful we would expect to be able to achieve all three of those claims in our label.***

Emphasis added.

*November 4, 2016 – Conference Call*

329. During the November 4, 2016 Conference Call, Defendant Radie discussed the dynamics in the current market with Embeda and MorphaBond and the trends for abuse-deterent opioids. These statements further substantiate that Egalet and Radie were acutely aware of the developments in the abuse-deterrent opioid market and ARYMO ER's potential and actual competitors, including MorphaBond. Specifically, Defendant Radie stated in response to a question from analyst filling in for Annabel Samimy from Stifel Financial Corporation:

> **Operator**
>
> Thank you. And the next question comes from Annabel Samimy form Stifel.
>
> **Analyst**
>
> Hi, guys. This Andrew in for Annabel. Thanks for taking the question. First, can you talk about the dynamics in the current market with Embeda and MorphaBond,

kind of what responses is to be determined and whether they are successfully transitioning physicians at least to turns, because it looks like from a prescription trends that and morphine still holds a very large study share making only small dent into the morphine sulfate despite marketing presence? What can happen to the shift this – to shift this mentality or accelerate the shift and kind of what – as they currently doing to accelerate this?

**Bob Radie**

Yes. So really great question. So I think we'll start in terms of the broader sort of market dynamics, I think it's important to recall that, that of all of the extended release opioids morphine represents the largest and most commonly prescribed about 6.4 million prescriptions written for extended release morphine's in 2015. So we're talking about a very, very large market.

Your observation is accurate and that as of today only a small portion of that market, you know, less than 2% of those 6.4 million prescriptions are for abuse deterrent products and that's almost exclusively today made up of Embeda.

So I think one of the challenges to drive and shift that paradigm is just more voices if you will, having more companies out there, interacting with healthcare professionals, interacting with payers, reminding them of the importance of these products and the kinds of abuse and misuse that they could deter.

So we, you know, we think that critical mass here is important. And having another couple of voices out there in the sense that we know the in Septodont [ph] product MorphaBond was approved in October 2015, we know Embeda is currently on the market today. And then obviously we anticipate and hope for approval here for ARYMO soon. And that will then be three companies out there with their commercial organizations and marketing efforts educating physicians on the benefits, the potential benefits of these abuse deterrent product.

So I think with that, we can continue to see a shift in the market from non-abuse deterrent again if these are easily abusable forms, these abuse deterrent product being either Embeda, MorphaBond or ARYMO.

I also think its part of that, from a slightly bigger picture perspective, we're starting to see some real momentum at the state level as it relates to payers and state legislating the requirement for payers to put these abuse deterrent products on at least a similar playing field to non-abuse deterrent alternatives.

We now have five states that have actually pass legislation, Maine, Maryland, West Virginia, Florida, and Massachusetts the fifth one and we have 22 additional states that we are aware of actively looking to pass legislation that would make it easier for physicians to prescribe these products, at least on parallel to non-abuse deterrent alternatives.

> And this is also a critical part of the FDA's opioid action plan that they highlighted in February of 2016 of this year, where one of the pillars of that action plan was making sure that patients had access to these abuse deterrent products and that without that access, there would be very little incentive for innovative companies to continue to invest and develop these important advancements in dealing with the epidemic of opioid abuse and misuse.

330. Later during the November 4, 2016 Conference Call, Defendant Radie admitted that the FDA Briefing Document included MorphaBond's 9.2 label section (the section that describes MorphaBond's abuse-deterrent formulation and its intranasal abuse-deterrent labeling) and that he knew and was aware of the content of MorphaBond's Section 9.2 labeling. Specifically, Defendant Radie stated in response to a question from analyst Chiara Russo from from Cantor Fitzgerald:

> **Chiara Russo**
>
> Okay. Great. And then sort of going back to the ARYMO delay issue, I mean, do you have a feeling that this is more specifically to just the tailoring of the language and section 9.2 obviously if you could review the previous deterrent label, everything one of them on its different in the language that it used, do you think is more of the issue, is that there just solidifying the exact language?
>
> **Bob Radie**
>
> Yes, Chiara. Thanks for your question. Obviously, this would be speculating on our parts,. I want to highlight that, but we know that that each of these product is unique and you've highlighted that I think very astute observation, that the labels have been going through an evolution – an evolution process and ***in fact ours was the first advisory committee meeting where the FDA in their pre-meeting briefing book actually put the label section 9.2 of each of the approved ADF product, that was the first time that they had done that in an effort to share with the advisers kind of that evolutionary process around these label.***
>
> ***So we think that - and speculate that as our product is unique, has some very unique features and the way we studied it was different than some of the other products which was necessitated by the significant abuse deterrent features of the ARYMO and Guardian Technology.***
>
> ***So certainly that could be part of the challenges that the agency has, as you would sort of get that final label language approved to share with the sponsor.***

Emphasis added.

***Defendants' Admitted there were Issues with ARYMO ER's Label to it Sales Representatives***

331. CW 1 worked for Inventiv Health where he served as a contract territory manager for Egalet from June 2016 to January 2017. During the Class Period, Inventiv Health was contracted to serve as Egalet's dedicated specialty salesforce until Egalet decided to bring its salesforce in-house. Inventiv Health served as the Company's salesforce as least as early as February 2016 through approximately January 2017.

332. CW 1 worked for six months selling Egalet's products to physicians. During this six-month tenure, CW 1 participated in three or four conference calls where CEO Robert Radie, CFO Stan Musial, and CMO Dayno spoke to Egalet's contracted sales representatives. CW 1 explained that these sale representative conference calls were held typically every other month and that the sales representatives were muted during the calls.

333. CW 1 explained that Radie usually took the lead during the calls with the sales representatives. The general purpose for these calls was for the executives to talk about how Egalet's salesforce was performing, what was coming up, and ARYMO ER's progress on the road to approval and release.

334. During the sales representatives conference calls held in October and November 2016, Egalet executives informed the salesforce that ARYMO ER was encountering difficulties getting approved by the FDA with its proposed labeling. According to CW 1, the issue discussed during these calls was that FDA wasn't approving ARYMO ER's label as quickly as anticipated and that the delay was related to the drug's labeling, including the language touting ARYMO ER's abuse-deterrent properties.

335. CW 1's statements further substantiate that as least as early as October 2016, Defendants knew and/or with deliberate recklessness disregarded that ARYMO ER was

precluded from receiving intranasal abuse-deterrent labeling given MorphaBond's marketing exclusivity.

***Defendants Benefitted Financially from the Fraud***

**Egalet Acquires Secured Debt Financing Based on the Misleading Favorable Future for ARYMO ER**

336. Defendants were motivated to commit fraud. Egalet required additional funds to fund its future operating costs, finance its preparations for commercialization of ARYMO ER in advance of its expected approval, ensure the continued development of Egalet-002, and to repay an outstanding loan of approximately $15 million. By concealing the fact that Egalet was precluded from receiving the intranasal abuse-deterrent labeling for ARYMO ER, Defendants were able to obtain secured debt financing by inducing the lenders with lucrative royalty rights from ARYMO ER upon ARYMO ER receiving FDA approval.

337. These facts further substantiate Defendants' motive and opportunity to defraud investors and establish a cogent and compelling inference of scienter.

338. First, in January 2015, Egalet had entered into Loan and Security Agreement (subsequently amended) with Hercules Technology Growth Capital, Inc. ("Hercules") and certain other lenders, pursuant to which Egalet borrowed $15.0 million under a term loan ("Hercules Loan"). The Hercules Loan was an interest-only loan through July 1, 2016 with the interest-only payments to be extended if certain criteria were met. Egalet was unable to meet one of the required criteria to achieve this interest-only extension. Thus, beginning on July 1, 2016, Egalet began making 25 equal monthly payments of principal and interest through the scheduled maturity date of July 1, 2018. This equated to an additional payment obligation of approximately $600,000 per month alone on the principal payments. Given that Egalet granted a security

interest in substantially all of its assets, excluding intellectual property and certain new drug applications and related approvals, as collateral for the obligations under the Hercules Loan, default on these payments would have been catastrophic to Egalet, Defendants, and their colleagues.

339. As of July 1, 2016, Egalet did not have sufficient capital to commercialize ARYMO ER if the FDA approved its NDA and fund Egalet-002 through development and approval. In the 2Q2016 Form 10-Q filed on August 15, 2016, Egalet stated it "believe[s] that [its] existing cash, cash equivalents and marketable securities will be sufficient to fund our projected operating requirements through at least June 30, 2017."

340. As discussed above, ARYMO ER was Egalet's lead drug candidate. Given it did not have operating capital beyond one year and remained unprofitable, Egalet was highly dependent on financing to fund its operations, drug development, and commercialization efforts.

341. Given it only had cash, cash equivalents and marketable securities sufficient to operate for approximately one year from the time it began making principal payments under the Hercules Loan, Egalet desperately needed to obtain additional financing. This issue was further compounded by that fact that without the additional financing, Egalet would not have sufficient funds to market ARYMO ER, if it was approved, and to benefit from the revenue procured from the projected sales thereof. Given Egalet's burgeoning deficit and continued unprofitability, revenue generation was critical to Egalet's continued survival and, indeed, the Individual Defendants' salaries and livelihoods.

342. On August 31, 2016, news was announced that would alleviate these concerns in the near term. In a press release issued that day by Egalet, it announced that it just completed $40

million in secured debt financing ("August 31, 2016 Press Release"). In the August 31, 2016 Press Release, Egalet stated:

> **Egalet Completes $40 Million Secured Debt Financing**
>
> --An additional $40 million to be funded if ARYMO™ ER is approved by June 2017--
>
> NEWS PROVIDED BY
> Egalet Corporation
> 31 Aug, 2016, 16:48 ET
>
> WAYNE, Pa., Aug. 31, 2016 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, today announced the completion of a secured debt offering of $40 million. Egalet plans to use the net proceeds from this transaction to repay all outstanding obligations to Hercules Capital, Inc. under its existing loan agreement, ***to support the approval and planned commercialization of ARYMO™ ER (Morphine Sulfate) extended-release tablets***, an abuse-deterrent morphine, to support the development of Egalet-002, an abuse-deterrent, extended-release oxycodone, and for general corporate purposes. Morgan Stanley & Co. LLC acted as sole placement agent for the transaction.
>
> ***Egalet received $40 million (before expenses) at the close of the transaction, and will receive an additional $40 million upon approval from the U.S. Food and Drug Administration (FDA) of ARYMO ER, if such approval is obtained on or before June 30, 2017.*** The notes bear interest at a rate of 13% per annum, paid semi-annually on March 20 and September 20 of each year, commencing on March 20, 2017. On each payment date, commencing on March 20, 2018, Egalet will pay an installment of principal of the notes pursuant to a straight-line fixed amortization schedule. ***However, if ARYMO ER is approved on or before June 30, 2017, in lieu of the straight-line fixed amortization schedule, on each payment date, commencing on March 20, 2018, Egalet will pay an installment of principal of the notes in an amount equal to 15% of the aggregate net sales of OXAYDO® (oxycodone HCI, USP) tablets for oral use only –CII, SPRIX®(ketorolac tromethamine) Nasal Spray, ARYMO ER and Egalet-002, less the amount of interest paid on the notes on such payment date.*** The stated maturity date of the notes is March 20, 2020, unless ARYMO ER is approved by the FDA on or before June 30, 2017, in which case the date will be September 20, 2033. The notes are redeemable at the option of Egalet at a redemption price which includes a make-whole premium until August 30, 2018 and, thereafter, at a redemption price that includes a declining premium to par over four years. The notes are secured by substantially all of the property and assets (subject to certain exclusions) of Egalet Corporation and its subsidiaries.

> Additionally, Egalet has sold a royalty right to the note purchasers, representing a right to receive an aggregate 1.5% royalty payment on net sales of SPRIX and OXAYDO. ***If ARYMO ER is approved by the FDA on or before June 30, 2017, in connection with the issuance of the second tranche of notes, Egalet will sell a royalty right to the note purchasers, representing a right to receive an aggregate 1.5% royalty payment on net sales of ARYMO ER. The royalty will be paid semi-annually, on the same dates as the notes and will be paid until December 31, 2019 unless ARYMO ER is approved by the FDA on or before June 30, 2017, in which case, December 31, 2020.***
>
> "This non-dilutive financing puts us in a good position to bring ARYMO ER through FDA approval and if approved commercial launch, to complete Egalet-002 late-stage development and to conduct additional research and development of other compounds employing our proprietary Guardian™ Technology," said Bob Radie, president and chief executive officer of Egalet. "***This financing combined with our existing cash on hand, SPRIX and OXAYDO product sales, and potential ARYMO sales, could take us to break even.***"
>
> For more information regarding the terms and conditions of the notes, please refer to the current report on form 8-K filed today by Egalet with the Securities and Exchange Commission.

Emphasis added.

343. As a result of the secured debt financing agreement announced on August 31, 2016 (the "Secured Debt Agreement"), Egalet raised much needed financing to support ARYMO ER's commercialization, pay off the balance of $15 million dollar term loan coming due on July 1, 2018, and provide funding for the continued development of Egalet-002.

344. In light of the funds Egalet raised, Egalet was able to report in its Form 10-Q for the period ended September 30, 2016 ("3Q2016 Form 10-Q") that it had paid $15.9 million to pay off the loan due on July 1, 2018, and that it "believe[s] that [its] existing cash, cash equivalents and marketable securities will be sufficient to fund our projected operating requirements through at least September 30, 2017."

345. Thus, this first tranche of secured financing pursuant to the Secured Debt Agreement alleviated the heavy financial burden of the principal payment under the Hercules Loan, allowed Egalet to continue its preparations for marketing ARYMO ER in advance of its anticipated FDA approval, and added a crucial buffer period whereupon Egalet would have

sufficient funds for operations in the event that ARYMO ER's approval did not come until the June 30, 2017 cutoff for Egalet to receive the second $40 million tranche of secured financing under the Secured Debt Agreement.

346. Given Egalet's prospects were directly tied to the projected revenue from ARYMO ER, Defendants were incentivized to make false and/or misleading statements during the Class Period to increase the likelihood it could receive the much needed financing it ultimately received under the Secured Debt Agreement. Had the truth been know that ARYMO ER could not and would not receive the intranasal abuse-deterrent labeling and that ARYMO ER's possibility of becoming the first ER morphine product to receive FDA approval for labeling on each of the three routes of abuse, the likelihood that ARYMO ER would have received this financing would have been greatly reduced. Furthermore, if the truth had been known, it would have also greatly reduced the interest in any other funders coming to the table on the terms that Egalet received.

347. By obtaining the Secured Debt Agreement, Defendants were able to ensure the continued operations of Egalet. As a result, Radie also benefited personally as a result of the fraud by ensuring that he received the remainder of bonuses and lucrative option award as detailed by the following chart detailing his compensation in 2016:

| Name | Salary ($) | Bonus ($) | Option Awards ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|---|
| Radie | 531,000 | 254,880 | 1,715,2090 | 1,889 | 2,513,983 |

**<u>Egalet's Executive Officer's Capitalized on the Inflated Stock Price in Advance of the Truth being Revealed</u>**

348. During the time Defendants' materially false and/or misleading statements and/or omissions were alive in the market place, the Individual Defendants sought to benefit financially by selling significant portions of their Egalet shares prior to the FDA's decision on the ARYMO ER 505(b)(2) NDA.

349. These insiders had a duty to disclose to investors that ARYMO ER was precluded from receiving intranasal abuse-deterrent labeling or abstain from trading. As they were in possession of this non-public information, each of the executives were under a duty to abstain from trading or to disclose this information prior to trading. As each of the below executives chose to trade on non-public information, they were each under a duty to disclose ARYMO ER's inability to receive FDA approval for the intranasal abuse-deterrent labeling.

350. During the Class Period, Defendant Radie's Forms 4 filed with the SEC list that he sold 60,000 shares of Egalet stock and reaped proceeds of approximately $440,935. The Forms 4, also contain a discrepancy. This discrepancy shows that Radie actually reduced his position by 67,500 shares during the Class Period despite only listing sales for 60,000 shares. This reduction in position equates to a 22.2% decrease of Radie's stock ownership during the Class Period. Radie's reduction in his position has been substantial since the filing of MorphaBond's 505(b)(2) NDA - having reduced his ownership position in Egalet from 356,160 shares to 234,900, or approximately 34%. The following chart lists Radie's sales of Egalet stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 1/4/2016 | S-Sale | 1,500 | 302,400 | $ 10.47 | $ 15,705.00 |
| 1/5/2016 | S-Sale | 1,400 | 301,000 | $ 11.11 | $ 15,554.00 |
| 1/6/2016 | S-Sale | 2,100 | 298,900 | $ 10.16 | $ 21,336.00 |
| 1/7/2016 | S-Sale | 3,000 | 286,900 | $ 9.61 | $ 28,830.00 |
| 1/8/2016 | S-Sale | 4,000 | 282,900 | $ 9.69 | $ 38,760.00 |
| 1/11/2016 | S-Sale | 3,000 | 279,900 | $ 9.65 | $ 28,950.00 |
| 4/1/2016 | S-Sale | 5,000 | 274,900 | $ 6.94 | $ 34,700.00 |
| 4/4/2016 | S-Sale | 5,000 | 269,900 | $ 6.99 | $ 34,950.00 |
| 4/5/2016 | S-Sale | 5,000 | 264,900 | $ 6.99 | $ 34,950.00 |
| 7/1/2016 | S-Sale | 5,000 | 259,900 | $ 5.07 | $ 25,350.00 |

| | | | | | |
|---|---|---|---|---|---|
| 7/5/2016 | S-Sale | 5,000 | 254,900 | $ 4.94 | $ 24,700.00 |
| 7/6/2016 | S-Sale | 5,000 | 249,900 | $ 5.02 | $ 25,100.00 |
| 10/3/2016 | S-Sale | 15,000 | 234,900 | $ 7.47 | $ 112,050.00 |
| ***TOTALS*** | | ***60,000*** | | | ***$ 440,935.00*** |

351. During the Class Period, non-party Mark Strobek ("Strobek"), Egalet's chief operating officer since his appointment to that position in October 2015, sold a significant portion of his Egalet holdings. From October 2015 to December 30, 2016, Strobek sold over 64.2% of his Egalet holdings and received proceeds totaling approximately $512,868. Strobek's sales were accelerated over his previous year's sales and also contained an abnormal sale of 25,000 shares on September 30, 2016 (Strobek's largest ever sale). The following chart lists Strobek's sales of Egalet stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 12/31/2015 | S-Sale | 8,700 | 97,980 | $ 10.40 | $ 90,480.00 |
| 3/31/2016 | S-Sale | 8,700 | 89,280 | $ 6.70 | $ 58,290.00 |
| 6/30/2016 | S-Sale | 8,700 | 80,580 | $ 4.68 | $ 40,716.00 |
| 9/30/2016 | S-Sale | 8,700 | 71,880 | $ 7.55 | $ 65,685.00 |
| 9/30/2016 | S-Sale | 25,000 | 46,880 | $ 7.59 | $ 189,750.00 |
| 12/30/2016 | S-Sale | 8,700 | 38,180 | $ 7.81 | $ 67,947.00 |
| ***TOTALS*** | | ***68,500*** | | | $ 512,868.00 |

352. During the Class Period, Defendant Musial sold 47,400 shares of Egalet stock and reaped proceeds of approximately $334,666. These sales equate to a 46.5% reduction in Musial's position in Egalet common stock during the Class Period. During the Class Period, Musial sold over 9,560 shares more than he did in 2014 and 2015 combined. Moreover, during 2015 he sold over 25% more shares during 2014 and 2015. The following chart lists Musial's sales of Egalet stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 1/4/2016 | S-Sale | 3,480 | 98,420 | $ 10.68 | $ 37,166.40 |
| 4/1/2016 | S-Sale | 3,480 | 94,940 | $ 7.02 | $ 24,429.60 |
| 7/1/2016 | S-Sale | 10,000 | 84,940 | $ 5.06 | $ 50,600.00 |
| 7/5/2016 | S-Sale | 3,480 | 81,460 | $ 5.05 | $ 17,574.00 |
| 10/3/2016 | S-Sale | 13,480 | 67,980 | $ 7.47 | $ 100,695.60 |
| 1/3/2017 | S-Sale | 13,480 | 54,500 | $ 7.73 | $ 104,200.40 |
| ***TOTALS*** | | ***47,400*** | | | ***$ 334,666.00*** |

353. During the Class Period, Defendant Dayno sold 2,680 shares of Egalet stock and reaped proceeds of $19,944.56. These sales equate to a 12.5% reduction in Dayno's position in Egalet common stock during the Class Period. The following chart lists Dayno's sales of Egalet stock during the Class Period:

| Transaction Date | Transaction Type | Shares of Common Stock Sold | Number of Securities Owned | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 12/31/2015 | S-Sale | 536 | 20,892 | $ 10.40 | $ 5,574.40 |
| 3/31/2016 | S-Sale | 536 | 20,356 | $ 6.72 | $ 3,601.92 |
| 6/30/2016 | S-Sale | 536 | 19,820 | $ 4.65 | $ 2,492.40 |
| 9/30/2016 | S-Sale | 536 | 19,284 | $ 7.69 | $ 4,121.84 |
| 1/3/2017 | S-Sale | 536 | 18,748 | $ 7.75 | $ 4,154.00 |
| ***TOTALS*** | | ***2,680*** | | | ***$ 19,944.56*** |

354. By selling their shares during the Class Period, Defendants and other executives were able to reap the benefits of the artificially inflated stock price. Had these individuals sold their shares after the disclosures on January 9, 2017 and the precipitous stock price drop, they would have received significantly less in proceeds. As such, the Individual Defendants were motivated to make the false and/or misleading statements or not to disclose the truth concerning ARYMO ER's inability to receive FDA approval for the intranasal abuse-deterrent labeling.

***Core Operations***

355. The development of ARYMO ER and achieving FDA approval of the abuse-deterrent labeling for it constituted, throughout the Class Period (as well as all times prior thereto), Egalet's "core matters of central importance" or its "core operations."

356. Indeed, at all times until January 9, 2017, Egalet's main focus was the development of its lead product candidates. ARYMO ER was Egalet's most developed product candidate and was the only product candidate that Egalet had a pending NDA.

357. As detailed in herein, Defendants consistently discussed in their SEC filings, their press releases, and in their conference calls the status of Egalet's lead product candidate ARYMO ER. Throughout the Class Period, in addition to supporting ARYMO ER's NDA, Egalet monitored the progress of ARYMO ER's competitors and readied itself for the marketing and sales of ARYMO ER once it received the expected FDA approval of ARYMO ER's 505(b)(2).

358. As noted *supra* in paragraph 33, Egalet was founded around its Guardian Technology. ARYMO ER was Egalet's first product candidate employing Guardian Technology to seek FDA approval. Understandably, ARYMO ER was of a unique importance to Egalet and the Defendants.

359. Moreover, Defendants' repeated assertions of the materiality of ARYMO ER's approval to Egalet further supports a "core operations" inference. Egalet's own risk factors (discussed *supra* in paragraphs 235-239) discuss the materiality of achieving abuse-deterrent labeling not only to Egalet's individual products (including ARYMO ER), but also to Egalet as a whole.

360. Indeed, as discussed *supra*, both Defendants Radie and Dayno were intimately knowledgeable about the results of ARYMO ER's clinical studies and MorphaBond's approval and labeling, as evidenced by their detailed discussions conference calls with analysts, statements in Egalet's press releases, and their active participation in the August 4, 2016 Advisory Committee Meeting (as substantiated by the transcript of the meeting).

361. Moreover, the FDA approval of ARYMO ER served as the defining contingent event that would trigger numerous material clauses in the Secured Debt Agreement that it entered into during the Class Period. As discussed *supra* in paragraphs 336-347, Egalet's Secured Debt Agreement, provided that upon approval of ARYMO ER's NDA prior to June 30, 2017, Egalet not only would receive a second tranche of financing in the amount of $40 million, but that this event would result in over a 13 year extension on the maturity date for the notes, a change in the payment installments as tied to aggregate sales of certain of Egalet's products (including ARYMO ER), and required Egalet to sell to the funders a 1.5% royalty right on ARYMO ER's net sales. Importantly, Radie admitted that Defendants took into account MorphaBond when modeling the marketplace for ARYMO ER when he stated during the November 4, 2015 Conference Call: "And the last question I think was around MorphaBond. This is a product that we've anticipated coming to the marketplace, as we modeled the market potential for ARYMO."

362. Accordingly, Defendants must have known or were reckless in not knowing that MorphaBond had intranasal abuse-deterrent labeling exclusivity. Defendants had access to documents and information related to Egalet's clinical trial concerning ARYMO ER's intranasal abuse-deterrence and were well aware and tracking MorphaBond. The fact that MorphaBond received FDA approval and intranasal abuse deterrent labeling even before Egalet submitted

ARYMO ER's 505(b)(2) NDA (thus allowing Defendants access to the FDA's review documents it made publicly available on its website concerning its review of the MorphaBond's 505(b)(2) NDA, its clinical studies, etc.), their knowledge concerning the 505(b)(2) NDA process and Hatch-Waxman exclusivity as substantiated not only by their statements but the fact that they had filed a 505(b)(2) NDA for ARYMO with the assistance of numerous experts and consultants, this supports a strong inference that Defendants must have known and/or were reckless in not knowing that ARYMO ER was precluded from receiving intranasal abuse-deterrent labeling given MorphaBond's 505(b)(2) NDA approval and the exclusivity that attached at that time. Simply put, there was no reasonable basis for Defendants to believe that the foregoing would not preclude ARYMO ER from receiving intranasal abuse-deterrent labeling.

363. The facts set forth *supra* in paragraphs 355-362 all support a conclusion that the development of ARYMO ER was a "core operation." Consequently, Defendants' scienter concerning such core operations – and, specifically, ARYMO ER's inability to obtain intranasal abuse-deterrent labeling – may be inferred.

364. At all relevant times, Egalet was a relatively small company (excluding its sales force). Most relevant here, that during the Class Period, Egalet had approximately 21 people in research and development. The relatively few individuals working in this department, the fact Egalet had only 5 products in development during the Class Period (with only ARYMO ER being the only one to submit an NDA during the Class Period), further supports an inference of scienter, making it less likely that details concerning ARYMO ER's prospects of receiving FDA approval were known only by front-line technical personnel, and making it more likely that the details were fully known by Egalet's senior executives and officers.

365. Additionally, Defendants Radie and Dayno possessed primarily "technical" or "scientific," rather than "business" or "management," backgrounds.

(a) Radie has a B.S. in chemistry and has been in the pharmaceutical industry for more than three decades, including serving in senior management positions for multiple pharmaceutical and biotechnology companies.

(b) Defendant Dayno serves as Egalet's Chief Medical Officer and has ten years in clinical and academic medicine before moving into the pharmaceutical industry. Moreover, prior to joining Egalet, Dayno was the chief medical officer at Labopharm, Inc., a drug delivery technology company based in Montreal, Canada, where he first started working in the field of abuse-deterrent opioid product development.

366. Collectively, these facts support a strong and cogent inference of Defendants' scienter.

***<u>Corporate Scienter: Egalet's Employees and Advisors had Extensive Expertise in Pharmaceuticals</u>***

367. Egalet's public statements about ARYMO ER and its sought intranasal abuse deterrent labeling were critical to Egalet's reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Egalet's corporate officials knew of the falsity of the statements at the time of publication. Specifically, Egalet's CEO Radie, CMO Dayno, and CFO Musial knew facts concerning MorphaBond's 505(b)(2) NDA, its studies, developments concerning MorphaBond and abuse-deterrent opioids in general (including regulatory events and policies).

368. Moreover, Egalet created a scientific advisory board and appointed multiple "scientific leaders" to "gain a critical external perspective on the potential applications of our Guardian™ Technology[.]" Specifically, Egalet announced in a press release the appointment of multiple experts and their experience to Egalet's scientific advisory board:

**Egalet Appoints Leading Experts to Scientific Advisory Board**

Dec 9, 2015

WAYNE, Penn., Dec. 9, 2015 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions, announced the appointment of leading experts to its newly formed scientific advisory board (SAB).

"With the high caliber of scientific leaders joining our scientific advisory board, we will gain a critical external perspective on the potential applications of our Guardian™ Technology," said Bob Radie, president and chief executive officer of Egalet. "While the initial applications of our Guardian Technology are moving through the final stage of development, future applications of our technology platform can go beyond abuse-deterrence. We look forward to collaborating with our advisors to help guide us into new areas of growth for Egalet."

The members of Egalet's scientific advisory board include:

- Vincent Lee, Ph.D., D.Sc. research professor and former director of the School of Pharmacy at the Chinese University of Hong Kong and former chairman of the department of pharmaceutical sciences at the School of Pharmacy at the University of Southern California;
- Jacques-Pierre Moreau, D.Sc., former founder and president of Biomeasure,Inc. and chief scientific officer and executive vice president of Ipsen SA (France);
- Nicholas Nicolaides, Ph.D., president, chief executive officer and co-founder of Morphotek;
- Kenneth Shea, Ph.D., professor of chemistry at the School of Physical Science at the University of California, Irvine;
- Giovanni Traverso, M.D., Ph.D., instructor in medicine at Harvard Medical School, a gastroenterologist at the Massachusetts General Hospital and a research affiliate at the Massachusetts Institute of Technology; and
- Jeffrey Wilkins, M.D., chief medical officer of Lycera.

The newly formed SAB will serve as a strategic resource to Egalet regarding the numerous potential applications of its Guardian™ Technology.

369. Radie's, Dayno's, and Musial's knowledge is imputed to Egalet. Thus, Egalet acted with scienter under the corporate scienter doctrine.

370. Furthermore, the fact that v maintained a scientific advisory board of numerous "experts" to assist Egalet with drug using its Guardian Technology, their knowledge is also imputed to Egalet. Thus, Egalet acted with scienter under the corporate scienter doctrine.

***The Company's Well-Respected Chief Commercial Officer is Fired with Barely Any Statements by Egalet***

371. From January 2, 2015 until approximately May 2016, Egalet's Chief Commercial Officer ("CCO") was Deanne Melloy ("Melloy"). Melloy had obtained significant pedigree in the pharmaceuticals industry prior to working for Egalet. In the lead up to becoming the CCO at Egalet she steadily moved up the corporate ladder from working for approximately five years as the Vice President of Marketing at Endo Pharmaceuticals, to serving three years as the Vice President of General Therapeutics at Sanofi-Aventis, and finally serving three years as the Executive Vice President / Chief Operating Officer at Japanese Pharma prior to joining Egalet as its CCO.

372. Without issuing a Form 8-K or issuing a press release, during the May 10, 2016 Conference Call Radie barely mentioned that the Company's well-respected CCO was fired by him. During the May 10, 2016 Conference Call, Radie stated "[i]n order to allow me to get closer to the commercial organization and take advantage of my commercial experience, I have eliminated the position of Chief Commercial Officer and now have the leaders of our sales, marketing and sales operations teams reporting directly to me."

373. This came to a surprise to some investors as these investors held Melloy in very high esteem and believed her to be the most competent of the Company's executives.

374. This out-of-the-blue elimination of the CCO position by Radie, and by extension, Melloy, coupled with the minimalistic announcement appears peculiar on its own. Indicative that Melloy's termination was more than what was represented by Radie is supported by the fact that merely four months later, the Company entered into an employment agreement on September 19, 2016 hiring Patrick M. Shea as the Company's CCO.

375. On the same date it hired Shea, Egalet issued a press release stating that it has appointed Shea as CCO, that he would be directly reporting to Radie, and touted Shea's accomplishments and benefits he would bring to ARYMO ER's expected launch (the "September 19, 2016 Press Release"). Specifically, September 19, 2016 Press Release stated, in relevant part:

**Egalet Appoints Patrick Shea as Chief Commercial Officer**

> Sep 19, 2016
>
> WAYNE, Pa., Sept. 19, 2016 /PRNewswire/ -- Egalet Corporation (Nasdaq: EGLT) ("Egalet"), a fully integrated specialty pharmaceutical company focused on developing, manufacturing and commercializing innovative treatments for pain and other conditions today announced the appointment of Patrick Shea as chief commercial officer (CCO). Mr. Shea will be responsible for leading Egalet's commercial activities and will report to Bob Radie, Egalet's chief executive officer.
>
> In his role Mr. Shea will be responsible for developing and implementing the commercialization strategy for OXAYDO® (oxycodone HCI, USP) tablets for oral use only –CII, SPRIX® (ketorolac tromethamine) Nasal Spray, ARYMO™ ER (morphine sulfate) extended-release tablets which is under review at the U.S. Food and Drug Administration and additional Guardian™ Technology pipeline products as they are developed.
>
> "With his extensive pharmaceutical and biotechnology sales and marketing experience, including his intimate knowledge of payor dynamics and product launch leadership, ***Pat will be an extremely valuable asset to Egalet as we prepare to launch ARYMO ER, pending FDA approval, in the first quarter of 2017," said Mr. Radie.***

> Mr. Shea has over two decades of sales, marketing, market access and commercial operations experience. Most recently Mr. Shea served as CCO at Clarus Therapeutics, Inc., a men's health specialty pharmaceutical company. Prior to Clarus he served as vice president of sales and marketing for the U.S. commercial operations of CSL Behring, where he oversaw strategic efforts for sales, marketing and managed care business. Before that he served as senior vice president of sales and marketing for the U.S. pharmaceutical operations at Astellas Pharmaceuticals, and held senior sales and marketing roles at Ligand Pharmaceuticals and Boehringer Ingelheim. Mr. Shea received his bachelor's degree in Psychology from Alfred University.

376. Given the stark contrast of Radie's reasoning for terminating Melloy with the relatively quiet way it was announced to the market as compared to the fanfare announcement of hiring Shea, it stands that Melloy's departure was not for the reasons represented.

377. These facts further support a cogent and compelling inference of scienter.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

378. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Egalet's stock price, and operated as a fraud or deceit on acquirers of Egalet's common stock. As detailed above, when the truth about the intranasal abuse deterrent labeling for ARYMO ER was revealed, the value of Egalet's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Egalet's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Egalet -specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Egalet's stock price and the subsequent significant decline in the value of Egalet's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

379. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Egalet's oral-abuse deterrent labeling of ARYMO ER, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Egalet's common stock to be artificially inflated. Lead Plaintiffs and other Class members purchased Egalet's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## VII. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

380. At all relevant times, the market for Egalet's common stock was an efficient market for the following reasons, among others:

(a) Egalet's common stock met the requirements for listing and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

(b) Egalet communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Egalet was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Egalet was reflected in and incorporated into Egalet's stock price during the Class Period.

381. As a result of the foregoing, the market for Egalet's common stock promptly digested current information regarding Egalet from all publicly available sources and reflected such information in Egalet's stock price. Under these circumstances, all purchasers of Egalet's common stock during the Class Period suffered similar injury through their purchase of Egalet's common stock at artificially inflated prices, and a presumption of reliance applies.

382. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## VIII. NO SAFE HARBOR; INAPPLICABILITY OF THE BESPEAKS CAUTION DOCTRINE

383. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

384. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

385. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Egalet who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

386. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Egalet common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of Egalet, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

387. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Egalet securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of

the Class may be identified from records maintained by Egalet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 8, 2016, Egalet had 25,189,125 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

388. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

389. Lead Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

390. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b) whether the Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c) whether the price of Egalet common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, what

is the proper measure of damages.

391. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants**

392. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

393. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) cause Lead Plaintiffs and other members of the Class to purchase Egalet common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

394. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Egalet's securities in an effort to maintain artificially high market prices for Egalet common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

395. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Egalet as specified herein.

396. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Egalet's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Egalet and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Egalet common stock during the Class Period.

397. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at Egalet during the Class Period and members of Egalet's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of Egalet, was privy to and participated in the creation, development and reporting of Egalet's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was

advised of and had access to other members of Egalet's management team, internal reports and other data and information about Egalet's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of Egalet's dissemination of information to the investing public which they knew or with deliberate recklessness disregarded was materially false and misleading.

398. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing Egalet's ARYMO ER's intranasal abuse-deterrent labeling and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of ARYMO ER's potential abuse-deterrent labeling throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

399. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Egalet's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Egalet's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that

was known to or with deliberate recklessness disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Egalet's securities during the Class Period at artificially high prices and were or will be damaged thereby.

400. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the concerning the intranasal abuse-deterrent labeling for ARYMO ER, which was not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Egalet common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

401. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

402. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Egalet's securities during the Class Period.

403. This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiffs' purchases of securities giving rise to the cause of action.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

404. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

405. The Individual Defendants acted as controlling persons of Egalet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, agency, ownership and contractual rights, and participation in and/or awareness of Egalet's operations and/or intimate knowledge of the false financial statements filed by Egalet with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Egalet, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Egalet's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

406. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of Egalet and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

407. As set forth above, the Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

408. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Egalet's common stock during the Class Period.

409. This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: July 3, 2017

**O'KELLY & ERNST, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esquire (No. 202191)
Daniel P. Murray, Esquire (No. 313112)
901 N. Market Street, Suite 100
Wilmington DE 19801
(302) 778-400
(302) 295-2873 (facsimile)
renerst@oelegal.com
dmurray@oelegal.com

*Liaison Counsel for Plaintiff*

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (*Pro hac vice to be submitted*)
Adam M. Apton (*Admitted pro hac vice)*
Alexander A. Krot III (*Pro hac vice to be submitted)*
1101 30th Street NW, Suite 115

Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: akrot@zlk.com

-and-

**POMERANTZ LLP**
Jeremy A. Lieberman (*Admitted pro hac vice)*
Tamar A. Weinrib (*Admitted pro hac vice)*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*Admitted pro hac vice)*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*